# EXHIBIT # 1

## RESOLUTION AGREEMENT BETWEEN
## BUREAU OF RECLAMATION AND RENE COCHISE

On April 8, 1999, Employee raised the issue of hostile work environment because of Employee's Race (Native American).

This Settlement Agreement (hereinafter "Agreement") is made and entered into voluntarily between Rene' Cochise (hereinafter "Employee") and the Bureau of Reclamation, U.S. Department of the Interior (hereinafter "Agency"). Accordingly, under the authority of Title VII of the Civil Rights Act of 1964, the Agency and Employee each agree to the following actions.

A. To effect a more comfortable and productive work relationship, employee Rene' Cochise and supervisor Chris Kenney agree that they will:

1. Talk to each other when either perceives something the other does as offensive;

2. Take the initiative to communicate with each other whenever appropriate -- or when in doubt about whether to communicate;

3. Meet on August 31, 1999, to dialogue on Rene's analytical skills as reflected in the completed Indian O & M report; and

4. Go to the other person for discussion when they have concerns about that person's behavior or actions.

B. Except as provided in paragraph C.4 (below), Ms. Cochise shall not institute or cause to be instituted any complaint or other action against the Bureau of Reclamation or the Department of the Interior, their agents or employees, including civil court litigation, concerning the issues presented to the EEO Counselor and resolved by this agreement -- or any other matters which occurred **prior to** the signing of this agreement.

C. By signing this agreement, Chris Kenney and Rene' Cochise acknowledge that they are entering into this agreement voluntarily and without coercion of any kind, that they have had sufficient opportunity to seek legal counsel, and that they understand and will abide by all the terms described herein.

1. This Agreement constitutes the complete understanding between the Employee and the Agency. No other promises or agreements shall be binding unless in writing and signed by both parties.

2. The parties agree that this Agreement shall not be construed as an admission of discrimination by the Agency. The parties further agree that the terms and conditions of this Agreement shall remain confidential, except to those officials necessary to implement its terms. The parties agree that this Agreement may be used as evidence in a subsequent proceeding in which either of the parties alleges a breach of this Agreement.

3. It is understood by both parties that the aggrieved person shall be free from restraint, interference, coercion, discrimination, or reprisal because of participation in the Equal Employment Opportunity discrimination complaint process, and that if the aggrieved person believes she is so subjected she may contact an EEO Counselor within 45 days of the incident.

4. It is understood by both parties that if the actions identified above are not carried out as specified or if they are in any way rescinded, the Employee may, in accordance with 29 C.F.R. 1614.504, petition the Agency to implement the terms of this Agreement or to reopen the pre-complaint for further processing from the point processing ceased under the terms of this Agreement. This request shall be made in writing to the Director, Office for Equal Opportunity, U.S. Department of the Interior, within 30 days of when the Employee knew or should have known of the alleged noncompliance.

_____          6/4/99
Rene' Cochise                             Date
Policy Analyst

I certify that I have the authority to enter into this Precomplaint Resolution Agreement on behalf of the Agency, and that the terms and conditions contained herein are agreed to by the Agency.

_____          6-4-99
Chris Kenney                              Date
Chief, Native American Affairs Office

Reviewed by:

_____          _____
Sheila Kenney                             Date
Equal Opportunity Manager

**AGREEMENT TO MEDIATE**

This is an agreement between Rene Cochise and Chris Kenney of the Bureau of Reclamation, Native American Affairs Office.

The Parties agree to enter into mediation voluntarily, in good faith, and with a sincere desire to reach a mutually acceptable resolution of their concerns regarding workplace matters and communication.

Provisions:  The provisions of this agreement are as follows:

1.  The mediator, Mr. Gary Bracken, is a neutral third-party facilitator who will guide the Parties through a process designed to help them reach their own resolution.  The mediator will not make decisions about "right" or "wrong" or tell the Parties what to do.

2.  Mediators do not offer legal advice nor do they provide legal counsel.  Each party is advised to consult with the Equal Employment Office or Personnel Office in order to be properly counseled about her/his right to legal representation.

3.  For mediation to work, the Parties agree and understand that open and honest communications are essential.  Accordingly, all written and oral communications, negotiations and statements made in the course of mediation will be treated as privileged discussions and are absolutely confidential.

Therefore:

a.  The mediator will not reveal to anyone the names of the Parties or anything discussed in mediation unless expressly requested to do so by the Parties.  It is understood that the mediator is not required to maintain confidentiality if he has reason to believe that any party is in danger of bodily or egregious psychological harm, or if criminal activity is divulged..

b.  The Parties agree that they will not at any time before, during, or after mediation, call the mediator as a witness in any legal or administrative proceeding concerning the subject matter of this mediation.

1

      c.   The mediator will destroy any records, notes, work product or the like developed during the mediation process (with the exception of the written settlement/resolution agreement, if one is reached).

4.   It is understood that full disclosure of all relevant and pertinent information is essential to the mediation process. Accordingly, there will be a complete and honest disclosure by each of the Parties to the other and to the mediator of relevant information and documents.

5.   All Parties must be in agreement regarding who will participate in the mediation sessions. In this mediation, the Parties will be Rene Cochise and Chris Kenney.

6.   All parties agree not to propose any punitive personnel action or proceed in another forum (such as the negotiated grievance, MSPB, EEO complaint process or administrative grievance procedure) as long as mediation continues on June 2-3, 1999.

7.   Reclamation management agrees not to take or propose any formal action which could adversely affect any party to this mediation prior to completion of mediation, unless one or more of the Parties' conduct so seriously violates acceptable standards as to require immediate action.

8.   While all Parties will participate in reaching agreement through mediation, it is understood that mediation is voluntary and any Party may withdraw from mediation at any time. It is agreed that if one or more Parties decide to withdraw from mediation, good faith efforts will be made to discuss this decision in the presence of both Parties and the mediator.

9.   If the mediator determines that it is not possible to resolve the issues through mediation, the process can be terminated once this has been conveyed to the parties and confirmed in writing.

10.  If an agreement is reached, the mediator will prepare a written agreement to be finalized in a joint session with the Parties. Each party will be advised to seek his/her own representative or legal counsel before the agreement is sent (if appropriate) for technical review (usually to EEO and Human Resources officials). The agreement will be reviewed

2

for technical adequacy within 48 hours (normally) of its receipt by appropriate technical specialists and other officials as required to ensure the agreement meets regulatory requirements.

11. The specifics of any future agreement arising out of this mediation will be spelled out as a provision of the agreement itself.

I have read, understood, and agreed of my own free will and without coercion to each of the provisions of this agreement.


Rene Cochise

_____  6/2/99
signature and date


Chris Kenney

_____  6/2/99
signature and date


Mediator, Gary Bracken

_____  June 2, 1999
signature and date

3

# EXHIBIT # 2

P.     September 3, 1999, protested alleged discriminatory practices.

Q.     September 27, 1999, protested alleged discriminatory practices.

R.     November 1999, protested alleged discriminatory practices.

S.     November 24, 1999, protested alleged discriminatory practices.

T.     November 30, 1999, contacted EEO representative, breech of resolution agreement
       between Reclamation and René L. Cochise, signed and dated June 4, 1999, complaint of
       race (Native American), discrimination and hostile work environment.

U.     December 6, 1999 notified Reclamation breech of resolution agreement between
       Reclamation and René L. Cochise, signed and dated June 4, 1999.

V.     January 25-26, 2000, protested alleged discriminatory practices.

W.     February 8, 2000, protested alleged discriminatory practices.

X.     Filed formal complaint against Reclamation February 29, 2000, complaint of race (Native
       American), discrimination, prior participation in EEO counseling process and hostile
       work environment.

Y.     Filed formal complaint against Reclamation February 29, 2000, notice of Non-
       compliance with Resolution Agreement.

**7.     Please describe your prior EEO complaint activity that you believe has led to
       reprisal against you.  Please give dates of occurrence of each incident, date of filing,
       basis of discrimination, and disposition of claim.  Also, please state names, titles and
       grades, and work relationship to you of those individuals involved in each claim.**

A.     Dates: The week of August 25-29, 1997,
       Date of Filing: Included in informal complaint filed 4/8/99
       Basis of Discrimination: Retaliation and favoritism
       Disposition of Claim: Resolution agreement signed
       Those involved in claim: Debbie Saint, Program Manager, Lower Colorado Region;
       Ramona Saunders, Deputy Program Manager, Lower Colorado Region; Christopher
       Kenney, Chief, Native American Affairs; Barbara White, Policy Analyst, Native
       American Affairs; Lynne Davis, Program Analyst, Native American Affairs.

B.     Dates: September 25-26, 1997
       Date of Filing: Included in informal complaint filed 4/8/99
       Basis of Discrimination: Retaliation

6.    **Aggrieved Person's Initial Contact with EEO Official** (Date):    __11/30/99__


**EEO Counselor's Initial Interview with Aggrieved Person** (Date):   __12/06/99__
Rene was on Travel status and 12/6/99 was the first opportunity we had to talk.


8.    **Regional Equal Opportunity Manager Advised of Complaint** (Date):    __11/30/99__

(When providing alternate counseling, Bureau EEO Officer/EEO Manager advised of Complaint
(Date):


9.    **Notice of Rights and Responsibilities for Processing Complaints of Discrimination Issued**
(Date):    __12/6/99__


9a.   **Notice of Rights and Responsibilities for Processing Complaints of Discrimination pursuant to
373 DM Chapter 7 Issued**
(Date): _____


10.   **Notice of Final Interview (NOFI):**        Date hand delivered:    __N/A__

                                   Date Sent and Certified Mail number:   __12/28/99__


(Note: The NOFI also must be sent to the representative if the aggrieved person has designated
one)


11.   **Notice of Final Interview Received by Aggrieved Person** (Date):    __12/29/99__

(If the Notice of Final Interview was mailed, attach the certified mail return receipt card [green
card]).


12.   **Agreement to Extend Counseling Period**

      a. Date on which Agreement to Extend Counseling Period was Signed:    __N/A__

      b. Date to which Counseling Period was Extended:   __N/A__


4


Page 2 of 2

# EXHIBIT # 3

 **United States Department of the Interior** 

BUREAU OF RECLAMATION
Washington, D.C. 20240

W-6100                                DEC 1 0 1999

MEMORANDUM

To:        Rene' Cochise, Policy Analyst

From:      Christopher L. Kenney
           Director, Office of Native American Affairs

Subject:   Memorandum of Counseling

I am providing you this Memorandum of Counseling in order to make clear my comments and conclusions to our discussion held on November 30, 1999, and to put our conversation in larger context.

During our mediation on June 2-3, 1999, we discussed the difficulties with your conduct in our office, as well as the conflicts which individuals in the office were reporting to me. It was my hope that those discussions would be a new start and a new basis for interaction with myself and others. However, I am concerned that recent events have proven those expectations to be premature.

On November 24, 1999, you had a confrontation with Barbara White, as Acting Director, in response to her inquiries concerning a travel voucher you had submitted. Barbara submitted a report to me that characterized your behavior as rude, abusive and insubordinate. Other office members were witness to the exchange between you and Barbara. When I questioned you about your behavior regarding these allegations, you stated you were angry and felt that Barbara was being unfair by making references about you outside your presence. Also you questioned Barbara's competency for the office, and further stated your opinion that I was being manipulated by Barbara to your detriment.

This is the third occasion this year in which I have received a report that you have not conducted yourself in a professional or courteous manner to fellow employees. We discussed those prior occasions at the time of our mediation session. This most recent event indicates you are still prepared to exhibit inappropriate behavior and conduct. While I deferred a written response at those earlier events, I am making explicit this time that such behavior is unacceptable and will not be tolerated in this organization.

In our meeting, I asked you to consider the adverse impacts this behavior has on office morale. Because of your behavior, the tension in the office has been raised unnecessarily and the level of trust for you has decreased. I want you to be successful in Native American Affairs, but you cannot be successful by continuing this sort of rude and discourteous behavior which has the effect of limiting productive working relationships with fellow employees.

In addition to your conduct with other employees, we discussed your practices regarding travel and work routine. Because I have provided limited open travel to NAAO staff, I have emphasized the need for staff to keep me informed as to when and why they are traveling. You have modified numerous trips without explanation from which I have been informed late, or the justification was not clear or available. There were such trips as the late arrival and early departure from the NAAO conference in 1998, and the trips to Albuquerque in February, 1999 for an extended stay without informing me or the acting Director. Recently you committed to meet with the Dakotas Area office without consulting with me first. Earlier this year you scheduled meetings for the Jicarilla Tribe with the Commissioner's office without coordinating with our office. Then you scheduled pre-meetings with the Tribe without coordinating with the acting Director. These types of activities are contrary to the team coordination and collegiality I have worked to incorporate in the Native American Affairs Office. I reference these events to illustrate a pattern of behavior which is long-standing and contrary to the team effort of our office. It is this long-standing behavior and conduct that I asked at our November 24, 1999, meeting for you to consider. It is the responsibility of each and every employee to keep either myself, or the acting, informed regarding travel and its purpose, and to keep the office informed of your activities and contacts with Tribes. This is your direct responsibility.

This memorandum is not disciplinary in nature and will not be placed in your Official Personnel File. It is my way of expressing my concerns regarding your behavior. In the future I expect you to 1) give proper respect to the individuals of this office, particularly those designated to act in my behalf, 2) keep me, or my acting, informed in timely manner of your travel and its purpose, and 3) keep me, or my acting, informed in a timely manner of activities and contacts outside the Native American Affairs Office. If your conduct and work practices regarding travel and communication with others in the context of your duties does not improve, disciplinary action may be taken.

Please sign this memorandum to acknowledge receipt. If you do not sign I will annotate that we discussed this memorandum and that you were given a copy.

Acknowledge Receipt:

_____            _____
Signature                                                          Date

cc: D-4800, (L.Broussard)

 **United States Department of the Interior** 

BUREAU OF RECLAMATION
Washington, D.C. 20240

JAN 1 8 2000

W-6100

MEMORANDUM

To:          Personnel Files for Rene' Cochise

From:        Christopher L. Kenney          *Christopher L. Kenney*

Subject:     Documentation Regarding Letter of Counseling

On December 17,1999, I met with Ms. Cochise to give her a Memorandum of Counseling regarding her unacceptable conduct and behavior with fellow employees of this office. The memorandum requested that Ms. Cochise sign a copy of the memorandum for her file, otherwise the transmittal would be documented. She has failed to return a signed acceptance. Therefore, this memorandum is a formal statement that, in fact, Ms. Cochise and I met on December 17, 1999, and that I provided the Memorandum of Counseling to her. In that meeting, I expressed my hope and belief that her relationships in this office could and would improve to her benefit, and to the benefit of all her fellow employees.

7-1596B (8-89)
Bureau of Reclamation

| OFFICIAL FILE COPY | | |
|---|---|---|
| DATE | SURNAME | CODE |
| 1/18 | _Kenney_ | 6100 |
| | | |
| | | |
| | | |
| | | |
| | | |
| Classification | | |
| Project | | |
| Control No. | | |
| Feeder I.D. | | |

JAN 1 8 2000

W-6100

## MEMORANDUM

To:          Personnel Files for Rene' Cochise

From:        Christopher L. Kenney

Subject:     Documentation Regarding Letter of Counseling

On December 17,1999, I met with Ms. Cochise to give her a Memorandum of Counseling regarding her unacceptable conduct and behavior with fellow employees of this office. The memorandum requested that Ms. Cochise sign a copy of the memorandum for her file, otherwise the transmittal would be documented. She has failed to return a signed acceptance. Therefore, this memorandum is a formal statement that, in fact, Ms. Cochise and I met on December 17, 1999, and that I provided the Memorandum of Counseling to her. In that meeting, I expressed my hope and belief that her relationships in this office could and would improve to her benefit, and to the benefit of all her fellow employees.

bc: W-6100, (Rcochise)

WBR:CLKENNEY:lm:01/18/00
DOC\HOME\PERSONEL\internal\RC\rene6.wpd

# EXHIBIT # 4

/00  MON 16:55 FAX 202 208 6688        NATIVE AMER AFFR OFF. WO                      ☒003

| Form DI-1892<br>REV. 3/96 | U. S. Department of the Interior<br>Complaint of Discrimination |
|---|---|

**1. Complainant's Name:** Renee Cochise

**Street Address** 5260 Duke Street #418

**City, State, Zip Code:** Alexandria, VA 22304

**Home Phone:** (703) 751-8773

**Place of Employment:** Bureau of Reclamation, DOI

**Address** 1849 C Street, N.W. MS 7548

**City, State, Zip Code:** Washington, DC 20240

**Work Phone:** (202) 208-6382

---

**2. DOI Office which you believe discriminated against you?**

**Bureau:** Reclamation

**Address:** same as above

**City/State:** same

**Division/Office:** Native American Affairs

**Region** Washington Office

---

**3. Basis(es) for believing you were discriminated against?** (Check one or more, and provide the specific information.)

| | | | |
|---|---|---|---|
| X | Race  Native American | ___ | Age (Date of Birth) _____ |
| ___ | Color | ___ | Physical Handicap _____ |
| ___ | Religion | ___ | Mental Handicap _____ |
| ___ | Sex | X | Reprisal  for prior complaint activity |
| ___ | National Origin | | (Date of previous EEO activity) April 8, 1999 |

---

**4. Allegation(s) of Discrimination?** (For each allegation, state the date and the specific incident causing you to believe that you have been discriminated against.  FOR EXAMPLE: I was discriminated against on January 1, 1992, when I was not selected for the position of Analyst. (Use additional pages as necessary.)

See attached

---

**5. Have you discussed your complaint with an EEO Counselor?** Yes __X__ No _____ (If yes, name of Counselor):
Pat Hagan, Ana M. Samour                      January 8, 2000
_____ Date you first contacted the Counselor.

---

**6. Are you agreeable to using the Alternative Dispute Resolution (ADR) process?** Yes _____ No __X__

---

**7. Have you presented these allegations to any other forum?** If so, please indicate:    N/A

____ Negotiated Grievance Procedure  ____ Merit Systems Protection Board  ____ Court (Civil Action)

---

**8. List the remedies which you believe will resolve your complaint:** (Use additional pages, as necessary.)

See attached

---

**9. Complainant's Signature:** _Renee M. Okay for R. Cochise_    **Date:** 2/29/2000

---

**10. For Agency Use:**
Complaint Docket Number: _____      Date Received of Postmarked: _____

---

Memorandum
April 20, 2000

To:      Lorraine Bobian, EEO Counselor
         Reclamation Service Center

From:    René L. Cochise, Policy Analyst
         Native American Affairs Office                    [signature]    4/25/2000

Subject: EEO Complaint Against - Christopher L. Kenney, Director, Native American
         Affairs Office

I have been discriminated against by Christopher L. Kenney, Director, Native American Affairs
Office, Bureau of Reclamation, Department of Interior, on the basis of my race (Native
American) and suffered reprisal for my prior EEO complaint activities (sought EEO counseling
in mediated complaint beginning on April 8, 1999). The events encompassed by this memo
include the following background information.

## Background Information

**Tuesday, March 28, 2000:** Mrs. Madalena sent out a e-mail message informing the
Commissioner's Office that I would be Acting Director, Monday, March 27, 2000 thru Thursday,
March 30, 2000 (Attachment A).

**Thursday, March 30, 2000:** Mr. Bill Burleigh, Upper Colorado Regional Liaison, came into my
office inquiring about the location of the Shivwits Paiute Indian tribe. I informed him that the
tribe was located in the Lower Colorado Region. He provided me a copy of H.R. 3291 - DOI
Proposed Testimony Re: Shivwits Band of the Paiute Indian Tribe of Utah Water Rights
Settlement Act. I noticed that the Native American Affairs office code was include in the cc, I
could not locate our hard copy in our office. I provided Lori Gray, Lower Colorado Regional
Liaison, a copy of the bill, I left it on her chair. (Attachment B)

Noting the due date was on Wednesday, March 29, 2000, at 5:00 p.m. I called Wendy Fink and
asked for an extension. Mrs. Fink returned the call and denied the extension, explaining that the
package was on its way to OMB for review. After discussing the concerns I had with the bill,
Mrs. Fink, agreed to incorporate my written comments for the file.

Around 10:30 A.M., I received e-mail rescinding my designation as Acting Director. Adrienne
Marks was then designated Acting Director, March 30-31, 2000. (Attachment C) I informed and
discussed at length with Mrs. Marks, the fact that Native American Affairs Office did not receive
a hard copy of the aforemention bill. Mrs. Marks suggested that I send Mr. Kenney e-mail

1

EXHIBIT
5-2d

message on the problem. During this discussion Leia Madalena was present. Mrs. Madalena is Mr. Kenney's secretary.

Around 2:30 P.M., Mrs. Madalena provided me with copies of aforementioned request from Department of the Interior, Legislative Counsel Referral, concerning H.R. 3291 - DOI Proposed Testimony Re: Shivwits Band of the Paiute Indian Tribe of Utah Water Rights Settlement Act. I was informed the information was received, Wednesday afternoon, March 29, 2000, and it was in Mr. Kenney's Office. Mrs. Madalena explained she was instructed by Mr. Kenney to place all mail in his Office. Mr. Kenney's Office was locked during this time and I was not aware that Mrs. Madalena had access (Attachment D).

In conclusion, I worked with the Reclamation representatives on the Shivwits water rights settlement team, Frank Perniciaro and Debbie Saint, Mr. Kenney, and Leslie Brown, Legislative Affairs to provide comments to DOI, Legislative Counsel Referral, concerning H.R. 3291, for the file, since we had missed the deadline (Attachment E).

Through the actions of my immediate supervisor, Christopher L. Kenney, the Bureau of Reclamation, Native American Affairs Program, has created a hostile work environment based on reprisal and race. The work environment has become hostile through the repeated failure on the part of Mr. Kenney - by withholding information on work assignments that are time sensitive and work assignments and responsibilities to other similarly-situated employees not in my protected class.

I feel discrimination was the basis for the withholding of information that comes into the Commissioner's Native American Affairs office. Mr. Kenney failed to adequately provide this information or allow adequate time to prepare a response to the aforementioned water rights settlement bill. Mr. Kenney does not treat other similarly situated members within our office in this manner. I feel the supervisor has further breached our prior agreement by his failure to openly communicate and allow all correspondence to be seen by those individuals who are Acting during his absence from the office.

**Requested Relief**

I request as relief for this complaint of discrimination, the following.

- Management Assessment of Reclamation's Native American Affairs Office located in Washington, DC; and
- I should be provided the same confidence given other Acting Directors.

2

# EXHIBIT # 5

| Form DI-1892 REV. 12/98 | U. S. Department of the Interior Complaint of Discrimination |
|---|---|

**1.** Complainant's Name: __Rene Cochise__

Street Address: __P.O. Box 23213__

City, State, Zip Code: __Alexandria, VA  22304__

Home Phone: __(703) 941-9287__

Place of Employment: __Bureau of Reclamation - DOI__

Address: __1849 C Street, NW MS-7060-MIB__

City, State, Zip Code: __Washington, DC  20240__

Work Phone: __(202) 513-0601__

**2.** DOI Office which you believe discriminated against you?

Bureau: __Reclamation__

Address: __Same as above__

City/State: ____

Division/Office: __Native American Affairs__

Region __Washington Office__

**3.** Basis(es) for believing you were discriminated against?  (Check one or more, and provide the specific Information.)

__X__ Race __Native American__

__*__ Color ____

____ Religion ____

____ Sex ____

____ National Origin ____

____ Age (Date of Birth) ____

____ Physical Disability ____

____ Mental Disability ____

____ Sexual Orientation ____
(If filing on this basis please use DI-1892 for procedural rights)

__X__ Reprisal  for __prior EEO complaints__

(Date of previous EEO activity) __see attachment__

**4.** Allegation(s) of discrimination? (For each allegation, state the date and the specific incident causing you to believe that you have been discriminated against.  FOR EXAMPLE: I was discriminated against on January 1, 1992, when I was not selected for the position of Analyst.  (Use additional pages as necessary.)

See Attached

**5.** Have you discussed your complaint with an EEO Counselor?  Yes __✓__ No ____  (If yes, name of Counselor):

__LORRAINE BOBIAN__ Date you first contacted the Counselor: __3/15/01__

**6.** Are you agreeable to using the Alternative Dispute Resolution (ADR) process?  Yes ____ No ____

**7.** Have you presented these allegations to any other forum?  If so, please indicate:

____ Negotiated Grievance Procedure ____ Merit Systems Protection Board ____ Court (Civil Action)

**8.** List the remedies which you believe will resolve your complaint: (Use additional pages, as necessary.)

See Attached

**9.** Complainant's Signature: ____    Date: __April 20, 2001__

__Hand Delivered to OEO on 4/24/01__

**10.** For Agency Use:
Complaint Docket Number: __WBR-01-021__ Date Received of Postmarked: __4/24/01__

## Date of Previous EEO Activity

1. July 3, 2000;

2. February 29, 2000;

3. April 8, 1999.

<u>Formal Complaint of Discrimination of René Cochise</u>

Item 4. Allegation(s) of discrimination? (For each allegation, state the date and the specific incident causing you to believe that you have been discriminated against. FOR EXAMPLE: 1 was discrimination against on January 1, 1992, when I was not selected for the position of Analyst...)

I have been discriminated against by the Bureau of Reclamation, Department of Interior, on the basis of my race (Native American), and in reprisal for my prior EEO complaint activities (sought EEO counseling and mediated complaint beginning on April 8, 1999 and filed 2 formal complaints, WBR-00-005 and WBR-00-023). Through the actions of my former supervisor, Mr. Christopher Kenney, Chief, Native American Affairs Program, and Larry Todd, Director of Operations, the Agency created a hostile work environment based on race and reprisal.

The events encompassed by this complaint include the following actions of my former supervisor, Mr. Christopher Kenney.

#1.    The work environment continues to be hostile through the attempt of my former supervisor, Mr. Kenney, who on Thursday, March 15, 2001, requested a meeting to discuss issues concerning the Jicarilla Apache Tribe. During the meeting Mr. Kenney advised me that he was conducting an "administrative investigation" and if I gave false answers to any of his questions, I would be subject to "criminal prosecution." Mr. Kenney's threat of criminal prosecution is a violation of federal administrative law as well as the Fifth Amendment of the United States Constitution. Since, I have filed formal complaint(s) against Reclamation, I continue to experience reprisals, threats, retaliation, and fear of physical harm from Mr. Kenney. Mr. Kenney's threat only further supports the hostile work environment.

1

3

# EXHIBIT # 6

U.S. Department of the Interior
Office of the Inspector General
*and the*
Department of the Interior University

# Managing the Federal Employee Discipline and Performance Process



**Training Presented by:**
William N. Rudman
William Rudman Assoc., Inc.
4 Mt. Vernon Ave.
Waltham, MA 02451
781.642.0332

**Locations and Dates:**
Washington, DC
February 14–15, 2000

Lakewood, Colorado
May 11–12, 2000



# TABLE OF CONTENTS

Course Outline     iii
Instructor Biography     v

## RIGHTS AND RESPONSIBILITIES

Rights and Responsibilities     1-1
The Managers' Bill of Rights     1-2
Requirement to Cooperate     1-3

## PROVING A MISCONDUCT CASE

The Government's Three-Part Burden     2-1
Detection of Misconduct     2-2
Search of the Worksite     2-2
Interviewing the Subject     2-3
Miranda, Voluntary and Administrative Warnings     2-5
Kalkines Warning and Weingarten     2-6
Case: *Grubka v. Department of the Treasury, Internal Revenue Service*
Case: *Ashford v. Department of Justice, Bureau of Prisons*
Article: "On the Hot Seat"

## THE ADMINISTRATIVE PROCESS

The Administrative Process     3-1
Agency Decisional Process     3-3
Adverse Actions, (5 USC §§7503, 7512 & 7513)     3-5
National Security Suspension and Removal (5 USC §7532)     3-6
Adverse Actions (5 CFR §752.401-405)     3-7
Suitability Actions (5 CFR §§731.101, 731.403-404, 731.501)     3-10
Probationary Employees (5 CFR §§315.801-806 & 315.901-909)     3-11
Management Rights (5 USC §7106); Grievance, Appeals & Review
(5 USC §§7121-7122)     3-14
Actions Against Senior Executives     3-15

## ERRORS OF MANAGEMENT & COMPLAINT VEHICLES

Errors of Management     4-1
Disparate Penalties     4-2
Douglas Factors Check List     4-3
Lying and Impeding Investigations     4-5
Complaint Vehicles     4-6
Table of Offenses and Penalties     4-7

i

# MIRANDA WARNING

You have the right to remain silent.

Anything you say can be used against you in a court or other proceeding.

You have the right to consult an attorney before making any statement or answering any questions, and you may have him present with you during questioning.

You may have an attorney appointed by the U.S. Magistrate or the court to represent you if you cannot afford or otherwise obtain one.

If you decide to answer questions now, with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting with a lawyer.

However, you may waive the right to advice or counsel and your right to remain silent and answer questions or make a statement without consulting a lawyer if you so desire.

# VOLUNTARY (BECKWITH/CIVILETTI) WARNING

You have a right to remain silent if your answers may tend to incriminate you.
Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you.

If you refuse to answer the questions posed to you on the grounds that the answers may tend to incriminate you, you cannot be discharged solely for remaining silent. However, your silence can be considered in an administrative proceeding for its evidentiary value that is warranted by the facts surrounding your case.

# ADMINISTRATIVE WARNING

I am conducting an investigation which is solely administrative in nature into an allegation that...

Under [the applicable section of the agency manual] you are required to disclose any information in your possession pertaining to the matter which I am investigating and answer any proper questions which I might put to you.

You may be subject to disciplinary action for your failure or refusal to answer proper questions relating to the performance of your duties as an employee of the [agency]. You may also be subject to criminal prosecution for any false answer that you give to any of my questions.

2-5

# EXHIBIT # 7

RECEIVED

JAN  3 2007

Reclamation Instructions

PLCB

Supplement to                                          Series 700  Personnel Relations
Federal Personnel Manual                                          and Services

FPM CHAPTER 736   INVESTIGATIONS                                  FPM R736.1.1

Subchapter 1.  <u>Investigations of Allegations of Serious Misconduct</u>.

.1    <u>Authority</u>.  The Office of Inspector General is responsible for carrying
      out the provisions of the Inspector General Act of 1978 (Public Law 95
      452; 92 Stat. 1101).  Departmental instructions on investigations are
      pursuant to the provisions of the Act.

.2    <u>Instructions</u>.  The Bureau of Reclamation is subject to and adopts the
      Department's instructions on Departmental Investigations and
      Investigations by other Agencies as published in Parts 355 and 356 of the
      Departmental Manual.  Reclamation offices will follow the policies and
      procedures described in those instructions.

      For ease of reference, 355 and 356 DM are reproduced as Appendix A to
      this subchapter.

.3    <u>Reporting Procedures</u>.

      A.    Reclamation officials must immediately report, through official
            channels, to the Assistant Inspector General for Investigations
            (AIGI) known, suspected, or alleged fraud, waste, or abuse affecting
            the Department's programs and operations.  These reports will be
            made through Reclamation channels to the Denver Office,
            attention D-7530.  Initial reports should be by telephone with
            written confirmation when necessary.

      B.    Each employee also has the duty to report matters outlined in
            paragraph A. above to the AIGI.  Employee reports may be made through
            official channels or directly to the AIGI.

      C.    Incidents requiring immediate police action shall be reported
            directly to Federal and/or local law enforcement officers and then
            reported through channels to the AIGI when appropriate.

      D.    The legend "For Official Use Only", will be affixed to all
            investigative reports and correspondence related thereto, including
            envelopes.

# EXHIBIT # 8

BOR;                      303 445 6349;          Feb-27-02  2:21PM;        Page 4

Department of the Interior

# DEPARTMENTAL MANUAL

| Personnel | Part 370 DM Addition to FPM |
|---|---|

| Chapter 752  Discipline and Adverse Actions | 370 DM 752,1.6 |
|---|---|

1.6  Determining the Facts and Proposed Action.

A.    Determining the Facts. The supervisor will examine the evidence to determine what action is warranted. If sufficient evidence to provide a proper basis for initiating action is available from official sources (e.g., time and attendance records), the supervisor will use those sources as supporting documentation. Where such evidence is not available, administrative review will be made into noncriminal incidents or situations as soon as possible. Ordinarily, this inquiry will be made by the appropriate line supervisor, except where the conduct is required by 355 DM to be reported to the OIG. When necessary, the employee who is alleged to have committed the offense and any other persons who may have pertinent information about the case should be interviewed and signed statements obtained as appropriate. Information will be developed impartially, and a reasonable effort will be made to reconcile conflicting statements by developing additional evidence. The information obtained should be documented. When any additional information is needed, the responsible personnel official will so advise the line manager.

B.    Reportable Incidents. The Office of Inspector General (OIG) should be notified immediately of serious misconduct, alleged violations of Departmental Standards of Conduct or of Federal criminal or civil fraud statutes, or similar incidents involving employees. (See 355 DM for further guidance on reportable incidents.) In such instances, local inquiry into further details should await concurrence or assumption of jurisdiction by the OIG. When circumstances of retaining the employee concerned in a duty status may present a hazard to employees or property, the OIG should be notified of the need to remove the employee from the work site pending investigation.

C.    Using Official Investigation Reports.

(1)    It may not be necessary or appropriate for a supervisor to inquire into an incident where sufficient evidence to provide a proper basis for initiating action is available from other official sources (e.g. investigative reports, court records, affidavits of witnesses, etc.).

(2)    When management relies on facts developed from an official investigation or other official inquiry to support a proposed disciplinary or adverse action, extracts which are relied upon will be assembled for the evidence file, which the employee or representative may review. Investigative reports emanating from the Office of the Inspector General may not be released without prior approval from that office.

8/5/80 FPM-224
Replaces 5/20/69 FPM-117 and 7/24/69 FPM-121

# EXHIBIT # 9

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4   - - - - - - - - - - - - - x

5   RENE COCHISE              :

6          Plaintiff,         :

7   vs.                       :   Case No.: 1:06CV00980

8   GALE A. NORTON, SECRETARY  :

9   DEPARTMENT OF THE INTERIOR  :

10          Defendant         :

11  - - - - - - - - - - - - - x

12

13                              Washington, D.C.

14                              Tuesday, September 18, 2007

15

16

17

18  Whereupon,

19                      RENE COCHISE

20  the Witness, called for examination by Counsel for the

21  Defendant, pursuant to notice and agreement of counsel as to

22  time and place, at 501 3rd Street, N.W., Third Floor,

23  Washington, D.C., where were present on behalf of the parties:

24

25

1          MS. WHITAKER:  Let's see if I can put my hands on it

2  since it should be in here.

3          MR. WALTON:  Yeah.  I'm certain it's in there.

4          MS. WHITAKER:  In fact, there's an index in the

5  first volume, and I'm sure that the letter of counseling is in

6  several places.

7          MR. WALTON:  It's at 02 -- I'm looking at Volume --

8  I'm looking at WBR 005023, Volume 1 of 3.

9          MS. WHITAKER:  Okay.  And what page?

10         MR. WALTON:  And that would be -- and the report

11  indicates that it's in Volume 1.  It's in Volume 1 at page 02-

12  01C.

13         MS. WHITAKER:  And could we look at first the

14  counseling and then your -- here's the Memorandum of

15  Counseling.  That's the first one.

16         MR. WALTON:  Okay.

17         MS. WHITAKER:  Okay.  Now you can put that back.

18  Thank you so much.

19         MR. WALTON:  Sure.

20         BY MS. WHITAKER:

21     Q.  All right.

22     A.  Now in his letter of counseling he specifically

23  cites our mediation which was performed on the 2nd and the

24  3rd.  What was very apparent during the mediation was that --

25  there were certain things that I was bringing up that Chris --

FREE STATE REPORTING, INC.

10    negotiations and implementation.  She was well respected in

11    this area.  She held training within her region even before we

12    looked at our national training.  That was something that that

13    region -- that region was pretty much, I hate to say it, way

14    far ahead of what the other regions were doing.

15         Q.    Which region was that?

16         A.    It was the Lower Colorado Region, I believe is what

17    they called it.  Debbie was located out of Phoenix.

18         Q.    Oh, really?

19         A.    And she had an excellent rapport with her Regional

20    Director.  Like I said, in my opinion there had to have been

21    history.  These were two people that have been within

22    Reclamation for probably umph number of, you know, years, and

23    so at one point or another I'm sure they probably had not seen

24    eye to eye, but there was definitely history there.

25         Q.    Okay.  So you think that your attitude towards these

88

1    three individuals or your lack of attitude towards them --

2         A.    I think what it was --

3         Q.    -- had some influence on --

4         A.    I think what the influence was was that I chose not

5    to bad mouth them.  I chose not to get involved in, you know,

6  ignoring them, giving them the silent treatment.  I chose to

7  be -- you know, if, indeed, these people were -- if I was

8  going to be able to get my work done, I knew at one point or

9  another I may have to rely on these people, and the way I

10  looked at it and what I shared with Barbara and Chris was that

11  I didn't see this as my battle.

12      Q.    And when did you share that with him?

13      A.    Very early on.

14      Q.    And how did -- you were talking about you found all

15  this out -- that was the impression you gave me -- from his

16  comments to you during the mediation session.  The mediation

17  session was in June of '99, and that was the confidential --

18  it was confidential?

19      A.    Yes, it was.

20      Q.    There are confidential provisions with that and the

21  Settlement Agreement?

22      A.    Yes.

23      Q.    I think that's something we need to deal with, that

24  these are not to be shared.  I mean they're being shared right

25  now, but that's probably inappropriate.

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

153

```
 1              CERTIFICATE OF NOTARY REPORTER

 2         I, Victor Lindsay, hereby certify, as the Notary

 3    Reporter, that the witness, RENE COCHISE, whose testimony

 4    appears in the foregoing deposition, was duly sworn by me,

 5    that the testimony of said witness was duly recorded and

 6    accurately transcribed by me or under my direction; further,

 7    that said proceedings are a true and accurate record of the

 8    testimony given by said witness; and that I am neither counsel

 9    for, related to, nor employed by any of the parties to the

10    action in which this deposition was taken; and, further, that

11    I am not relative or employee of any of the parties or counsel

12    employed by the parties, and I am not financially or otherwise

13    interested in the outcome of the action.

14

15

16                        --------------------------------

17                        Victor Lindsay, Reporter

18                        Notary Public in and for

19                        the District of Columbia

20

21

22

23    My Commission Expires:

24    March 14, 2012

25

                    FREE STATE REPORTING, INC.
```

# EXHIBIT # 10

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3
     - - - - - - - - - - - - - - x
 4
     RENE COCHISE                    :
 5
                   Plaintiff         :
 6
     vs.                             :   Case No. 06-0980
 7
     GALE A. NORTON, SECRETARY       :
     DEPARTMENT OF INTERIOR
 8                                   :
                   Defendant
 9                                   :
     - - - - - - - - - - - - - - x
10

11

12                                      Washington, D.C.

13                                      Thursday, October 11, 2007

14

15

16   Deposition of:

17                          RENE COCHISE

18   the Deponent, called for examination by counsel for the

19   Defendant, pursuant to notice and agreement as to time

20   and place, at 501 3rd Street, Washington, D.C., before

21   Sean Williams, a Notary Public in and for the District of

22   Columbia.

23

24

25
</pre>

1   about your travel authorization being suspended and you

2   filed another complaint, and then you got the Letter of

3   Reprimand, and then the altercation between the two of

4   you and you filed -- you went and sought counseling

5   again.  So every time you had contact with Mr. --

6        A.   Kenney.

7        Q.   -- Kenney at that point you filed a complaint

8   during that one period of time.

9        A.   Thank you.  If we could just break for a

10  second.

                    (OFF THE RECORD)

                    (ON THE RECORD)

13            BY MS. WHITAKER:

14       Q.   So you were made Acting Director in his absence

15  in late March --

16       A.   That's correct.

17       Q.   -- and you were able to perform those duties

18  even though there was some issue about Leah locking you

19  out of the office and having to get the documents?

20       A.   Well, what Leah did was she took information

21  was coming into the office that was time sensitive and

22  she took it into Mr. Kenney's office and locked it up.

23       Q.   Okay.  And then -- but you were able to get

24  that information unlocked?  I mean did you actually --

25  you did respond to whatever the time sensitive

1    information was?

2         A.    No, didn't meet the deadline.

3         Q.    You missed it?

4         A.    Missed it, missed it, and that was when I asked

5    Chris, you know, why -- he felt that her apology was

6    enough.

7         Q.    I see.  So you missed the deadline?

8         A.    We missed the deadline.

9         Q.    And was it ever made up?

10        A.    No.  Can't make that up.  It was sensitive.  It

11   had to do with a water rights settlement, a bill that was

12   up on the hill and we usually had to clear those through

13   the Department and OMB before it goes up on the hill.

14        Q.    Did you do your part?

15        A.    Like I told you, we didn't meet the deadline,

16   so --

17        Q.    You didn't get anything out?

18        A.    -- it was not reviewed.  I pulled together the

19   information, but all the Department said they were going

20   to do was just put in a folder.  It was going to go

21   nowhere.

22        Q.    But you did do it?

23        A.    Did do it.

24        Q.    Okay.  And then you went to Phoenix.  You came

25   back.  And then at that point in time these various

1    things occurred.  And the last thing that occurred was

2    the incident between you and he that involved the

3    grabbing of the travel voucher, correct?

4         A.   That's correct.

5         Q.   And you testified earlier that he grabbed your

6    wrist.

7         A.   Yes.

8         Q.   Is that your testimony?

9         A.   Yes.

10        Q.   Because it seems to be different from earlier

11   testimony.

12        A.   No.  He grabbed my wrist and pried the voucher

13   out of my fingers.  He didn't grab the voucher.  He

14   grabbed -- it was my wrist, and then he --

15        Q.   He held your wrist --

16        A.   Held my wrist.

17        Q.   -- with one hand and took the travel voucher --

18        A.   Yes.

19        Q.   -- peeled the travel voucher -- peeled your

20   fingers back with the other hand and then the travel

21   voucher dropped on the table?  Is that basically what

22   happened?

23        A.   It didn't drop on the table.  He took it.  He

24   just bent it back and took it.

25        Q.   Well, I mean if he's got one hand holding your

1    wrist and the other hand --

2        A.    Well, he took it back, peeled my -- was holding

3    onto it, peeled it back, took it.

4        Q.    Okay.  And you've explained what you did after

5    that.

6                                (Whereupon, the document that

7                                was referred to as Exhibit

8                                Number 4 was marked for

9                                identification.)

10            BY MS. WHITAKER:

11        Q.    Just to go back to -- if you could take a look

12    at Exhibit 4.  Are these the documents that you indicate

13    reflect your invitation to a --

14        A.    Now I gave you the document.  I don't see it

15    here.  I don't see the invitation from Roy Montoya.

16        Q.    I guess --

17            MR. WALTON:  Oh, I see.  You have it, I think.

18    Oh, no.

19            WITNESS:  No.  It's in there.

20            BY MS. WHITAKER:

21        Q.    Oh, okay, so it is in there.  It was --

22        A.    It's like it was conveniently left out.

23        Q.    Excuse me?

24        A.    I think it was conveniently left out.  It's in

25    there.

1  Jicarilla Apache Tribe.  And Jicarilla is J-I-C-A-R-I-L-

2  L-A.  And she had called in to get the telephone -- she

3  wanted the phone number for Larry Todd, and had said that

4  the tribe was planning to come in and wanted to have a

5  meeting with Larry Todd.

6          When I went into the meeting -- I was extremely

7  surprised even at the request from Chris to host this

8  meeting because, you know, when I left the office I had

9  just -- I mean I, as I stated before, had no intentions

10  on going back to that office.  When Chris requested this,

11  I did get a hold of the EEO counselor, Lorraine Bobdian,

12  and I wasn't quite sure how to handle this.

13      Q.   You had had no contact with him up until ten

14  months before?

15      A.   You know what, I did not even know what he was

16  calling the meeting for.  And he did catch me off guard.

17  I was caught off guard in this meeting.  I was not sure

18  what the meeting was about, but I did ask for

19  representation and Tino Tafoia  agreed to come.

20          The thing about coming into the office was that

21  I noticed that Tino wasn't even facing Chris and I.  He

22  was facing the Secretary's office and we were back here.

23  And I felt that that was very strategic because I think

24  when Chris came in he said Tino, you sit here, Betty, you

25  sit here, and Betty was there.  And both Chris and I went

1    to another office and that's when he handed me the slip

2    of paper and read to me the words, you know, that it was

3    an administrative warning and he was gong to do -- excuse

4    me, I have to take a break.

5        Q.    Okay.

6                        (OFF THE RECORD)

7                        (ON THE RECORD)

8            BY MS. WHITAKER:

9        Q.    Are you all set?

10       A.    I'll be okay.  Mr. Kenney asked me to answer a

11   series of questions, and if I did not answer them, I

12   would be subject to criminal prosecution.

13       Q.    Now who was in attendance, Betty and --

14       A.    Yes.

15       Q.    Betty Johnson?

16       A.    Correct.

17       Q.    And someone from EEO?  Who was the second

18   person?  I'm sorry.

19       A.    Tino Tafoia.

20       Q.    That's right.  You said that.  That's a new

21   name.  I hadn't heard that before.  She's in the unit?

22       A.    No, it's a he.

23       Q.    What was his name again?

24       A.    Tino.

25       Q.    Tino.

1    Q.   In general, and I guess we never discussed

2  this, but we -- or maybe we never asked, but we talked, I

3  guess, around it, what do you consider a hostile work

4  environment?

5    A.   I think everything that happened to me

6  beginning with when I first went to work for Chris Kenney

7  and the meeting that was held out in San Francisco when I

8  saw a staff member verbally attack another staff member

9  and Chris not bring it to her attention, not reprimand

10 her, not talk to her about her conduct, but in a sense,

11 you know, treat her as though it was appropriate to treat

12 another person, another coworker, that way, I became

13 aware then that this office was not only unique and

14 different, but that if Chris didn't like someone, I

15 probably could have treated them any way I wanted to and

16 I don't think Chris would have objected to it.

17    Q.   Okay.  Now you stated that -- I believe, that

18 you went home -- and just moving along and I'm speaking

19 of the incident, the physical altercation, between you

20 and Mr. Kenney on April the 28th.  I think it was your

21 testimony that you went home after the incident.

22    A.   Well, actually what had happened was after the

23 incident I went to another floor and went to the

24 bathroom.

25    Q.   And then after you went to the bathroom you

1  went home?

2      A.    After I got myself together I went home.

3      Q.    Did you ask anyone for permission to leave?

4      A.    No.

5      Q.    Why did you go home?

6      A.    Because I had urinated on myself.

7      Q.    Well, did you contact anyone before you came

8  back to work?

9      A.    I contacted Lorraine Bobdian.

10     Q.    And what, if anything, did she tell you?

11     A.    I told her I was -- I told her I didn't want to

12  go back into the office, I wanted to be detailed to

13  another office.  I didn't feel safe around Chris and I

14  wanted it -- I wanted either Larry Todd or someone in the

15  front office to remove me, to move me to another office.

16     Q.    And what, if anything, did they do?

17     A.    When I came to work on Monday, Margaret Sibley

18  came and spoke with me and requested that I just pack up

19  my things and she was going to move me over to the Office

20  of Policy, and I did that.  I just took what I had.  I

21  didn't really pack anything up.

22     Q.    Now I'm going to one last issue.  You indicated

23  that when you had a discussion with Mr. Kenney --

24             REPORTER:  Sorry, Counselor, I --

25             MR. WALTON:  I'm sorry.

1                    C E R T I F I C A T E

2

3         I, Sean Williams, a Shorthand Reporter and a Notary

4   Public, do hereby certify that the foregoing witness,

5   RENE COCHISE, was duly sworn on the date indicated, and

6   that the foregoing is a true and accurate transcription

7   of my stenographic notes and is a true record of the

8   testimony given by the foregoing witness.  I further

9   certify that I am not employed by or related to any party

10  to this action by blood or marriage and that I am in no

11  way interested in the outcome of this matter.  In witness

12  whereof I have hereunto set my hand this 24th day of

13  October, 2007.

14

15

16

17                        _____
                          Sean Williams
18                        Notary Public in and for the
                          District of Columbia
19

20
    My Commission Expires:
21
    March 14, 2012
22

23

24

25

# EXHIBIT # 11

**In The Matter Of:**

*RENE COCHISE   v.*
*GALE NORTON, SEC US DEPARTMENT OF INTERIOR*

---

*CHRISTOPHER KENNY*
*April 30, 2002*

---

*BETA REPORTING & VIDEOGRAPHY SERVICES*
*910 SEVENTEENTH STREET, NW*
*SUITE 200*
*WASHINGTON, DC  USA  20006*
*(202) 638-2400    FAX: (202) 833-3030*

Original File AAKENNY.TXT, 158 Pages
Min-U-Script® File ID: 2352553851

**Word Index included with this Min-U-Script®**

[20] Q: Different. And do you recall what [21] her background is or do you know offhand?

[22] A: The only background I know about

**Page 25**

[1] is the experience that she's had since she [2] came to my office.

[3] Q: She came to your office as a [4] program analyst?

[5] A: She came to my office as my [6] secretary.

[7] Q: As your secretary. And what grade [8] did she come to your office as? Do you [9] recall?

[10] A: Seven.

[11] Q: Seven. What grade was your [12] secretary at that time, Ms. Madalena?

[13] A: Seven.

[14] Q: Seven. And what grade was [15] Mrs. Cochise?

[16] A: Thirteen.

[17] Q: Now, if I could just go back a [18] second, could you tell me the duties of your [19] particular group that you are the [20] director [20] of?

[21] A: The Office of Native American [22] Affairs is generally responsible for policy

**Page 26**

[1] and policy development at the Bureau of [2] Reclamation regarding activities with [3] Indians and Indian tribes.

[4] I'm responsible for the direction [5] of reclamation personnel that serve on what [6] are actually negotiation teams for the [7] Department, and we have a Technical [8] Assistance Program that we administer for [9] the benefit of the tribes, under the [10] Reclamation Program.

[11] Q: Now, how many other policy [12] analysts do you have in the office?

[13] A: Other? Meaning?

[14] Q: Other than Native Americans, I'm [15] sorry.

[16] A: Three.

[17] Q: Three. And who are they?

[18] A: Barbara White. Adrian Marks.

[19] Q: And Mr. Peterson?

[20] A: And John Peterson.

[21] Q: Now, we discussed the complaint [22] that you received from Barbara White in

**Page 27**

[1] reference to the travel voucher earlier.

[2] A: Yes.

[3] Q: Did you receive any other [4] complaints from Ms. Marks or Mr. Peterson [5] concerning Mrs. Cochise?

[6] A: No.

[7] Q: I'll ask this again, but I think [8] you did answer it: Ms. White is a GS-14?

[9] A: Yes.

[10] Q: Does Ms. White supervise [11] Mrs. Cochise?

[12] A: No.

[13] Q: Now, to your knowledge, did there [14] come a time when Mrs. Cochise attempted to [15] gain promotion to GS-14?

[16] A: I guess I don't understand that [17] question.

[18] Q: Sure. Did you ever have any [19] discussions with Mrs. Cochise concerning her [20] promotion to the grade of 14?

[21] A: The first time I had a discussion [22] with her was when we had the mediation

**Page 28**

[1] session in June of 1999.

[2] Q: Do you recall what, if any, [3] agreements you made that would facilitate [4] Mrs. Cochise being promoted to 14?

[5] A: What we had agreed in the formal [6] agreement mediation was that she was in the [7] process of finalizing a report from a team [8] that she was the chair of, and when that [9] report was completed, that we would use that [10] report as a vehicle for a discussion of [11] skills and competence to be considered for [12] promotion to 14.

[13] Q: Did she complete the requirements [14] for being promoted to a GS-14?

[15] A: Not to my knowledge.

[16] Q: When you say "not to your [17] knowledge," are you saying that she did not [18] complete the program that had been agreed [19] upon?

[20] A: She's never given me the final [21] report that was agreed to in the mediation.

[22] Q: Do you recall what type of final

**Page 29**

[1] report? Is this just a general final report [2] that you agreed to or was it in reference to [3] any specific project?

[4] MS. ARMSTRONG: Let me interject. [5] It might be helpful if you refer him to the [6] agreement itself.

[7] MR. WALTON: You can take a look [8] at it, if you like.

[9] THE WITNESS: Sure.

[10] MR. WALTON: Take your time and [11] take a look at it.

[12] THE WITNESS: In Paragraph A, Sub-[13] Item 3, we agreed that we'd meet on [14] August 31, 1999, "to dialog on Rene's [15] analytical skills as reflected in the [16] completed Indian O&M report."

[17] So the meeting on August 31 st was [18] a projected date when that report would be [19] completed.

[20] BY MR. WALTON:

[21] Q: And you said you agreed that you [22] would meet. Do you recall?

**Page 30**

[1] A: No, we did not meet.

[2] Q: You did not meet. Do you know why [3] you did not meet?

[4] A: When I made inquiries of Rene [5] about the complete O&M report, it wasn't [6] completed.

[7] Q: What happened after that, if [8] anything?

[9] A: I continued to inquire about the [10] O&M report. Rene asked for additional time. [11] That was acceptable to me, and she continued [12] to ask for additional time and I never got [13] the report.

[14] Q: Is it your testimony that if the [15] report had been completed, she would have [16] been promoted to satisfactory?

[17] A: No. The report would have been [18] the triggering event to discuss promotion.

[19] Q: What did the report involve, just [20] in a general sense?

[21] A: The report was a culmination of a [22] group that was put together to investigate a

**Page 31**

[1] policy question regarding Operation [2] Maintenance Cost on Indian tribes in the [3] Reclamation Program.

[4] Q: Thank you. Now, drawing your [5] intention to March 6, 2000, did there ever [6] come a time when you criticized Mrs. Cochise [7] in front of other staff members concerning [8] an assignment? Do you recall doing that?

[9] A: March 6th? No. I don't remember [10] anything like that.

[11] Q: You don't remember anything. [12] Now, on March 9th — let me skip [13] around; March 28th; I'll come back to the [14] 9th — on March 28th, do you recall [15] appointing Mrs. Cochise as the acting [16] director in your absence, on or about [17] March 28th, 2000?

[18] A: I have appointed Rene as acting [19] director. In relationship to a specific [20] date isn't very helpful for me. I can't [21] answer that that way.

[22] Q: So, is it your testimony that you

**Page 32**

[1] appointed her as acting director more than [2] once?

[3] A: My memory is twice.

[4] Q: Twice. In one incident where you

RENE COCHISE  v.                                                CHRISTOPHER KENNY
GALE NORTON, SEC US DEPARTMENT OF INTERIOR                      April 30, 2002

[5] appointed her as acting director, do you [6] recall a situation where there was a [7] complaint concerning material being locked [8] in your office in your absence and where she [9] was unable to obtain that information?

[10] A: Yes.

[11] Q: Would you tell me your knowledge [12] of that incidence.

[13] A: My memory was as acting director, [14] she was asked to provide comments on some [15] pending legislation. She was having [16] difficulty finding the material that had [17] come into the office and the report was that [18] that frustrated her ability to be responsive [19] to the request.

[20] Q: She made an attempt to get into [21] your office. Is that correct?

[22] A: I don't know.

### Page 33

[1] Q: Do you recall whether or not your [2] secretary ever admitted that she did not [3] give Mrs. Cochise certain documents that [4] were in the possession of your office?

[5] A: I have correspondence from my [6] secretary that she had misplaced and [7] misunderstood and was late in getting [8] documents to Mrs. Cochise. That's what I [9] remember.

[10] Q: Now, as an acting director, [11] irrespective of whether it's Mrs. Cochise or [12] Mr. Peterson or Ms. Marks or Ms. White, [13] would they have an occasion to go into your [14] office, if they were serving in the role as [15] acting director?

[16] A: Yeah.

[17] Q: How would they get into your [18] office normally?

[19] A: In my absence, usually my office [20] is locked because I have negotiation files [21] in there. My secretary has a key to the [22] office and if they inquire of the secretary,

### Page 34

[1] they can get in my office any time they [2] need.

[3] Q: Well, did Mrs. Cochise inquire of [4] your secretary, when she was acting [5] director, in an attempt to get into your [6] office?

[7] A: I'm told she did.

[8] Q: What, if anything, took place?

[9] A: I don't remember. I remember [10] being reported that she had difficulty [11] getting in the office.

[12] Q: But do you recall that your [13] secretary apologized for not getting [14] documents to Mrs. Cochise?

[15] A: She apologized for misplacing [16] documents, for misunderstanding, yes.

[17] Q: Did you issue any form of [18] disciplinary action to your secretary for [19] that?

[20] A: No.

[21] Q: Was there any reason why you did [22] not?

### Page 35

[1] A: My assessment of the situation was [2] that it was a simple human error. It was a [3] misunderstanding, and it didn't arise to a [4] level of a disciplinary action.

[5] Q: Did you consider it any form of [6] insubordination when Mrs. Cochise, as acting [7] director, attempted to get in and the [8] secretary did not give her access?

[9] A: That was not the way it was [10] represented to me.

[11] Q: How was it represented to you?

[12] A: I'm told that Mrs. Cochise said [13] she tried to get into the office, but she [14] couldn't, but that she did not make any [15] inquiry of the secretary that she was trying [16] to get in the office, so my memory of the [17] experience is that it was reported she was [18] frustrated and couldn't get in the office, [19] but that she didn't make an inquiry to get [20] into the office or ask for the key.

[21] Q: It was just an oversight. The [22] secretary just failed to give her documents

### Page 36

[1] that she should have given to her. Is that [2] it?

[3] A: As I understand it, she [4] misunderstood the documents that she was [5] looking for, and once she realized what [6] Mrs. Cochise was looking for, she found them [7] for her.

[8] Q: Now, did that in any way impact [9] Mrs. Cochise's ability to respond to the [10] request for information that she had to [11] comply with?

[12] A: I can't say, because I don't [13] remember the circumstances of her actions.

[14] Q: Did there ever come a time when [15] you issued a directive on March 9th, [16] informing Mrs. Cochise not to contact Indian [17] tribes unless they were approved by you?

[18] A: The way you stated the question, [19] I'd say no.

[20] Q: Would you tell me in your own [21] way?

[21] A: Because I think it's very [22] important — let me find that document, the

### Page 37

[1] e-mail transmittal to Rene. I want to be [2] very careful here. I'd like to read to you [3] the statement that I sent to her and

the [4] e-mail.

[5] Q: Sure.

[6] MS. ARMSTRONG: For the record, [7] this is already in evidence. It's Agency [8] SDRY Reported Investigation Exhibit 2-2H, at [9] Page 10.

[10] THE WITNESS: What I said was any [11] meetings with Indian tribes, which involved [12] this office, meaning the Office of Native [13] American Affairs, are to be approved by the [14] director.

[15] BY MR. WALTON:

[16] Q: "To be approved by the director." [17] Now, what did you mean by "they are to be [18] approved by the director"?

[19] A: Exactly that; either myself or [20] someone acting in my capacity as acting [21] director has to approve a meeting with an [22] Indian tribe, and "meeting" means a meeting

### Page 38

[1] with an Indian tribe in which the Bureau of [2] Reclamation would be represented to the [3] tribe in the context of that meeting.

[4] Q: Who is the director?

[5] A: I'm the designated director of the [6] office.

[7] Q: I see.

[8] A: I consider anyone who acts in my [9] place to be the director of the office for [10] the purposes of this statement.

[11] Q: How does the process work — just [12] so we can understand, for the record — how [13] does the process work, with respect to [14] setting up meetings with Indian tribes, [15] based on your knowledge?

[16] A: As a general principle, we don't [17] set up meetings with Indian tribes per se. [18] We have inquiries from Indian tribes who [19] want to meet with us in Washington or there [20] is formal circumstances, such as water [21] rights negotiations where meetings are going [22] to happen as a matter of course by virtue of

### Page 39

[1] that activity.

[2] Q: I see. Now, there came a time [3] when you admonished Mrs. Cochise for [4] allegedly setting up a meeting. Is that [5] correct?

[6] A: I don't know what you're asking [7] me.

[8] Q: Well, did there ever come a time [9] when you attempted to issue some form of [10] discipline with regards to Mrs. Cochise and [11] her relationship with attempting to — in [12] your words — attempting to meet with or [13] arrange for a meeting with Indian tribes in [14] your office?

CHRISTOPHER KENNY
April 30, 2002

RENE COCHISE  v.
GALE NORTON, SEC US DEPARTMENT OF INTERIOR

[15] **A:** If you're talking about a specific [16] meeting, I can't answer your quest- [17] ion. I [17] don't know specifically what you're [18] referring to.

[19] **Q:** Did there ever come a time, on or [20] about March 15, 2001, when you had a meeting [21] with Mrs. Cochise, where you informed her [22] that you were conducting an administrative

**Page 40**

[1] investigation into issues related to her [2] failure to follow your instructions [3] regarding not meeting with Indian tribes or [4] arranging meetings with Indian tribes [5] without your approval?

[6] **A:** Yes.

[7] **Q:** Would you, just for the record, [8] tell us why you called her in concerning [9] your investigation.

[10] **A:** The investigation I believe you're [11] talking about was regarding a meet- [11] ing with [12] the Jicarilla Tribe. At that point, [13] Mrs. Cochise was on detail to another [14] division in the Bureau of Reclamation in [15] Washington and I had been informed, from the [16] front office, and given information that [17] indicated that Mrs. Cochise was actively [18] fac- [18] ilitating a meeting between the Jicarilla [19] tribe and the Director of Operations and the [20] Deputy Director of Oper- ations in the [21] commissioner's office. [22] I considered this another example

**Page 41**

[1] of activities that I had counseled her on in [2] the past and so, in order to make sure that [3] the information that I had indicated what it [4] seemed to indicate, I had a meeting with her [5] to discuss that information.

[6] **Q:** You said that you were "informed [7] by the front office." Who informed you in [8] the front office?

[9] **A:** I had e-mails that had been copied [10] by Ms. Karen Anderson, the secretary for the [11] Director of Operations.

[12] **Q:** Would Ms. Anderson normally copy [13] e-mails? Does she normally do that and [14] refer those to you?

[15] **A:** If there were circumstances on the [16] front corridor that had relation- ships or [17] pending activities with Indian tribes, it [18] wouldn't be un- common for her to notify our [19] office since we deal with Native American [20] issues and concerns.

[21] **Q:** So if the e-mail is sent to the [22] Office Operations Director, if it involves

**Page 42**

[1] your office, Ms. Anderson would send those [2] e-mails to you? You have to answer.

[3] **A:** It wouldn't be uncommon for her to [4] do that. It's part of her duties.

[5] **Q:** Now, when you say she sent these [6] e-mails to you, was that the basis for you [7] believing that Mrs. Cochise had violated [8] your instructions?

[9] **A:** Yes.

[10] **Q:** What type of investigation did you [11] make to confirm that, other than seeing the [12] e-mails that this was evidence of a [13] violation?

[14] **A:** Well, the e-mails were a clear [15] indication to me that Mrs. Cochise was [16] actively participating in coordinating and [17] assisting the tribes and she — from my own [18] personal experience, I know she had a long [19] working relationship with the tribes, so the [20] next step that was indicated to me was to [21] sit down and ask questions of her about that [22] experience.

**Page 43**

[1] **Q:** When you began to ask her [2] questions about it, what, if anything, did [3] you say to her?

[4] **A:** I had a list of specific questions [5] that I asked of her and asked her to respond [6] to those. She was hesitant to do so, but [7] ultimately agreed to do so.

[8] **Q:** Now, did there ever come a time [9] when you indicated that if she gave false [10] answers, that she could be subjected to [11] criminal prosecution?

[12] **A:** I provided her a copy of a [13] statement that I had obtained, in the course [14] of taking training in Federal personnel [15] matters, that was strongly recommended by [16] the instructor, which makes it clear that [17] the in- vestigation that's being conducted, [18] generally speaking, is of an admin- [19] istrative nature and that she should [20] understand that [20] it's of an admin- istrative nature. But it [21] does caution, at the end of the statement, [22] that false answers could make a person

**Page 44**

[1] criminally liable, and I believe that [2] statement's part of the record.

[3] **Q:** Now, did you, at that time, when [4] you indicated to her that it could subject [5] you — "could"; and I believe that was [6] the [6] word you used, "could," not " would," but [7] "could." Is that correct?

[8] **A:** Yes.

[9] **Q:** Did you, at that time, advise her [10] that she had a right to counsel? Did you [11] give her any type of rights of that nature?

[12] **A:** No, sir.

[13] **Q:** Is there any reason why you [14] didn't?

[15] **A:** Because it was an administrative [16] hearing and my understanding is that [17] administrative meetings are between the [18] supervisor and the subordinate

and doesn't [19] rise to the level of counsel.

[20] **Q:** Well, at what point, if you [21] believe that the answers were false, do you [22] believe that it could lead to or subject her

**Page 45**

[1] to possibly criminal prosecution?

[2] **A:** I wouldn't have any way of making [3] that assessment.

[4] **Q:** Did you refer this matter to the [5] Inspector General's Office of the Dep- [6] artment [6] of the Interior?

[7] **A:** It wasn't necessary to do so.

[8] **Q:** Why was it not necessary?

[9] **A:** I didn't have any indication that [10] there was any reason for me to refer [11] anything to the I.G.'s Office; nothing to my [12] knowledge or my experience.

[13] **Q:** So the reason that you gave the [14] warning concerning the criminal [15] prosecution — subjecting possibly to [16] criminal prosecution — was simply because [17] it was a statement that had been given in a [18] training session?

[19] **A:** And as I understand, it was a [20] proper cautionary statement to be made in [21] these kind of proceedings.

[22] **Q:** Did you advise her that she had a

**Page 46**

[1] right to have a representative at the [2] meeting?

[3] **A:** No, I did not.

[4] **Q:** Was there any representative at [5] the meeting?

[6] **A:** No. For Mrs. Cochise?

[7] **Q:** Yes.

[8] **A:** No.

[9] **Q:** Did anyone else attend the [10] meeting?

[11] **A:** I did have two observers attend [12] the meeting.

[13] **Q:** At your request?

[14] **A:** At my request.

[15] **Q:** Who were those two?

[16] **A:** Ms. Betty Johnson and Mr. Tino [17] Tafaya.

[18] **Q:** Would you tell me the title of [19] Ms. Johnson and Mr. Tafaya?

[20] **A:** Ms. Johnson is a program analyst [21] in my office and Mr. Tafaya is — I don't [22] know his formal title — he's a Reclamation

**Page 47**

[1] Representative in the Office of the [2] Assistant Secretary for Water and Sci- ence. [3] I guess liaison.

[4] **Q:** Now, why did you ask those two [5] individuals to attend the meeting?

[6] A: Because of the long experience [7] that I had with Mrs. Cochise, I wanted two [8] observers that I believed would be objective [9] because in all of our meetings, because of [10] the tension between us, I thought it was [11] appropriate to have two other individuals to [12] monitor the meeting: Ms. Johnson because I [13] trust her integrity and Mr. Tafaya because I [14] trust his integrity, and he had been [15] assisting in the mediation effort in the [16] earlier EEO discussions.

[17] Q: Now, the Office of the Assistant [18] Secretary, he works for, you said?

[19] A: He's liaison with the Office of [20] the Assistant Secretary.

[21] Q: Liaison — and I'm not looking for [22] you to be exact with that. Is that above

**Page 48**

[1] your office or below your office or where [2] does that fall on the organizational chart?

[3] A: He's attached to the [4] commissioner's office.

[5] Q: Is that over the Bureau of [6] Reclamation?

[7] A: Well, he works technically for the [8] Bureau of Reclamation, the Assistant [9] Secretary for Water and Science. He [10] supervises or has jurisdictional [11] responsibilities over the Bureau of [12] Reclamation.

[13] Q: Where were they seated in [14] relations to the meeting?

[15] A: There were two chairs that were in [16] the room. They were in front of my desk. I [17] offered them those two chairs.

[18] Q: They were seated in front of your [19] desk?

[20] A: Yes.

[21] Q: Do you have a conference room or a [22] mini conference room within your office?

**Page 49**

[1] A: Yes. Yes.

[2] Q: Explain how your office is [3] arranged in relation to the mini conference [4] room.

[5] A: If you walk in the door into my [6] office, you'd be looking at my desk. If you [7] look to the left, there's an opening into a [8] room about half the size of my main office [9] that has a small table that seats six [10] people.

[11] Q: Where were you and Mrs. Cochise [12] seated?

[13] A: We were seated at the conference [14] table in the smaller conference room.

[15] Q: Ms. Johnson and Mr. Tafaya were [16] seated where?

[17] A: They were seated in my main [18]

office, just behind us.

[19] Q: Main office; Okay. And is there [20] any reason why you were in the conference [21] room with Mrs. Cochise and had Ms. Johnson [22] and Mr. Tafaya in your main office?

**Page 50**

[1] A: Well, the space and the logistics [2] of the room are such that I wanted to have [3] Mrs. Cochise and myself at a table talking [4] to each other, as a meeting between herself [5] and myself. And so the logistics of the [6] room were such that Ms. Johnson and [7] Mr. Tafaya were going to have to sit in my [8] office without — you can't sit in the [9] conference room and not sit at the table, so [10] they were free, just sitting where in my [11] office that they chose.

[12] Q: Now, going back a second, have you [13] ever had an opportunity to review the [14] adverse action procedures, disciplinary [15] procedures, of the department?

[16] A: I've gone through their [17] regulations.

[18] MR. WALTON: Okay. This was [19] provided by your counsel, on our request, [20] during discovery, and I'm showing your [21] counsel again the documents that I'm [22] referring to.

**Page 51**

[1] One is the Department of Interior [2] Investigative Policy Authority of [3] Responsibility and Organization, and I [4] believe it's 355DM 1.1, and it has Office [5] of [5] Inspector General on it; and the other is [6] 370DM, "Discipline and Adverse Actions," I [7] believe is the title. Thank you.

[8] BY MR. WALTON:

[9] Q: Now, have you ever had an [10] opportunity to review these documents, [11] Mr. Kenny?

[12] MS. ARMSTRONG: Wait, before you [13] respond. I'm just looking.

[14] MR. WALTON: And if not, that's [15] what I'm about to ask you. If not, I'd ask [16] you to take a few moments, if you haven't [17] had an opportunity to review them.

[18] THE WITNESS: Yes.

[19] BY MR. WALTON:

[20] Q: Take your time and take a look at [21] the other there.

[22] MS. ARMSTRONG: I think that's

**Page 52**

[1] fine.

[2] THE WITNESS: Okay.

[3] MR. WALTON: All right.

[4] BY MR. WALTON:

[5] Q: Now, have you ever seen these two

[6] before?

[7] A: Yes.

[8] Q: Is it fair to say that they sort [9] of outline Discipline and Adverse Action [10] Policies of the Department?

[11] A: Yes.

[12] Q: Now, is there any indication, to [13] your knowledge, in these guidelines or this [14] policy statement, FPM statement, that [15] discusses the statements that you're to [16] give [16] and conduct in an administrative [17] investigation?

[18] A: No.

[19] Q: Is there any reference to [20] informing an employee that they could be [21] subject to criminal prosecution in these [22] guidelines?

**Page 53**

[1] A: No.

[2] Q: So, to your knowledge, that is not [3] the official policy of the Department of the [4] Interior; is it?

[5] MS. ARMSTRONG: I object.

[6] THE WITNESS: I don't know how to [7] answer that.

[8] MR. WALTON: Well, yes or no; and [9] we note the objection of your counsel.

[10] MS. ARMSTRONG: If you don't [11] know, you can also say you don't know.

[12] THE WITNESS: Well, I don't think [13] I can answer that question honestly.

[14] BY MR. WALTON:

[15] Q: Well, when you say "you can't [16] answer it honestly," what —

[17] A: The way you put the question to me [18] is — in essence, it suggests the Department [19] is opposed to that. I don't think that's [20] true.

[21] Q: Well, I'm asking: To your [22] knowledge, is there anything within the

**Page 54**

[1] Department's Discipline and Adverse Actions [2] that require you to inform an employee that [3] they may be subject or could be subject to [4] criminal prosecution if they give a false [5] statement to you?

[6] A: There's nothing in those [7] regulations that require that.

[8] Q: Do you know of any other [9] regulations that require it?

[10] A: No.

[11] Q: Going back to the investigation [12] that you were conducting, did you ever come [13] to any conclusions — after you questioned [14] Mrs. Cochise — did you ever reach a [15] conclusion as to whether or not she did, in [16] fact, violate your instructions?

[17] A: That was my conclusion.

RENE COCHISE  v.
GALE NORTON, SEC US DEPARTMENT OF INTERIOR

CHRISTOPHER KENNY
April 30, 2002

[18] Q: Outside of the e-mails, I believe [19] you testified that there was — is that the [20] only documentation that you're referring to, [21] the e-mails, or was there other [22] documentation?

Page 92

[1] A: My memory is that we tried to [2] provide all the documentation that we had to [3] you. So I don't know of any other [4] documentation that we haven't provided to [5] you that we have.

[6] MS. ARMSTRONG: For the record, [7] we'll look again. If it's not in the Report [8] of the Investigation, we will produce it.

[9] BY MR. WALTON:

[10] Q: Let me ask you this: Do you have [11] personal notes that you made? You didn't [12] make any personal notes?

[13] A: Not to memory, no.

[14] Q: You just looked at e-mails and [15] made your determination as to whether [16] you should issue a Letter of Reprimand?

[17] A: Yes.

[18] Q: Now, going to on or about [19] April 28, 2000 — and I'm referring to your [20] affidavit so that you can follow me. I [21] believe it's page 11 of your affidavit.

[22] MS. ARMSTRONG: What report or

Page 93

[1] investigation are you talking about?

[2] MRS. COCHISE: I think it's on [3] page 2-3 — the third one.

[4] MS. ARMSTRONG: 01 021?

[5] MR. WALTON: That's what I [6] believe.

[7] MRS. COCHISE: 023.

[8] MR. WALTON: 023.

[9] MS. ARMSTRONG: Exhibit 6; okay.

[10] BY MR. WALTON:

[11] Q: Page 11 of your affidavit, I [12] believe it is. Okay. Now, in reference to [13] No. 15, on April 28, 2000, "Kenny denied [14] approval for payment of complainant's travel [15] voucher and lunged toward complainant and [16] physically removed Tribal Voucher she was [17] holding." Now, is this your affidavit?

[18] A: Yes.

[19] Q: You signed the affidavit at [20] page 13. Is that correct?

[21] A: Yes.

[22] Q: Now, going to Line 25, where it

Page 94

[1] begins "the package", would you read, [2] beginning at Line 25, until you get to the [3] end of Line 33. Would you read that into [4] the record, please?

[5] A: "And" —

[6] Q: Beginning — I'm sorry.

[7] A: "The package"?

[8] Q: Yes, sir.

[9] A: "The package was lying on her desk [10] behind her. I reached down and picked up [11] the package while informing Mrs. Cochise [12] that I had, in fact, needed to have a copy [13] made. Mrs. Cochise rolled around in her [14] chair and grabbed ahold of the package and [15] stated that she would make a copy.

[16] I jerked the package and told her [17] that I would have a copy made. She did not [18] loose her handhold and told me she did not [19] trust me. I told her I understood, but [20] because of our mutual distrust, I needed to [21] have a copy made.

[22] "Afraid that if I jerked the

Page 95

[1] package again, Mrs. Cochise might be injured [2] by a staple, I pried her hand from the [3] package and left."

[4] Q: Yeah; you can stop there. Is [5] there any reason why you jerked the package [6] from her?

[7] A: Involuntary response.

[8] Q: When you say an "involuntary [9] response," you mean that —

[10] A: I came in with the purpose in mind [11] of getting the package to go have a copy [12] made, when she grabbed it, and I [13] involuntarily tried to jerk it out of her [14] hand.

[15] Q: Now, describe what happened when [16] you pried it from her hand. What exactly [17] did you do?

[18] A: She had a grip on it with her [19] right hand, and she had her hand over where [20] you lay the staples off the packages I [21] stated, I would have tried to jerk it from [22] her hand again, but I realized that it was

Page 96

[1] going to take so much force that it would [2] have the potential for cutting her hand. [3] That's the first thing that occurred to me. [4] I was intent upon having the package, so I [5] just reached down and loosened her fingers [6] and took the package.

[7] Q: For the record, I'm trying to [8] demonstrate. I have a fist as if I'm [9] gripping this book, and is it your testimony [10] that you pulled her fingers off of the [11] package? How would you describe how you did [12] that for me?

[13] A: My memory is that I pried off a [14] couple fingers to loosen her hand and she [15] didn't. At that point, she may have even [16] released her handhold on the package, [17] because I don't remember exerting very much [18] force to do that.

[19] Q: Would you tell us, for the record, [20] your height.

[21] A: I believe it's six feet.

[22] Q: Would you tell us your weight, for

Page 97

[1] the record.

[2] A: Two twenty, 225.

[3] Q: So you didn't find that there was [4] very much force, is your testimony, that it [5] took for you to pry her fingers open. Is [6] that correct?

[7] A: I don't remember using very much [8] force at all.

[9] Q: Do you consider that an assault?

[10] MS. ARMSTRONG: Objection. This [11] is irrelevant. We're here about [12] discrimination based on performance under [13] Title VII. This is not a criminal assault [14] case.

[15] MR. WALTON: We note your [16] objection. Thank you.

[17] BY MR. WALTON:

[18] Q: Do you consider this an assault?

[19] A: No.

[20] Q: What do consider it?

[21] A: I consider it a physical action to [22] try to do what I started out to do.

Page 98

[1] Q: You consider it a physical action?

[2] A: I think it's obvious that it was [3] physical.

[4] Q: But it wasn't an assault, in your [5] opinion?

[6] MS. ARMSTRONG: Objection; asked [7] and answered.

[8] BY MR. WALTON:

[9] Q: I'm sorry. But it wasn't an [10] assault, in your opinion?

[11] THE WITNESS: No.

[12] MS. ARMSTRONG: Objection; same [13] reason.

[14] BY MR. WALTON:

[15] Q: What did you do after you pried [16] the package from her?

[17] A: I took it to my secretary and had [18] her make a copy.

[19] Q: After you made the copy, what did [20] you do?

[21] A: I went to my office. I didn't [22] make a copy. I gave the copy to my

Page 99

[1] secretary and instructed her to make a copy [2] and return the package back to Mrs. Cochise, [3] and I went to my office.

[4] Q: Do you know if your secretary [5] returned it to Mrs. Cochise?

[6] A: I assume she did. I believe that [7] she — to my memory, she reported that she [8] returned it to Mrs. Cochise.

# EXHIBIT # 12



COPY

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

-------------------------x

RENE COCHISE,                    :
                                 :
                                 :
        Complainant,             :
                                 :
                                 :
        v.                       : EEOC No.  100-A2-8041X
                                 : Agency No.  WBR 00005
GALE NORTON, SECRETARY           :   00023, 01021, 02030
UNITED STATES DEPARTMENT         :
OF THE INTERIOR,                 :
                                 :
        Respondent.              : Volume 4
-------------------------x

                        1849 C Street, NW.
                         Washington, D.C.

                    Thursday, March 4, 2004


        The HEARING in this matter

continued at 8:44 a.m. pursuant to notice.

BEFORE:

        RICHARD E. SCHNEIDER

        Administrative Judge

910 17th Street, NW, Suite 200
Washington, DC 20006
info@betareporting.com
betareporting.com


Beta
COURT REPORTING

p. 202.638.2400
f. 202.833.3030
1.800.522.BETA (2382)

1191

1    Q    The O&M report, with respect to

2    the finality of that report, as you

3    testified, upper management's decision,

4    approximately how many team members did you

5    have?

6    A    Gosh, 12 or 13 team members.  I

7    forget now.

8    Q    Going back -- last question for

9    you -- what is your weight?

10    JUDGE SCHNEIDER:  I'm sorry.

11    Weight?

12    MR. WALTON:  Yes.

13    THE WITNESS:  118, 119 pounds.

14    MR. WALTON:  No further questions,

15    Judge.

16    JUDGE SCHNEIDER:  Any cross?

17    FURTHER RECROSS EXAMINATION

18    BY MS. ARMSTRONG:

19    Q    Ms. Cochise, you were suppose to

20    meet with Mr. Kenney in August of 1999 to

21    discuss the Indian O&M report.

22    MR. WALTON:  Objection, Judge.