Exhibit A

1      A.    1990.

2      Q.    Oh, you said 1990?

3      A.    Yes.

4      Q.    Sorry.  I heard '94.

5      A.    I might have said '94.  I meant 1990.

6      Q.    Okay.  So the federal government.  What was your

7   first job with the federal government?

8      A.    I believe it was a Program Specialist with the

9   Office of Trust Responsibility, Division of Natural Resources,

10  Irrigation and Power -- it's a branch of Irrigation and Power

11  and Safety of Dams.

12     Q.    Department of Interior?

13     A.    Department of Interior.

14     Q.    And the division was called Office of Dams or

15  something?

16     A.    It was a branch of Irrigation and Power and Safety

17  of Dams.

18     Q.    And how long were you there?

19     A.    Over two years.

20     Q.    And what grade did you start with the federal

21  government?

22     A.    GS-9.

23     Q.    Okay.  And were you promoted while you were there?

24     A.    Yes.  I was promoted to an 11.

25     Q.    As a Program Specialist 11?

Exhibit B

36

1   area?

2        A.    Yes.

3        Q.    And when did you meet Mr. Kenney?

4        A.    The first time I met Mr. Kenney was probably in the

5   early '90s.

6        Q.    Oh, early '90s.

7        A.    Yes.

8        Q.    And what were the circumstances of that?

9        A.    A mutual friend introduced us.

10       Q.    And when you came to the Bureau of Reclamation, that

11  would have been roughly '96?

12       A.    '97.

13       Q.    '97.   '97 was when you came?

14       A.    Correct.

15       Q.    When in '97?

16       A.    August.   It was like the last week in August of '97.

17       Q.    And then Willy was your supervisor, but then he left

18  and who became the supervisor.

19       A.    Who became a supervisor?   The Grand Cooley Power

20  Office was going through a --

21       Q.    No, I'm talking about when you came back in August

22  of '97.

23       A.    Oh, Chris Kenney became my supervisor.

24       Q.    And had he been the supervisor before?

25       A.    Had Chris supervised me before?

1    Q.   Or was he a new supervisor?

2    A.   No.

3    Q.   You said Willy was your supervisor.  I just want to

4  know how that -- was Chris Kenney new to the operation?  Was

5  he your second line supervisor over this guy Willy?

6    A.   When I was out in -- at the Grand Cooley Power

7  Office, my first line supervisor was Willy and Steve Clark was

8  my second line supervisor.  In August of '97 I accepted a

9  position in the Commissioner's Office in the Native American

10  Affairs Program, and Chris Kenney was my first line

11  supervisor.

12    Q.   And that was a position that you didn't have to

13  interview for?  They just looked at your resume.

14    A.   No.  Chris did interview me.

15    Q.   Oh, okay.  So you were hired by Chris?

16    A.   Into which position are you --

17    Q.   I don't know.  You better explain to me what

18  position you were hired into when he interviewed you.

19    A.   When who interviewed me?

20    Q.   Mr. Kenney.

21    A.   Mr. Kenney?  The position I applied for was a Policy

22  Analyst position within the Native American Affairs Program,

23  and I applied for the job, interviewed for the job.  I believe

24  that the job had been -- I don't know if it was readvertised

25  or not.  I believe it was.  And I'm not quite sure how many

Exhibit C

A.    Dates: August 25-29, 1997

Background: The Native American Affairs Program held a "Team Building Workshop" in San Francisco, CA. This workshop was designed to develop a vision and mission statement. The group was also to develop guiding principles.

Activity: The evening of Wednesday, August 27, 1997, I observed Lynne Davis, co-worker, Program Analyst, Native American Affairs Program, verbally assault Mrs. Debbie Saint, in the hotel lobby. When I mentioned this incident to Mr. Kenney, he smiled and said "she had it coming". I was then instructed by Mr. Kenney and Barbara White, to disassociate myself from Mrs. Saint and use other resources at all cost.

August 28, 1997, sat next to Ramona Saunders, Deputy Program Manager, Lower Colorado during the workshop. Was further instructed by Mr. Kenney and Barbara White, to also disassociate myself from Mrs. Saunders as she was not a team player and could not be trusted. Mrs. Saunders was a member of Self Governance - Construction rule making working group where she was first observed and caught passing on confidential information to the tribe.

Mr. Kenney introduces Mrs. White, not as a co-worker, but as a personal friend. They are observed together; frequently sitting beside one another, during meetings and after hours. Mr. Kenney always displays preferential treatment to Mrs. White; assuring her every need, including assisting her with her chair and coat.

The fact I demonstrated independent thinking, by choosing to remain neutral re disagreements between Mr. Kenney and Mrs. Saint, I was condemned and treated differently than those not in my protected class(es).

B.    Dates: September 25-26, 1997

Background: I was assigned to assist in the development of the guiding principles.

Activity: The work team consisted of Bill Steele, Barbara White and myself. I was told for a second time, by Barbara White, that it would not be a good idea to work with Bill Steele. She said that "Chris did not see how his involvement would be beneficial". She strongly suggested we finalize the work without Bill Steele. Mrs. White concluded with, "Take this as a warning. *Do not speak or associate with anyone who has rubbed Mr. Kenney the wrong way.*" (Emphasis added)

The fact that I demonstrated independent thinking and judgment resisting Mrs. White's recommendation I was shunned and excluded as a member of the team.

C.    Dates: October 8-10, 1997

Background: Western States Water Council & Native American Rights Fund, Symposium in Phoenix, AZ.

Activity: During the symposium Mr. Kenney arranged to have lunch with some Program Managers and staff members. During lunch Mr. Kenney discussed intimate details of Lynn Davis's home life. Mr. Kenney disclosed problems she has had with her 3 children, further stating Mrs. Davis's daughter was pregnant at 14 or 15 yrs old, had an abortion, only to get pregnant again. I felt extremely uncomfortable with this discussion

I expressed that Mr. Kenney should not judge an individual, because she had a child so young or criticize how Mrs. Davis chose to raise her children. I stated I felt this discussion was inappropriate to Mr. Kenney. He disapproved of my comment and later that day requested I keep my comments to myself.

The fact that I demonstrated independent thinking, remained non-judgmental, I was shunned, excluded as a member of the team, and treated with disdain.

D.    Dates: November 14, 1997

Background: Earlier in the week, November 12-13, 1997, I attended two day training session on P.L. 93-638 and Self Governance, Interior Building, Washington, D.C.

Activity: The afternoon of November 14, 1997, Mr. Kenney summoned me into his office and confronted me re an allegation of inappropriate behavior during the training session. What I head Mr. Kenney say was "several individuals had complained about my behavior and conduct", further stating that I asked too many questions. I attempted to explain that my impression and understanding of training was to ask questions. Mr. Kenney disagreed further stating Barbara White coordinated and planned the training sessions and Ms. White indicated she did not appreciate my behavior as it gave the appearance I was not supportive of the program.

Following this meeting with Mr. Kenney, my co-workers avoided and rejected me. I was ignored when I asked questions and my questions were left unanswered. I was condemned and treated differently than those not in my protected class(es).

E.    Dates: January 19-30, 1998

Background: Ramona Saunders was detailed to Reclamation's Washington DC office, Lower Colorado Liaison position for two weeks.

Activity: Mr. Kenney asked on more than one occasion why I was having coffee with Mrs. Saunders. Mr. Kenney requested I avoid contact with Mrs. Saunders.

9

The fact that I demonstrated independent thinking, choose to be non-judgmental to another co-worker, choose to converse, interact, and request input and/or recommendations from an individual Mr. Kenney disliked, I was condemned and treated differently than those not in my protected class(es).

F.    Dates: March 3, 1998

Background: The Commissioner was planning a trip to Rapid City, S.D., April 29 & 30, 1998, to meet with the Standing Rock Sioux Tribe. I was called by Dave Archambuld, Tribal Council Member and Vice Chairman of the Secretary's Task Force on Water Rights Funding. Mr. Archambuld invited me to the meeting in Rapid City, S.D.

Activity: Mr. Kenney informed me that he was called by Dave Archambult. Mr. Archambult had extended a personal invitation to me to attend the meeting in Rapid City, SD, at the end of April. Mr. Kenney was very upset about this invitation, he specifically asked me not to solicit support from the tribes, for meetings. This was his decision and he did not appreciate the tribes calling on my behalf. I explained "I have no control over who the tribes wishes to invite. Nor do I have the control over who they contact to get support for my attendance."

The silent treatment continued by Mr. Kenney and co-workers. During staff meetings, my opinions were discouraged. I was treated as if I was non-existent or invisible.

G.    Dates: March 10, 1998

Background: Staff meeting on internal structure.

Activity: Mr. Kenney appointed John Peterson the office point person when dealing with Office of Policy, with Bill Steele the point person when Office of Policy was dealing with Native American Affairs. It was agreed by both offices to share information. Mr. Steele would have a standing invitation to our Monday morning staff meetings. Following the meeting, Mr. Kenney made derogatory remarks about Mr. Steele. Mr. Kenney informed the staff to avoid Mr. Steele.

The fact that I demonstrated independent thinking, remained non-judgmental of another co-worker, refused to ridicule another co-worker, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es)

H.    Dates: March 12, 1998

Background: Meeting with Office of Policy and Regional Program Managers in Denver, CO.

10

On Thursday, afternoon, I returned approximately 45 minutes late to the meeting. After I sat down, I instantly knew something was wrong. Jackie Murphy, Acting Program Manager, Upper Colorado, that Mr. Kenney was very upset at me. During the break I asked Mr. Kenney if there was something wrong. He refused to respond to me. However, it was clear he discussed the problem with the entire group as I again, received the cold shoulder treatment from my fellow co-workers.

That evening I had coffee with Mrs. Murphy and what I heard her say was "Mr. Kenney was not acting professional, he was irritated because he had a hang-over."

Mr. Kenney introduces Mrs. White, not as a co-worker, but as a personal friend. They are observed together; frequently sitting beside one another, during meetings and after hours. Mr. Kenney always displays preferential treatment to Mrs. White; assuring her every need, including assisting her with her chair and coat.

The fact that I did not socialize after hours, drink, have dinner with Mr. Kenney and other co-workers, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es)

I.    Dates: April 20, 1998

    Background:  Monday staff meeting

    Activity:  Barbara White mentioned a 638 issue with the Kickapoo Tribe, she said "we have a poo- poo problem with the Kickapoo tribe." I was offended and humiliated by the remark. I was dismayed that Mr. Kenney did not address the inappropriateness of the remark - he simply laughed and continued the meeting. Being Native American, I understood the ramifications of the insensitivity of the remark. I did not immediately bring this to Mr. Kenney's attention, as I determined a private meeting was more appropriate. Privately, we could discuss other disrespectful remarks made by Mrs. White.

    The fact that I demonstrated independent thinking by viewing the comment distasteful, not amusing, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es)

J.    Dates: October 19-21, 1998 - Reclamation's Native American Affairs Workshop

    Background: Reclamation's Native American Affairs Workshop, San Diego, CA.

    Activity: All policy analysts were invited to participate in the workshop. I was not included in any of the planning sessions and I was the only policy manager not invited to "open up" any of the sessions.

11

Mrs. Davis asked Mr. Kenney on three different occasions if I was to be included in the workshop.   I was told by Mrs. Davis that Mr. Kenney did not want me to participate at the workshop, stating, "absolutely no, her name is not to be anywhere on the agenda."

The fact that I was portrayed not as a team member, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es)

K.    Dates: Fall 1998 - EEO counseling

Background: Sought out EEO counseling with Sarita Davis-McIver.

Activity: Met with Mrs. Davis-McIver in the main Interior building, 7th floor, conference room located directly across from Reclamation's mail room.  I was later informed by Mrs. Lynne Davis, that Mrs. Davis-McIver had discussed and disclosed my meeting with the entire Native American Affairs staff members.

It was my understanding this meeting was confidential and all information would be considered "classified.  I was later told, Mrs. Davis-McIver was a close friend of Mrs. Davis, and she released all the information from the meeting to Mrs. Davis and Mr. Kenney.

The fact that I participated in EEO counseling, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es)

L.    Dates: January 8, 1999 - Indian O&M Working Group Meeting

Background: Indian O&M Working Group Meeting, Salt Lake City, Utah

Activity: Mr. Kenney met with the members of the Working Group.  During this meeting Mr. Kenney described the three Regional Directors (Todd, Calhoun, and Johnson) attending the meeting as "the three Amigos".  During the break I mentioned to Mr. Kenney, I felt the comment was derogatory and unprofessional.

The fact that I demonstrated independent thinking by choosing to determine this remark distasteful, not amusing, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

M.    Dates: April 2, 1999 - Meeting with lobbyist for Jicarilla Apache Tribe

Background: The Jicarilla Apache tribal lobbyist, Shenan Actitty, came into to meet with Reclamation, I was asked by Mrs. Actitty to attend the meeting scheduled with Steve Magnussen.  After the meeting with Mr. Magnussen everyone agreed we would have a short meeting to wrap up any additional questions Shenan Atcitty had.  During the wrap

12

up session, Mr. Johnson acted disrespectful towards me. At the end of the session I was asked by Mrs. Actitty why Mrs. Johnson treated me in this manner. Mrs. Actitty was very disturbed by this behavior. I apologized for Mrs. Johnson behavior.

The fact that I demonstrated independent thinking by determining this behavior intentionally disrespectful, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

N.     Dates: April 8, 1999 - Raised issue of Hostile Work Environment because of race (Native American) with Reclamation EEO counselor.

Background: I requested mediation to resolve the issues between Mr. Kenney and myself. Between April and June 1999, Mr. Kenney spoke no more than a couple of words to me. At the time of my request, Mr. Kenney was not speaking to me. I was given the silent treatment by most of the co-workers. The more daring co-workers spoke with contempt and in an unprofessional manner.

The fact that I sought and participated in EEO counseling, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es)

O.     Dates: June 2-3, 1999 -Mediation

Background: Raised the issue of: (1) hostile work environment; (2) confidentially; (3) inappropriate behavior on the part of Mr. Kenney and Mrs. White; (4) inappropriate remarks concerning co-workers and other Reclamation staff; (5) Rotating the Acting position; and (6) Mr. Kenney's failure to approve my career-ladder promotion to Policy Analyst, GS 14.

P.     Dates: September 3, 1999 - Unwillingness to support Mr. Kenney nomination for Diversity Award

Background: The members of the Native American Affairs Office were nominating Mr. Kenney for Commissioner's Workforce Diversify Award. I was unwilling and refused to support Mr. Kenney for this award.

The fact that I was unwilling to support the nomination of Mr. Kenney for this award, I was chastised, condemned and treated differently by my co-workers.

Q.     Dates: September 27, 1999 - Conduct NAAO Secretary

Background:  My leave and earning statement did not reflect credit hours earned during pay period #19, August 29 - September 11, 1999. I requested, Mrs. Madalena, the secretary, provide me a copy of my time and attendance (T&A) for that timeframe.  I was

13

notified that half of my files (pay period #8 to pay period #20) were missing. Mrs. Madalena expressed concern, inquiring "Who would be so interested in your T&A?" It was further stated that as of Friday, September 24, 1999, my time and attendance file was completed and in the office.

I was the only individual with T&A files missing. Mrs. White was Acting Director during this time frame. Furthermore, Mrs. Madalena withheld important information about earned credit hours. Via September 29, 1999, E-mail, Mrs. Madalena acknowledged this via e-mail message dated September 29, 1999, and apologized for not keeping me informed about such transactions.

The fact that I demonstrated independent thinking by determining this behavior intentionally disrespectful, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

R.    Dates: November 1999

Background: Conduct NAAO Secretary

Activity: I was told my LaVerne Hill, co-worker, Program Analyst, Native American Affairs, that Mrs. Madalena recommended Mr. Kenney fire Lynne Davis and promote her (Mrs. Madalena) into that position. I mentioned this to Mr. Kenney and he denied such a discussion taking place.

The fact that I demonstrated independent thinking by determining this behavior intentionally disrespectful, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

S.    Dates: November 24, 1999 - Discussion with Barbara White

Background:    I was informed by Mrs. Davis, Mrs. White once again questioned re my having a vehicle during the trip to Jemez Pueblo, New Mexico. Although other staff members rented vehicles for this trip, I was the only one questioned concerning the use of my vehicle during this trip. I asked why was this so important to Mrs. White? Mrs. Davis replied, Mrs. White feel you travel to much and you do not need a rental car. Mrs. White has always questioned your travel. I was confused by this, Mrs. White has never directly asked me questions about travel.

This was very interesting, while Mrs. White was going through her divorce, Mr. Kenney granted her liberal travel. Mr. Kenney allowed her to be out of town when ever she felt necessary to be away from her husband. This liberal travel included the use of a vehicle.

Once back in the office, it just so happen she was acting for Mr. Kenney, I asked Mrs.

14

White if she had any questions/concerns of my use of a car during travel to Albuquerque, New Mexico. Mrs. White became defensive and responded "You had better be nice to me or else." I responded by asking "Or else what". Mrs. White also responded with "I will not be signing any more of your travel."

The fact that I queried Mrs. White, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

T.    Dates: November 30, 1999 - Raised issue of Hostile Work Environment because of race (Native American) with Reclamation EEO counselor.

Background: Placed a telephone call to EEO official.

U.    Dates: December 6, 1999 - Wrote letter to Mr. Kenney

Background: Wrote letter to Mr. Kenney re the allegation that I released vital confidential budget information to the Chippewa Cree tribe of the Rocky Boy Indian Reservation, specific to their Water Right Settlement and Water Supply Act of 1999. I clearly denied this allegation. I felt Mr. Kenney was placing doubt (both internally and externally) on my credibility and integrity. Although, I have repeatedly requested Mr. Kenney address issues with me first, he, again, proceeded to discussed this issue with everyone on the office. I was concerned with his action and requested that the EEO process be revisited since this was a clear violation of our agreement signed June 4, 2000.

Mr. Kenney issued a letter of counseling on December 10, 1999. I deem the letter of counseling is reprisal for my prior EEO activities.

The fact that I demonstrated independent thinking by determining , his behavior intentionally disrespectful, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

V.    Dates: January 25-26, 2000 - Meeting with Mni Sose Water Rights Coalition

Background: Mr. Kenney made a presentation to the Coalition. During this presentation Mr. Kenney provided the Coalition with confidential FY 2001 Reclamation budget information. I mentioned to Mr. Kenney that the FY 2001 budget information should be excluded as the President has not presented his budget to Congress. Mr. Kenney was very upset about my comment. When I returned to the office, I asked Lou Manley, Reclamation Budget Office, if approval was necessary to release FY2001 budget figures. Mr. Manley responded that this information could not be released until the President delivered his budget to Congress in February.

The fact that I demonstrated independent thinking by determining this behavior

15

intentionally disrespectful, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

W.    Dates: February 8, 2000 - Meeting with BIA/BOR on Pueblo Rehabilitation Report

Background: Informed Mr. Kenney, Sharon Blackwell, Special Assistant to Assistant Secretary BIA, left message on my voice mail requesting you to re-schedule your meeting with Robert Barker, Albuquerque Area Office Director. Mrs. Blackwell implied that this meeting would be premature and it would better serve both Bureau's if rescheduled to a later date.   This would provide the Commissioner, Eluid Martinez and Assistant Secretary, Bureau of Indian Affairs, Mr. Kevin Gover an opportunity to discuss and accept the Pueblo Rehabilitation Report.

Mr. Kenney was clearly displeased with this. His face turned red, he begin to shake. He pointed his finger directly at me as though this was somehow my fault. What I heard Mr. Kenney say "I will not reschedule this meeting for anyone, get in touch with Mrs. Blackwell and tell her "NO"". As instructed, I informed Mrs. Blackwell.

The fact that I determined his gesture threatening and his actions intentionally disrespectful, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

X.    Dates: February 11, 2000 - Meeting with Mr. Kenney, Performance Rating

Background: I met with Mr. Kenney (approximately 5 minutes) to discuss my performance rating.  I explain that due to the current situation and my EEO complaint, I would not sign my performance appraisal.

In May 2000, I was provided a copy of my performance appraisal. I noted Mr. Kenney had written a comment in the PE stating "that he had discussed, as well as taken actions to improve my performance for the coming year."  This discussion did not take place in my presence.

The fact that I demonstrated independent thinking by my assertion that his comments were blatant lies which evidenced intentional disrespect, I was condemned and treated differently by Mr. Kenney than those not in my protected class(es).

Y. .   Dates: February 29, 2000 - Filed formal complaint of discrimination with Department of Interior.

Background #1: Formal complaint of discrimination against the Bureau of Reclamation, Department of Interior, on the basis of race (Native American), and in reprisal for my prior EEO complaint activities (sought counseling and mediated complaint beginning on

16

April 8, 1999). Complaint included the following.

First, I am the only member of the Policy staff that is Native American. The Agency created and perpetuated a hostile work environment based on race and reprisal, through the actions of my immediate supervisor, Christopher Kenney, and a co-worker, Ms. Barbara White. The work environment has become hostile through the repeated failure of my immediate supervisor to communicate with me on matters concerning my performance and my employment, and through Mr. Kenney's granting of preferences and favoritism in assigning work and responsibilities to other similarly-situated employees not im my protected class(es). Most recently, as discussed below, this work environment has manifested itself in Mr. Kenney's issuance of a Letter of Counseling to me on December 10, 1999.

Second, the Agency has committed an ongoing practice of discrimination and reprisal through its repeated failure to promote me to the next grade level. I was hired three years ago as a Policy Analyst GS 13/14, and I am the only remaining GS-13 Policy Analyst in this Office despite my positive performance record, and record of accomplishments. Other Program Analyst in our Office are graded at the appropriate GS-14 level. I consider this to be a continuing violation of my civil rights based on my race (Native American) and in reprisal for my prior informal complaint activities.

Third, I believe I was discriminated against on the basis of my race and in reprisal for my prior EEO activities when my immediate supervisor, Mr. Kenney, issued me a Letter of Counseling on December 10, 1999. The Letter of Counseling was based on a number of allegations of misconduct concerning my interactions with colleagues in the Office - allegations which I deny - and as to which Mr. Kenney failed to discuss even the underlying alleged incidents with me before he issued me the Letter on December 10, 1999. I believe that the Letter of Counseling was issued to me as a show of favoritism for other Office employees not in my protected classes, including Ms. Barbara White.

Finally, I believe that I was discriminated against when I was issued an annual performance appraisal on February 11, 2000. The rating, while showing an overall "Achieved" level of performance, contained a remark that I disagree with. Specifically, Mr. Kenney stated in the narrative that, "Additional work in analysis and documentation is needed to be a full performance." Mr. Kenney failed to discuss his apparent concern about analysis and documentation, or any of the rated aspects of my performance with me prior to issuing the rating. I don't believe that other similarly-situated members of our Office were provided ratings the basis of which were not discussed with the employee beforehand.

Background #2:  Mr. Christopher Kenney, my supervisor, breached our agreement. Specifically, Mr. Kenney has consistently failed to communicate apparent concerns about my conduct prior to issuing a Letter of Counseling on December 10, 1999. Mr. Kenney

also failed to communicate with me regarding apparent concerns about my performance, as evident by his narrative to my annual performance appraisal report, issued February 11, 2000.

Exhibit D

Chris Kenney, Director-
Bureau of Reclamation
Native American Affairs Program
1849 C Street NW, MS 7542 MIB
Washington, DC 20240                                   December 6, 1999

Dear Mr. Kenney,

This letter is in reference to the Equal Employment Opportunity, (EEO), resolution
Agreement between the Bureau of Reclamation, (BOR), and myself, signed June 4, 1999. In the
Agreement, both parties agreed to: (1) Talk to each other when either perceives something the
other does as offensive. I feel you are once again in direct violation of the signed agreement.

It was brought to my attention, on Monday, December 6, 1999, by the Program, Budget,
and Liaison Group that you alleged that I released vital "confidential" FY 2000 and FY 2001
budget information to the Chippewa Cree Tribe of the Rocky Boy Indian Reservation, in
reference to their Water Rights Settlement and Water Supply Enhancement Act of 1999. This
allegation is incorrect. You have made it very difficult to have credibility, internally and
externally, when these allegations are made. I am very disappointed and concerned with this
behavior. This behavior is what initially started the EEO process.

In accordance with 29 C.F.R. 1614.504, I will be petitioning the Agency to implement the
terms of the aforementioned Agreement or to reopen the pre-complaint for processing under the
terms of Agreement. The aforementioned request will be made in writing to the Director, Office
for Equal Opportunity, U.S. Department of the Interior.

Sincerely,

*/s/ René Cochise 12/6/99*
René L. Cochise
BOR Native American Affairs Office
Policy Analyst

cc: Steve V. Magnussen, W-6000
    Director Operations

    Lorraine Bobian, D-4700
    Equal Opportunity Specialist

    Anna Samour, D-2600
    Equal Opportunity Counselor



EXHIBIT

2-1a

Page 1 of 1

Chris Kenney, Director
Bureau of Reclamation
Native American Affairs Program
1849 C Street NW, MS 7542 MIB
Washington, DC 20240

December 6, 1999

Dear Mr. Kenney,

This letter is in reference to the Equal Employment Opportunity, (EEO), resolution Agreement between the Bureau of Reclamation, (BOR), and myself, signed June 4, 1999. In the Agreement, both parties agreed to: (1) Talk to each other when either perceives something the other does as offensive. I feel you are once again in direct violation of the signed agreement.

It was brought to my attention by the Program, Budget, and Liaison Group that you alleged that I released vital FY 2000 and FY 2001 budget information to the Chippewa Cree Tribe of the Rocky Boy Indian Reservation, in reference to their Water Rights Settlement and Water Supply Enhancement Act of 1999. This allegation is incorrect. You have made it very difficult to have credibility, internally and externally, when these allegations are made. I am very disappointed and concerned with this behavior. This behavior is what initially started the EEO process.

In accordance with 29 C.F.R. 1614.504, I will be petitioning the Agency to implement the terms of the aforementioned Agreement or to reopen the pre-complaint for processing under the terms of Agreement. The aforementioned request will be made in writing to the Director, Office for Equal Opportunity, U.S. Department of the Interior.

Sincerely,

René L. Cochise
BOR Native American Affairs Office
Policy Analyst

cc: Steve V. Magnussen, W-6000
    Director Operations

    Lorraine Bobian, D-4700
    Equal Opportunity Specialist

    Anna Samour, D-2600
    Equal Opportunity Counselor

## RESOLUTION AGREEMENT BETWEEN
## BUREAU OF RECLAMATION AND RENE COCHISE

On April 8, 1999, Employee raised the issue of hostile work environment because of Employee's Race (Native American).

This Settlement Agreement (hereinafter "Agreement") is made and entered into voluntarily between Rene' Cochise (hereinafter "Employee") and the Bureau of Reclamation, U.S. Department of the Interior (hereinafter "Agency"). Accordingly, under the authority of Title VII of the Civil Rights Act of 1964, the Agency and Employee each agree to the following actions.

A. To effect a more comfortable and productive work relationship, employee Rene' Cochise and supervisor Chris Kenney agree that they will:

1. Talk to each other when either perceives something the other does as offensive;

2. Take the initiative to communicate with each other whenever appropriate -- or when in doubt about whether to communicate;

3. Meet on August 31, 1999, to dialogue on Rene's analytical skills as reflected in the completed Indian O & M report; and

4. Go to the other person for discussion when they have concerns about that person's behavior or actions.

B. Except as provided in paragraph C.4 (below), Ms. Cochise shall not institute or cause to be instituted any complaint or other action against the Bureau of Reclamation or the Department of the Interior, their agents or employees, including civil court litigation, concerning the issues presented to the EEO Counselor and resolved by this agreement -- or any other matters which occurred **prior to** the signing of this agreement.

C. By signing this agreement, Chris Kenney and Rene' Cochise acknowledge that they are entering into this agreement voluntarily and without coercion of any kind, that they have had sufficient opportunity to seek legal counsel, and that they understand and will abide by all the terms described herein.

1. This Agreement constitutes the complete understanding between the Employee and the Agency. No other promises or agreements shall be binding unless in writing and signed by both parties.

2. The parties agree that this Agreement shall not be construed as an admission of discrimination by the Agency. The parties further agree that the terms and conditions of this Agreement shall remain confidential, except to those officials necessary to implement its terms. The parties agree that this Agreement may be used as evidence in a subsequent proceeding in which either of the parties alleges a breach of this Agreement.

3. It is understood by both parties that the aggrieved person shall be free from restraint, interference, coercion, discrimination, or reprisal because of participation in the Equal Employment Opportunity discrimination complaint process, and that if the aggrieved person believes she is so subjected she may contact an EEO Counselor within 45 days of the incident.

4. It is understood by both parties that if the actions identified above are not carried out as specified or if they are in any way rescinded, the Employee may, in accordance with 29 C.F.R. 1614.504, petition the Agency to implement the terms of this Agreement or to reopen the pre-complaint for further processing from the point processing ceased under the terms of this Agreement. This request shall be made in writing to the Director, Office for Equal Opportunity, U.S. Department of the Interior, within 30 days of when the Employee knew or should have known of the alleged noncompliance.

_____     6/4/99
Rene' Cochise                       Date
Policy Analyst

I certify that I have the authority to enter into this Precomplaint Resolution Agreement on behalf of the Agency, and that the terms and conditions contained herein are agreed to by the Agency.

_____     6-4-99
Chris Kenney                        Date
Chief, Native American Affairs Office

Reviewed by:

_____     _____
Sheila Kenney                       Date
Equal Opportunity Manager

Exhibit E

# AFFIDAVIT

Location: Washington, DC

I, Christopher L. Kenney, being first duly sworn on oath make the following statement freely and voluntarily to Johnie McCoy who has identified himself to me as an EEO investigator, Southwind Enterprises, Inc. assigned by the Bureau of Reclamation to perform this investigation, knowing this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties.

This statement is given in relation to a complaint of discrimination filed by Rene' Cochise.

I am aware the accepted claims in this complaint, as stated by Ms. Cochise, are:

**WBR-00-005**

*I allege discrimination on the basis of race (Native American) and reprisal for my prior participation in the EEO counseling process when:*

> *From August 25-29, 1997, and of currently, actions taken by my supervisor Chris Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to me and actions taken by a co-worker Barbara White have created a hostile work environment.*

**WBR-00-023**


*I allege discrimination on the basis of race (Native American) and reprisal for my prior participation in the EEO complaint process (prior complaint Docket Number WBR-00-005). I claim the following actions/incidents by Mr. Christopher Kenney and Ms Barbara White have created a hostile work environment:*

INITIAL 

1.  Because of the situation between me and my supervisor Chris Kenney, I have not been promoted to Policy Analyst GS-301-14.

2.  On March 6, 2000, I was assigned by Mr. Kenney to write a "white paper" on the database and upon completion of the assignment by me, Mr. Kenney provided criticism in an unprofessional manner to other staff members about the completed assignment.

3.  On March 9, 2000, I was issued a directive by Mr. Kenney, instructing me not to meet with any Indian tribes unless approved by Mr. Kenney first.

4.  On March 28, 2000, when I was Acting for Mr. Kenney, all correspondence were not provided to me but placed in Mr. Kenney's locked office (to which Mr. Kenney's Secretary had access) and I was unable to fulfill my duties as Acting Director.

5.  On April 14, 2000, Mr. Kenney requested a meeting between him and me with a co-worker present as his witness and denied my request for representation.

6   On April 25, 2000, I was issued a directive by Mr. Kenney which suspended my open travel authorization.

7.   On April 28, 2000, I was issued a Letter of Reprimand.

8.  On April 28, 2000, Mr. Kenney denied approval for payment of my travel voucher and lunged toward me and physically removed the travel voucher I was holding.

9.  Mr. Kenney consistently fails to allow me reasonable time frames for completion of assignments; withholds information on work assignments that are time sensitive; and grants personal preferences and favoritism of work assignments and other responsibilities to similarly situated employees not in my protected class.

INITIAL _C.=-/c_

1. **Please state for the record your full name.** Christopher L. Kenney
2. **Please state your title and grade.** Director, GM15
3. **Please state the name of the organizational unit to which your are assigned, the name of the organization for which you work, and the address of your duty station.** Unit, Organization, and Address: Office of Native American Affairs, Operations, Bureau of Reclamation, Washington, DC
4. **Please state how long you have worked for this organization and for the federal government.** My service date is August 1976 - I began work with the Bureau of Reclamation in August, 1982
5. **How long have you held your current position? What are the names and titles of your first and second line supervisors?** I have been Director of the Office of Native American Affairs since March, 1995. My first line supervisor is Mr. Larry Todd, Director, Operations, and my second line supervisor is the Commissioner, Bureau of Reclamation
6. **Please state for the record your race and whether you have engaged in prior EEO activity (entering counseling, talking to a counselor or investigator in complaint of another, filing a complaint, protesting alleged discriminatory practices, etc.)** My race is Caucasian. I have been involved in providing responses for a preliminary investigation.
7. **How long have you known the complainant? Do you have or did you have a working relationship with her? If so, please describe the working relationship.** I have known Ms. Rene' Cochise since August 1997. From that time, Ms. Cochise has been an employee of the Bureau of Reclamation in the Office of Native American Affairs, reporting to me, as her first line supervisor. Prior to that time, I did not have a working relationship with Ms. Cochise.

## WBR-00-005

Complainant alleges discrimination on the basis of race (Native American) and reprisal for her prior participation in the EEO counseling process when:

From August 25-29, 1997, and of currently, actions taken by her supervisor Chris Kenney, ie., when on December 10, 1999, a letter of counseling was issued to Complainant and actions taken by co-worker Barbara White have created a hostile work environment.

With regard to the allegations of discrimination and harassment since August 25-29, 1997, I have no memory of any of the issues or actions to which Ms. Cochise refers before I was formally notified by Reclamation's EEO office in the spring of 1999 that Ms. Cochise had file a formal complaint. Therefore, I had no knowledge of Ms. Cochise's discussions or complaints to the EEO prior to notification by the EEO office in the spring of 1999. Further, prior to the mediation of June 1999, Ms. Cochise had never expressed any concern to me regarding harassment or discriminatory practices. In fact, until Ms. Cochise's complaint in the spring of 1999, I had no indication that Ms. Cochise was concerned about her situation in the Office of Native American

INITIAL _C-K_

Affairs. In addition, I have never received any indication from upper management of any complaints by Ms. Cochise.

I issued a Letter of Counseling to Ms. Cochise on December 10, 1999, which was precipitated by Ms. Cochise's behavior and conduct towards Ms. Barbara White who was acting Director of the Office of Native American Affairs. By way of background, the Office of Native American Affairs was conducting a program meeting in New Mexico. As part of the meeting, all of the staff was invited to participate with members of the Jemez Pueblo in the pueblo's annual festival. During that trip, I observed that Ms. Cochise was driving a rented car that was larger than compact car. While Native American Affairs staff is authorized to rent cars while on travel, Reclamation policy requires rentals should be compact cars unless there is justification for the larger car. In that regard, others on my staff had rented large cars because the renters were providing transportation for other staff members. In Ms. Cochise's case, she was alone and lodging a significant distance from all other staff members. Because Ms. White would be acting for me in the period after the New Mexico trip, she would be required to approve travel vouchers submitted by staff from the New Mexico trip. I instructed Ms. White to be attentive in reviewing Ms. Cochise's travel voucher to insure that Ms. Cochise either submitted reimbursement for a compact car rate, or that the submittal contained justification for the larger rental car. Ms. White reviewed Ms. Cochise's travel voucher and found a submittal for the higher large car rate with no justification for the larger rental car. Ms. White ask Ms. Cochise to either adjust the travel voucher request, or provide a justification for the higher cost. Ms. Cochise became belligerent and insubordinate to Ms. White and initially refused. Ms. Cochise subsequently provided an acceptable justification. However, because Ms. White would not approve the travel voucher immediately, Ms. Cochise, again, insulted and antagonized Ms. White. Ms. White found the voucher in my inbox the next day and signed it. Ms. White reported to me on the interaction that transpired between her and Ms. Cochise. After consulting with Ms. Betty Johnson, who witnessed the exchange between Ms. White and Ms. Cochise, I had a discussion of the incident with Ms. Cochise, at which she admitted that she had been angry and expressed frustration that I was allowing Ms. White to improperly influence my decisions. I informed Ms. Cochise that I had expressly instructed the review of her travel voucher. Ms. Cochise responded that I did not know how to manage an office or people. I told her that she was entitled to her opinion, but Reclamation policy had to be followed. From those inquiries, it was my conclusion that a Letter of Counseling was appropriate. While this incident was not the first time that Ms. Cochise had provoked her fellow workers, I felt that such an unofficial low-level form of discipline would be sufficient to communicate to Ms. Cochise that such continued misconduct would not be acceptable. It was my hope that she would see such an action as a call for a self-evaluation and a change in her behavior.

I would recommend that Ms. White and Ms. Johnson be contacted for their observations of the incident.

I have attached copies of the letter of counseling, and two emails provided to me by Ms. White under Tab 1.

INITIAL _(signature)_

I would point out that, notwithstanding Ms. Cochise's assertions that I breached our June 4, 1999, agreement, that, in fact, she breached that agreement by not raising or indicating her concerns for all the issues she has asserted. Further, she never raised these issues with me, after I instituted a weekly meeting between her and myself for that purpose.

With regard to the allegation related to the Chippewa-Cree budget question, my memory of the events are somewhat different. Ms. Tammy White (Tammy) made an inquiry regarding a response to budget questions from the Department. At that time, the Chippewa-Cree Settlement was recently authorized, and I and Ms. Barbara White (Barbara) had been extensively involved with its implementation. One of the sensitive and difficult questions in the implementation was the quantity of funding to be identified in the current budget and future budgets, and how the funding would be allocated between the United States and Tribe. The question with which I was presented was whether Reclamation had included funding in the pending budget, which had been promised to the Tribe. Since it would be illegal for Reclamation to promise future funding, I concluded that the Tribe was in error, and may have misinterpreted a conversation the Tribe had with someone in Reclamation. I ask for clarification as to what conversations related to the Departmental question had transpired within Reclamation, and what was the current status. I was told by Tammy and Barbara that Ms. Cochise had made some inquiries with the Region, but the issue was still confused and further investigation was necessary. I told Tammy that I and Barbara would resolve the confusion and get back to her. Tammy ask whether she should give Ms. Cochise an update. I told Tammy that the update was not necessary, since Barbara and I had been managing the issue, we would follow the issue from there. The Department was provided an answer to its question.

Ms. Tammy White and Ms. Barbara White can provide additional information.

I have read all of Ms. Cochise's answers and comments regarding this claim. In order to respond to all of Ms. Cochise's comments would involve gross redundancy. Therefore, I believe it is more efficient to simply state that, except for the statements above, I cannot nor will not endorse the statements provided by Ms. Cochise as either truthful, proper representations of the facts, or circumstances which I recall. The above statements and answers to the questions presented are my understanding of the true facts, as I remember them.
**WBR-00-023**

**Complainant alleges discrimination on the basis of race (Native American) and reprisal for her prior participation in the EEO complaint process (prior complaint Docket Number WBR-00-005). Complainant claims the following actions/incidents by Mr. Christopher Kenney and Ms. Barbara White have created a hostile work environment:**

8.    **Because of the situation between Complainant and her supervisor Chris Kenney, she has not been promoted to Policy Analyst GS-301-14.**

At our first meeting, when Ms. Cochise first came to the Office of Native American Affairs, I verbally informed her that I would be monitoring her activities to assess her strengths and

INITIAL _C.K._

weaknesses for her duties. The intent was to provide Ms. Cochise the opportunity to exhibit her skills by assigning her special projects, which would normally be considered for the GS-14 staff of the Office. As a result, from August 1997 until Fall 1998, Ms. Cochise was assigned three projects, which provided a basis for evaluating her skills and capabilities for promotion.

The first assignment was a high visibility staff assignment to support the Water Rights Office in the Department of the Interior in its efforts to support the Federal Funding Task Force. The duties were essentially staff and logistical support for Task Force meetings. The value of the assignment was that Ms. Cochise would be working at the Departmental level in a political environment - one of the essentials for a GS-14. After approximately 2 months, Ms. Cochise reported that the Water Rights Office asked that Ms. Cochise no longer be assigned to the effort. When I ask Ms. Cochise her understanding as to why she was ask not to return, she stated that she had a personality clash with Ms. Heather Sibbison. I told her that she should drop the effort. Later, when I inquired of Ms. Sibbison as to why she had asked Ms. Cochise not return, she stated that she did not recall asking Ms. Cochise to leave, but that they were having trouble getting Ms. Cochise to inform them as to her status on projects, and getting work products from her. The Water Rights Office felt that Ms. Cochise was not dependable. Ms. Sibbison may be contacted for more details.

The second project I assigned to Ms. Cochise was to analyze and restructure the statistical information in a published document as part of a briefing to the Assistant Secretary - Water and Science on Indian water development. When I received Ms. Cochise's work product, I had to give her extensive guidance as to what should be done for the analysis.

Finally, I assigned Ms. Cochise a high visibility project requiring the management of a policy team and extensive policy analysis. The O&M team was to provide a report on the possible solutions to the question of federal funding of operation and maintenance costs on water projects constructed for Indian tribes. As the project developed, I received concerns expressed by some members of the team regarding Ms. Cochise's manner of managing the team and providing focus to the issues being addressed. As a result, I held periodic meetings to provide guidance and direction for the team. My expectation was that the report could be finished by the early Summer 1999. The final report of the team has been due since August 1999, and remains unfinished.

Subsequent to these specific assignments, Ms. Cochise was assigned responsibility for monitoring the Drought Program activities of the Bureau of Reclamation. As a part of that effort, Ms. Roseann Gonzales asked that Ms. Cochise provide her with staff support in gathering and analyzing information related specifically to tribal drought needs and federal, state, or local drought assistance currently provided to tribes. The analysis would be used in developing a Congressional Report from the National Drought Policy Commission. During that time, Ms. Gonzales consulted with me on several occasions in which she expressed frustration at Ms. Cochise's capabilities to provide work that in her opinion could be expected from a GS-13. As a result, I began to review the report, and consulted with Ms. Cochise regarding the lack of direction and focus in the report. Ms. Cochise characterized the problem as a lack of leadership on the part of Ms. Gonzales. After consultation with Ms. Gonzales, she indicated that

INITIAL _C=K_                                                                                    Page 6 of 13

Ms. Cochise had not asked any questions in response to the comments Ms. Gonzales had provided on the draft product, which led to my conclusion that Ms. Cochise has difficulties translating direction into an acceptable work product. For further information, you may contact Ms. Gonzales in our Denver office.

Ms. Cochise raised the issue of her promotion in the mediation conducted in June 1999. During those discussions, I agreed that Ms. Cochise should have a review and analysis from me, which would indicate under what circumstances I would approve her promotion to GS-14. The June 4, 1999, agreement from that mediation provided that an analysis of Ms. Cochise's analytical skills as reflected in the O&M report would provide a basis for review of all the various skills and capabilities needed for promotion. The agreement provides that a meeting would be conducted on August 31, 1999, concurrent with the conclusion of the O&M Report. It was critical to me that Ms. Cochise provide a final report so that I could use the report as a graphic and contemporary example to discuss what skills and performance would be addressed in order to approve a promotion. As the August date approached, I ask Ms. Cochise how the report was progressing. She asked that we postpone the meeting to provide her more time to finish the report. I agreed, with the proviso that we should not put the discussions off for too long. To date, Ms. Cochise has not submitted a final report. Therefore, per the provisions of the June 4, 1999, agreement, I have been waiting for Ms. Cochise to fulfill the prerequisite to which we agreed in order to continue discussions on her promotion. Since the conditions for the review are part of the negotiated June 4, 1999, agreement, I believed, and continue to believe, that I am obligated to act in accordance with that agreement. Since that time, Ms. Cochise has had difficulties with performing her duties. When she was task with responding to a Senate inquiry in March 2000, the Acting Director had to make extensive changes to her work product in order to make the product acceptable for submission to the Department.

I have attached Ms. Cochise's performance ratings and comments from August 1997 forward, and a copy of the mediation agreement in Tab 2.

9.    **On March 6, 2000, Complainant was assigned by Mr. Kenney to write a "white paper" on the database and upon completion of the assignment by Complainant, Mr. Kenney provided criticism in an unprofessional manner to other staff members about the completed assignment.**

The Office of Native American Affairs has been pursuing the development of a Bureau-wide database for Native American related data since approximately 1996. The original concept was for the Office to develop an internal database system for Office use only which would reflect all the differing aspects of Reclamation's relationships with Indian tribes, including; contracts, technical assistance, policy work, and statistical data on each tribe. As the project has evolved, its complexity has evolved as well. The original person on the database project was Ms. Lynne Davis. Ms. Davis was technically qualified to develop the database, but the complexity of the system was going to need a person familiar with the broader program and policy range of Indian and Reclamation issues. I concluded that Ms. Davis would need assistance. Therefore, in March 2000, I established a team to pursue the database project - made up of Ms. Davis and Ms.

INITIAL _C+C_                                                                                  Page 7 of 13

Cochise. When I established the team, I made it clear that neither individual was reporting to the other, but rather they were selected as a team because their relative skills complemented each other. Ms. Cochise was to assist with an overall conceptual approach and vision for the database, and Ms. Davis was to continue the software development and provide input regarding how data should be organized. Since this effort would be complex, I ask for a white paper which would lay out how the project would be approached, what was required by each team member, and some expectations on time lines for accomplishment. Ms. Davis had provided a technical paper previously, and I suggested the paper would be a good starting point. I suggested a first report date of one month. Ms. Cochise informed me that she was traveling in the coming weeks, and would not be in the office. I told her that, if they needed more time, we would renegotiate. I received a draft paper in April while on travel. I told Ms. Davis and Ms. Cochise that I would discuss the white paper with them when I returned to the office. When I returned to the office on the following Monday, Ms. Davis ask me for comments. I had not seen Ms. Cochise, so I ask Ms. Davis if she had seen her. She responded that she did not know when Ms. Cochise would be in the office. I told Ms. Davis that I would like to discuss the white paper with her and Ms. Cochise together. However, I did take the opportunity to clarify which portions on the paper were contributed by which individual, and I did relate my concerns about the additions by Ms. Cochise, and that we would need to have more extensive discussions. Because of circumstances that resulted from Ms. Davis's chronic illness and Ms. Cochise's requested departure from the office, I have not had an opportunity to subsequently discuss the paper with either person.

Ms. Davis has since left Federal Service under a disability retirement.

**10.    On March 9, 2000, Complainant was issued a directive by Mr. Kenney, instructing her not to meet with any Indian tribes unless approved by Mr. Kenney first.**

Ms. Cochise has misstated my statement as a "New Rule"- suggesting some formal statement, and also misstated its substance. I did not say that Ms. Cochise was not suppose to meet with tribes. What I said to Ms. Cochise was that meetings, which involved the Office of Native American Affairs, should be approved by the Director. The purpose of the statement is to assure that no statements, which represent the position of the Bureau of Reclamation, are made without the Director's knowledge. The Director, either myself or the Acting, is task with the institutional representation to Indian tribes. Therefore, it is critical that the Director has knowledge of any meetings that involve the immediate office. Ms. Cochise has had confusion with this point before. In April 1999, during my absence on travel, Ms. Cochise scheduled a meeting with the Jicarilla Tribe with the Director, Operations without the knowledge of the Office of Native American Affairs or the Director, Operations. I have attached a memo from Ms. Betty Johnson that documents the incident. Therefore, the purpose of my email message to Ms. Cochise was to remind her of the practice of the office and to request a summary of the meeting. Ms. Cochise provided the summary.

The email and memorandum are attached in Tab 3.

INITIAL _(signature)_

11.    On March 28, 2000, when Complainant was Acting for Mr. Kenney all
       correspondence were not provided to Complainant but placed in Mr. Kenney's
       locked office (to which Mr. Kenney's Secretary had access) and Complainant was
       unable to fulfill her duties as Acting Director.

I have no direct knowledge of the circumstance to which Ms. Cochise is referring. However, I
inquired about the circumstance with Ms. Madalena, and she does not recall an incident in which
Ms. Cochise asks admission to my office and was denied. While it is true that I lock my office
during non-duty hours and absences from the office, the Secretary, Ms. Madalena, has a key to
the office, and has been instructed to accommodate individuals who need access to the
conference room or to Office files. Further, Ms. Madalena makes sure that the key is available, if
she is to be absent. I have confirmed with Ms. Madalena the understanding that anyone who has
a legitimate need for access to my office is accommodated. With regard to the incident to which
Ms. Cochise makes reference, the document was never in my office. The document had come to
the office on March 29, and Ms. Madalena had neglected to provide it to Ms. Cochise because
she had not noticed that the document had a short deadline. It was an oversight to which Ms.
Madalena has acknowledged, and for which she has apologized.

A copy of an email to that effect is attached under Tab 4.

12.    On April 14, 2000, Mr. Kenney requested a meeting between him and Complainant
       with co-worker present as his witness and denied Complainant's request for
       representation.

The meeting to which Ms. Cochise refers was called by me to discuss her perspective on the
issues that led to her letter of reprimand of April 27, 2000. I had believed that Ms. Betty Johnson
would be perceived as an objective observer who would provide protection to both Ms. Cochise
and myself. The purpose for Ms. Johnson's presence was for observation only. When Ms.
Cochise objected to Ms. Johnson, I ask if she had another individual in mind. She first suggested
her EEO counselor. Since the meeting was for the purpose of getting feedback from Ms.
Cochise, I rejected that recommendation as inappropriate to a supervisor subordinate meeting.
When Ms. Cochise suggested Mr. Larry Todd, Director of Operations, I rejected that
recommendation for the same reason, that it would compromise the supervisor subordinate
relationship. I ask Ms. Cochise if there was any conditions upon which she would agree to the
meeting. She said no. I ask if she was refusing to meet with me as her supervisor. She replied
that, under the circumstances, she was refusing. I concluded the meeting. Ms. Johnson can be
contacted for further information on the meeting.

13.    On April 25, 2000, Complainant was issued a directive by Mr. Kenney which
       suspended Complainant's open travel authorization.

Limited-open travel authorizations are long-term provisions (usually one year) for travel that are
granted to employees at the discretion of management for the benefit of the organization.
Individuals in the Office of Native American Affairs are provided limited open, either because of

INITIAL                                                     Page 9 of 13

1  my determination regarding the nature of current activities or individual circumstance.
2  One requirement for those that possess limited-open authorizations is that individuals
3  keep the Director informed as to dates, purpose, and location of travel. The lack of a
4  limited-open travel authorization does not restrict an employee's ability to perform
5  their duties. Because there had been numerous questions regarding Ms. Cochise's
6  travel in which her location or purpose for travel were not known, I concluded that
7  rescission of her limited-open travel was indicated.

8
9  I have attached relevant portions of Federal Regulation regarding employee travel
10  under Tab 5.

11
12  **14.    On April 28, 2000, Complainant was issued Letter of Reprimand.**

13
14  On March 20, 2000, I requested that Ms. Betty Johnson follow-up on a Congressional
15  inquiry from the Senate. As senior program analyst, Ms. Johnson deals with
16  questions that come from the Appropriations Committees. Ms. Cochise was task with
17  coordinating, or addressing questions that arise from authorization committees.
18  When I realized that the question came from the authorization committee, I realized I
19  should have had Ms. Cochise manage the question Therefore, I ask Ms. Johnson to
20  inform Ms. Cochise, and tell Ms. Cochise to request additional time for response. If
21  Ms. Cochise had not been provided additional time, it is the practice of our staff to
22  pull together to respond to short turnaround request. Ms. Barbara White was acting,
23  and responsible for the approving the response from the Native American Affairs
24  Office. From the beginning, Ms. Cochise was belligerent. She chastised Ms. Johnson
25  for the untimely assignment and the short time for response, when the time element
26  was not Ms. Johnson's fault - it had been my misunderstanding. As Ms. Cochise
27  began to address the question, she began to have arguments with Ms. White.
28  Ms. White was requesting that Ms. Cochise provide a concise and simple response
29  susceptible to incorporation in a larger Departmental response. Ms. Cochise became
30  agitated and abusive. Ms. Cochise left on travel on March 21, without informing Ms.
31  White that she was leaving, or making provisions to assure that the Office provided a
32  competent response. Subsequently, Ms. White was obliged to retract Ms. Cochise's
33  response due to the fact that Ms. Cochise had not followed instructions and provided
34  incomplete information. When Ms. Cochise returned from travel on March 24, she
35  inquired as to the status of the response with the Office of Legislative Affairs and
36  confused the issue by changing the Office response without informing Ms. White.
37  Further, as a matter of insubordination, Ms. Cochise rejected Ms. White's attempt to
38  have her provide additional information on budget levels. My conclusion was that
39  Ms. Cochise's conduct was inappropriate, provocative, insubordinate, and worthy of
40  discipline. Any further information can be obtained from Ms. Betty Johnson, Ms.
41  White.

42
43  With regard to Ms. Cochise's response to this question, I believe that it is irrelevant
44  since the subject to which she refers is not the subject of the Letter of Reprimand.

INITIAL _Csk_                                    Page 10 of 13

1
2    The Letter of Reprimand, and the two reports I received from Ms. White and Ms.
3    Cochise are attached in Tab 6.
4
5    **15.    On April 28, 2000, Mr. Kenney denied approval for payment of**
6    **Complainant's travel voucher and lunged toward Complainant and**
7    **physically removed the travel voucher she was holding.**
8
9    With regard to the approval of Ms. Cochise's travel voucher, I rejected the travel
10    voucher because it was not in accordance travel regulations and policy. Ms. Cochise
11    provided a voucher that requested reimbursement of a lodging rate that exceeded the
12    rate provided by the published federal rates for the Phoenix, Arizona area. Since Ms.
13    Cochise had changed reservations from a hotel that charged a rate within the
14    published federal rate to a hotel that charged a higher rate, I had no basis for
15    approving a higher rate.
16
17    With regard to the assertion that I lunged towards Ms. Cochise, the circumstances are
18    the following. At the end of our meeting at which I had rejected Ms. Cochise's
19    voucher, I had returned the travel voucher package to Ms. Cochise to allow her to
20    make changes needed to bring the voucher into compliance. I assumed that my
21    Secretary had made a copy of the submitted voucher. When I inquired with the
22    Secretary, Ms. Madalena, about a copy, she informed me that she had not yet made a
23    copy. Since I believed that it was important to have a copy of the original submission,
24    I went to Ms. Cochise's office to obtain the package to have a copy made. When I
25    arrived, Ms. Cochise was at her desk with her back to the door. The package was
26    lying on her desk behind her. I reached down and picked up the package while
27    informing Ms. Cochise that I had in fact needed to have a copy made. Ms. Cochise
28    wheeled around in her chair and grabbed a hold of the package and stated that she
29    would make a copy. I jerked the package, and told her I would have a copy made.
30    She did not loose her handhold and told me she did not trust me. I told her I
31    understood, but because of our mutual mistrust, that I needed to have a copy made.
32    Afraid that, if I jerked the package again, Ms. Cochise might be injured by a staple, I
33    pried her hand from the package and left. I instructed Ms. Madalena to make a copy
34    and to return the package to Ms. Cochise as soon as possible. Ms. Cochise
35    subsequently submitted an adjusted travel voucher that was approved.
36
37    **16.    Mr. Kenney consistently fails to allow Complainant reasonable time**
38    **frames for completion of assignments; withholds information on work**
39    **assignments that are time sensitive; and grants personal preferences and**
40    **favoritism of work assignments and other responsibilities to similarly**
41    **situated employees not in Complainant's protected class.**
42
43    The assignments and duties that have been given to Ms. Cochise are typical of the
44    projects, practices, and timeframes of the Native American Affairs Office. Ms.

INITIAL _G⟶K_

1  Cochise was not ask to perform any activities that have not been requested of other
2  individuals in the office. Ms. Cochise is currently a GS-13. Her position description
3  provides that, as a GS-13, she will require more supervisory oversight than would be
4  expected if she was at the full performance level of a GS-14. As such, she has never
5  been disciplined or corrected regarding deadlines or her use of time. In fact, it is
6  expected that Ms. Cochise would require more time due to her inexperience. If
7  deadlines are tight, it is a practice of the office that office mates support and assist
8  each other, when possible. It is understood that in times of short deadlines that the
9  standard for our work may suffer, or that we will have to compromise on our
10  contributions. With regard to incident 1, I have responded in question 7 to Ms.
11  Cochise's assertions regarding her efforts to respond to the Senate question. With
12  regard to incident 2, I have responded in question 2 to Ms. Cochise's assertions
13  regarding the database paper. With regard to incident 3, I have responded in question
14  4 to Ms. Cochise's assertions regarding the Shivwits response. With regard to
15  incident 4, I do not recall the circumstances regarding the annual report to which Ms.
16  Cochise refers. Since there has never been any concern, there is no response
17  regarding the report pending in our Office, so I assume that Ms. Cochise responded to
18  the best of her ability in the time allotted. I consider that acceptable.
19
20  I have read all of Ms. Cochise's answers and comments regarding this claim. In order
21  to respond to all of Ms. Cochise's comments would involve gross redundancy.
22  Therefore, I believe it is more efficient to simply state that, except for the statements
23  above, I cannot nor will not endorse the statements provided by Ms. Cochise as either
24  truthful, proper representations of the facts, or circumstances which I recall. The
25  above statements and answers to the questions presented are my understanding of the
26  true facts, as I remember them. All of my actions have been the result of my
27  understanding and beliefs as to my responsibilities to the Bureau of Reclamation, and
28  7 other employees within my office. My actions regarding Ms. Cochise have been in
29  the context of my response, without regard to her race, to her misconduct and
30  unacceptable behavior. Those responses are the same responses that I would make
31  with any other individual in the Office of Native of Native American Affairs.
32

INITIAL _____    Page 12 of 13

1        I have read this statement consisting of _____ pages, and I have made all

2    necessary changes, additions, or corrections, and I have signed or initialed every

3    page.

4        I hereby declare under penalty of perjury that the foregoing statement is true,

5    correct, and complete to the best of my knowledge and belief.

6    Signature: _____

7    Date: ___December 26, 2000_____

8    Subscribed and sworn to before me this _2nd_ day of _December_ 2000

9    EEO Investigator, Southwind _____

10   Or

11   Notary Public _____

12   My commission expires _____

Jeanne A. Sell
Notary Public
Commonwealth of Virginia
My Commission Expires June 30, 2004

Exhibit F

7-1596B (9-89)
Bureau of Reclamation

OFFICIAL FILE COPY

| DATE | SURNAME | CODE |
|------|---------|------|
|      |         |      |
|      |         |      |
|      |         |      |
|      |         |      |
|      |         |      |
|      |         |      |

EXHIBIT

DEC 1 0 1999

6-1

W-6100

## MEMORANDUM

| | | Classification | |
|------|------|------|------|

**To:**      Rene' Cochise, Policy Analyst

**From:**    Christopher L. Kenney
            Director, Office of Native American Affairs

Project

Control No.

Folder I.D.

**Subject:**    Memorandum of Counseling

I am providing you this Memorandum of Counseling in order to make clear my comments and conclusions to our discussion held on November 30, 1999, and to put our conversation in larger context.

During our mediation on June 2-3, 1999, we discussed the difficulties with your conduct in our office, as well as the conflicts which individuals in the office were reporting to me. It was my hope that those discussions would be a new start and a new basis for interaction with myself and others. However, I am concerned that recent events have proven those expectations to be premature.

On November 24, 1999, you had a confrontation with Barbara White, as Acting Director, in response to her inquiries concerning a travel voucher you had submitted. Barbara submitted a report to me that characterized your behavior as rude, abusive and insubordinate. Other office members were witness to the exchange between you and Barbara. When I questioned you about your behavior regarding these allegations, you stated you were angry and felt that Barbara was being unfair by making references about you outside your presence. Also you questioned Barbara's competency for the office, and further stated your opinion that I was being manipulated by Barbara to your detriment.

This is the third occasion this year in which I have received a report that you have not conducted yourself in a professional or courteous manner to fellow employees. We discussed those prior occasions at the time of our mediation session. This most recent event indicates you are still prepared to exhibit inappropriate behavior and conduct. While I deferred a written response at those earlier events, I am making explicit this time that such behavior is unacceptable and will not be tolerated in this organization.

In our meeting, I asked you to consider the adverse impacts this behavior has on office morale. Because of your behavior, the tension in the office has been raised unnecessarily and the level of trust for you has decreased. I want you to be successful in Native American Affairs, but you

cannot be successful by continuing this sort of rude and discourteous behavior which has the effect of limiting productive working relationships with fellow employees.

In addition to your conduct with other employees, we discussed your practices regarding travel and work routine. Because I have provided limited open travel to NAAO staff, I have emphasized the need for staff to keep me informed as to when and why they are traveling. You have modified numerous trips without explanation from which I have been informed late, or the justification was not clear or available. There were such trips as the late arrival and early departure from the NAAO conference in 1998, and the trips to Albuquerque in February, 1999 for an extended stay without informing me or the acting Director. Recently you committed to meet with the Dakotas Area office without consulting with me first. Earlier this year you scheduled meetings for the Jicarilla Tribe with the Commissioner's office without coordinating with our office. Then you scheduled pre-meetings with the Tribe without coordinating with the acting Director. These types of activities are contrary to the team coordination and collegiality I have worked to incorporate in the Native American Affairs Office. I reference these events to illustrate a pattern of behavior which is long-standing and contrary to the team effort of our office. It is this long-standing behavior and conduct that I asked at our November 24, 1999, meeting for you to consider. It is the responsibility of each and every employee to keep either myself, or the acting, informed regarding travel and its purpose, and to keep the office informed of your activities and contacts with Tribes. This is your direct responsibility.

This memorandum is not disciplinary in nature and will not be placed in your Official Personnel File. It is my way of expressing my concerns regarding your behavior. In the future I expect you to 1) give proper respect to the individuals of this office, particularly those designated to act in my behalf, 2) keep me, or my acting, informed in timely manner of your travel and its purpose, and 3) keep me, or my acting, informed in a timely manner of activities and contacts outside the Native American Affairs Office. If your conduct and work practices regarding travel and communication with others in the context of your duties does not improve, disciplinary action may be taken.

Please sign this memorandum to acknowledge receipt. If you do not sign I will annotate that we discussed this memorandum and that you were given a copy.

Acknowledge Receipt:

_____          _____
Signature                                           Date

cc: D-4800, (L.Broussard)

bc: W-6100
    W-6100 (files)
    W-1100, Personnel

WBR:CKENNEY:lm:12/10/99:208-5000
DOC:H:\PMADALEN\counsel1.wpd

**From:**       Barbara White
**To:**         Kenney, Christopher
**Date:**       Wed, Nov 24, 1999  9:57 AM
**Subject:**    Rene Cochise travel voucher

Chris—

Rene submitted her travel voucher for her Albuquerque trip today.  In my capacity as Acting Director, I reviewed it and noted that she had rented an intermediate sized car.  I asked her to include a justification for a non-compact car in her submittal.  Her response was both rude and insubordinate.  She indicated that it was none of my business what kind of car she rented.  I reminded her that it was Reclamation policy and that you had amended the limited open travel authorizations to require compact cars only.  She responded that she thought that the compact car policy had been put in place because of my complaints about her.

I returned her unsigned travel voucher to Lia with a note to you that she refused to provide me a justification, that she indicated that she knows what the policy is and that it is none of my business.  She subsequently retrieved the file from Lia and told her that she doesn't trust me to review her travel and that she wants to see any note that I write to you about it in the future.

Barb

From:       Barbara White
To:         Kenney, Christopher
Date:       Fri, Nov 26, 1999  9:54 AM
Subject:    follow-up on Rene

Chris--

Continuing unprofessional encounters with Rene cause me to send you this e-mail.

Rene did obtain a formal statement from Carlson regarding her rental of an intermediate sized car.  She subsequently resubmitted the travel package to me at 1:00pm on Weds.  I placed it on my desk without taking any action and prepared to leave for the day.  On my way out, Rene asked me whether I had signed her travel and I told her no, that Raffi had already left for the day and I was also on my way out.  She said in a very belligerent way "I didn't ask you whether Raffi had left, I asked you whether you had signed my travel."  I said no and that I thought I would let you deal with her travel.  She then said to me "Well, maybe you shouldn't be Acting then!"  I told her that she didn't need to be so rude and left the Office.

When I came in this morning Rene's travel folder was not on my desk.  It appears that she entered my workspace after I left on Weds. and removed it.  I later found it in your inbox.  As you are aware, this is not the first time that Rene has entered another persons office without permission and removed paperwork without authorization.  She had no right to enter my workspace without my permission and remove official paperwork.  I don't know what the appropriate course of action is here, but I do not want it to happen again.  Rene's conduct has been extremely unprofessional and I believe illegal.

Exhibit G

**From:**     Barbara White
**To:**       Kenney, Christopher
**Date:**     11/24/99 9:57AM
**Subject:**  Rene Cochise travel voucher

Chris--

Rene submitted her travel voucher for her Albuquerque trip today. In my capacity as Acting Director, I reviewed it and noted that she had rented an intermediate sized car. I asked her to include a justification for a non-compact car in her submittal. Her response was both rude and insubordinate. She indicated that it was none of my business what kind of car she rented. I reminded her that it was Reclamation policy and that you had amended the limited open travel authorizations to require compact cars only. She responded that she thought that the compact car policy had been put in place because of my complaints about her.

I returned her unsigned travel voucher to Lia with a note to you that she refused to provide me a justification, that she indicated that she knows what the policy is and that it is none of my business. She subsequently retrieved the file from Lia and told her that she doesn't trust me to review her travel and that she wants to see any note that I write to you about it in the future.

Barb

**Mail Envelope Properties**    (383BFCC6.D0C : 15 : 53440)

| | |
|---|---|
| **Subject:** | Rene Cochise travel voucher |
| **Creation Date:** | 11/24/99 9:57AM |
| **From:** | Barbara White |

**Created By:**    BWHITE@usbr.gov

| Recipients | Action | Date & Time |
|---|---|---|
| usbr.gov | | |
| 9wo.ibr9dm10 | Delivered | 11/24/99 09:57AM |
| BWHITE BC (Barbara White) | Opened | 11/24/99 07:57AM |
| CKENNEY (Christopher Kenney) | Opened | 11/29/99 07:49AM |

| Post Office | Delivered | Route |
|---|---|---|
| 9wo.ibr9dm10 | 11/24/99 09:57AM | usbr.gov |

| Files | Size | Date & Time |
|---|---|---|
| MESSAGE | 1697 | 11/24/99 09:57AM |

**Options**

| | |
|---|---|
| **Auto Delete:** | No |
| **Expiration Date:** | None |
| **Notify Recipients:** | Yes |
| **Priority:** | Standard |
| **Reply Requested:** | No |
| **Return Notification:** | None |
| **Concealed Subject:** | No |
| **Security:** | Standard |
| **To Be Delivered:** | Immediate |
| **Status Tracking:** | Delivered & Opened |

Page 3 o 5

2 \

**From:**        Barbara White
**To:**          Kenney, Christopher
**Date:**        11/26/99 9:54AM
**Subject:**     follow-up on Rene

Chris--

Continuing unprofessional encounters with Rene cause me to send you this e-mail.

Rene did obtain a formal statement from Carlson regarding her rental of an intermediate sized car. She subsequently resubmitted the travel package to me at 1:00pm on Weds. I placed it on my desk without taking any action and prepared to leave for the day. On my way out, Rene asked me whether I had signed her travel and I told her no, that Raffi had already left for the day and I was also on my way out. She said in a very belligerent way "I didn't ask you whether Raffi had left, I asked you whether you had signed my travel." I said no and that I thought I would let you deal with her travel. She then said to me "Well, maybe you shouldn't be Acting then!" I told her that she didn't need to be so rude and left the Office.

When I came in this morning Rene's travel folder was not on my desk. It appears that she entered my workspace after I left on Weds. and removed it. I later found it in your inbox. As you are aware, this is not the first time that Rene has entered another persons office without permission and removed paperwork without authorization. She had no right to enter my workspace without my permission and remove official paperwork. I don't know what the appropriate course of action is here, but I do not want it to happen again. Rene's conduct has been extremely unprofessional and I believe illegal.

**Mail Envelope Properties**    (383E9F42.D0C : 15 : 53440)

**Subject:**          follow-up on Rene
**Creation Date:**    11/26/99 9:54AM
**From:**             Barbara White

**Created By:**       BWHITE@usbr.gov

| Recipients | Action | Date & Time |
|---|---|---|
| usbr.gov | | |
| 9wo.ibr9dm10 | Delivered | 11/26/99 09:54AM |
| BWHITE BC (Barbara White) | Opened | 11/29/99 11:40AM |
| CKENNEY (Christopher Kenney) | Opened | 11/29/99 08:15AM |

| Post Office | Delivered | Route |
|---|---|---|
| 9wo.ibr9dm10 | 11/26/99 09:54AM | usbr.gov |

| Files | Size | Date & Time |
|---|---|---|
| MESSAGE | 2116 | 11/26/99 09:54AM |

**Options**
**Auto Delete:**           No
**Expiration Date:**       None
**Notify Recipients:**     Yes
**Priority:**              Standard
**Reply Requested:**       No
**Return Notification:**   None

**Concealed Subject:**     No
**Security:**              Standard

**To Be Delivered:**       Immediate
**Status Tracking:**       Delivered & Opened

Exhibit H

April 5, 1999

Memo to the files

To:        Chris Kenney

From:      Betty Johnson *Betty Johnson*

Subject:   Personnel

On April 2, 1999, I was asked by John Peterson, the Acting Director, to act in his stead for April 2 and 5. On April 2 I had been asked to attend a meeting in Steve Magnussen's office with the Jicarilla Apache Tribe's counselor, Shannon Actilly.

Rene' had told me the day before that she had been talking with Shannon Actilly and that she had invited her to come to the office for a pre-meeting prior to Steve's meeting. Also she had invited Crispin Kinney of the Indian Health Service. I thought this was something that the Director of the office would do and not a staff person.

Barbara and I talked to Steve Magnussen to see what we should do about this. He said that this was inappropriate action and that it should not be repeated. He said that he should have been asked before a pre-meeting had been set. He suggested that I sit in the pre-meeting with the Jicarilla lawyer and Crispin Kinney from IHS.

I gave Steve a copy of our Blue NAA handout package so he would see what I was giving to the Jicarilla lawyer and Crispin Kinney. I attended the pre-meeting set by Rene'. At that meeting she invited the two to join her following Steve's meeting so she could discuss with them what Steve had said. She invited herself to Steve's meeting. I went to the debriefing session which she arranged in our conference room. I told Crispin Kinney that I was the NAA staff person responsible for developing partnerships with other Federal agencies. He invited you to speak at a meeting in his office on May 25th along with USDA and others. He would like for you to tell about our program and maybe a specific project. Call him prior to the meeting to see if he has a specific BOR project that he would like you to talk about.

----------

On April 5, 1999, while I was acting Director, Rene' came by my desk and said that she was going to a meeting and that she would catch the 10:30 a.m. shuttle back to the office. That afternoon at 2:30 p.m. she returned. I said, where have you been, we've been worried about you because you said you would take the 10:30 shuttle back to the office. She said in a sarcastic manner, "I bet you were." Then I asked her who she had met with and the subject. She said nothing. I said why don't you send me a email message with the information about who you met with and the subject. She said, "Why don't you send me an email message requesting the information." She became very defensive and disrespectful.

EXHIBIT

6-3

Later that day I told her that I would like to tell her my style when acting. I like to know where the staff members are and what they are doing. I did not intend to sound confrontational. She said, well, it could have been interpreted as confrontational.

She never told me where she went or who she was meeting with for that 5-hour period of time.

The next day John had a staff meeting and we were all asked to tell what we were working on. When it came her turn she said, "I'll be in the office all week." That's all she was going to share so I asked her if she had anything to share about O&M. She did talk about that. She never told any of us what she was doing.

| | |
|---|---|
| **From:** | Christopher Kenney |
| **To:** | Cochise, Rene |
| **Date:** | Thu, Mar 9, 2000  8:29 AM |
| **Subject:** | Report on your pueblo meeting |

As we discussed yesterday, any meetings with Indian tribes which involve this office are to be approved by the Director. Since I did not know about your meeting yesterday, please provide me a written report on the particulars of the meeting by close of business today.

| From: | Rene Cochise |
|-------|--------------|
| To: | Christopher Kenney |
| Date: | Thu, Mar 9, 2000 6:06 PM |
| Subject: | Fwd: Re: Report on your pueblo meeting |

Chris,

In reference to the discussed we had on Wednesday evening, (6:00 p.m.) March 8, 2000, where you established a "New Rule" , any meetings with Indian tribes which involve this office are to be approved by the Director. I understand the new rule, and thank you for the e-mail message. But would like clarification on a couple of issues pertaining to the "New Rule". (1) What kind of meetings will not be approved? (2) What is the procedures for approval? (3) What is the criteria? and (4) Does the "New Rule" apply across the board to everyone on staff? The implications are far reaching, need to inform Regional Program Managers and others who would possible be affected by the "New Rule". Thanks René

CC:            Larry Todd; Steve Magnussen

Exhibit I

 **United States Department of the Interior** 

BUREAU OF RECLAMATION
Washington, D.C. 20240

IN REPLY REFER TO:

W-6100

APR 2 7 2000

To:        Policy Analyst, Office of Native American Affairs
           Attention: Rene′ Cochise

From:      Christopher L. Kenney
           Director, Office of Native American Affairs

Subject:   Letter of Reprimand

This is an Official Letter of Reprimand for Failure to Follow Instructions.

On March 21, 2000, you had an assignment to answer a Congressional question, "Does the Bureau of Reclamation have a total dollar range for fiscal year 2001 with respect to Indian Water Settlements it is participating in under the Native American Affairs Program?" You put together a memorandum for my signature and circulated it for review.

Ms. Barbara White, acting for me, responded in an e-mail message to you that your memorandum was in an inappropriate response format and gave you instructions for the proper format, some additional guidance, and asked that you clear the revised memorandum with her before sending it forward. You did not respond to her and the next morning, on March 22, 2000, you asked my secretary, Ms. Perfilia Madalena to; "Please finalize the draft response for Acting Director signature." Furthermore, with the knowledge of Ms. White's recommendation to you, you called me on travel and failed to inform me of those recommendations. Without that information, I was mislead into contradicting Ms. White without my knowledge, which caused further confusion and conflict.

Ms. White sent you another e-mail on March 22, 2000, again reminding you to change the response format and to make sure to send the revised document to her before sending it forward. You sent it forward to the legislative staff without making the requested changes, and indicated to them that you were having it reviewed but did not expect any changes and that they were to consider it final if they did not hear from you by noon, that same day. You also sent out a copy to the office staff asking for comments. Ms. White did a redline/strikeout edit of your work and sent it back to you; you opened her message at 12:45.

At approximately 2:00 p.m., you left the office to travel to Portland, Oregon, without informing Ms. White that you would be on travel the rest of the week. You sent the draft to the legislative staff without making the requested changes to the format, and you did not send the document to Ms. White before sending it forward as requested by her on two previous occasions.

**EXHIBIT**

6-6

Exhibit J

**From:**      Barbara White
**To:**        Cochise, Rene
**Date:**      3/22/00 2:41PM
**Subject:**   CONGRESSIONAL QUESTION

Rene—As your acting Supervisor I asked you twice to make sure that I saw whatever you prepared in response to your assignment before you sent it forward. You did not do that, and since you did not leave a copy in the office files, I had to ask Lori to return it, so that I could sign off. Your behavior in this matter is insubordinate. and I do not expect it to be repeated.

In addition, you left work early today without informing me that you were travelling to Portland the rest of the week. In the future as your acting Supervisor, I expect you to keep me informed of your travel plans and out of office appointments so that we can make sure that appropriate coverage is available for any questions that otherwise would have been routed to you.

Exhibit K

W BR - 00 - 005

# SHAW, BRANSFORD, VEILLEUX & ROTH

### ATTORNEYS AT LAW

PROFESSIONAL CORPORATION

1100 CONNECTICUT AVENUE, N.W., SUITE 900

WASHINGTON, D.C. 20036

(202) 463-8400

THOMAS J. O'ROURKE
OF COUNSEL

FAX:
(202) 833-8082

WEB:
www.shawbransford.com

February 29, 2000

Ms. Mercedes Flores
Acting Director
Office of Equal Opportunity
Department of the Interior
1849 C Street, N.W.
MS-MIB-5221
Washington, DC 20240

    Re:    Renee Cochise

Dear Ms. Flores:

    Enclosed please find the formal complaint of discrimination of our client, Ms. Renee Cochise. A Designation of Representative form is enclosed authorizing us to act on Ms. Cochise's behalf.

                        Sincerely,

                        *Chris M. Okay*

                        Diana J. Veilleux
                        Christopher M. Okay

Enclosures

BUREAU OF RECLAMATION

MAR 2 4 2000

HUMAN RESOURCES OFFICE

hand carried by Janice Johnson,

EXHIBIT

1 - 1

Page 1 . 1

## DESIGNATION OF REPRESENTATIVE

I, Rene L. Cochise, hereby designate the firm of Shaw, Bransford, Veilleux & Roth to act as my representative in any and all matters concerning my employment with the U.S. Department of Interior. I understand that the firm is authorized to act on my behalf, and I expressly request that all correspondence in these matters be directed to them with a copy to me. I specifically authorize the release of information to my representatives which would otherwise be protected by the Privacy Act, 5 U.S.C. § 552a.

_2-14- 2000_
Date

_____
Rene L. Cochise

02/14/00  MON 16:55 FAX 2   208 6688 _____ NATIVE AMER AFF  FF. WO                     ☑008

---

| Form DI-1892<br>REV. 3/96 | U. S. Department of the Interior<br>Complaint of Discrimination |
|---|---|

**1. Complainant's Name:** Renee Cochise   **Place of Employment:** Bureau of Reclamation, DOI
**Street Address** 5260 Duke Street #418   **Address** 1849 C.Street, N.W.  MS 7548
**City, State, Zip Code:** Alexandria, VA 22304   **City, State, Zip Code:** Washington, DC 20240
**Home Phone:** (703) 751-8773   **Work Phone:** (202) 208-6982

**2. DOI Office which you believe discriminated against you?**

**Bureau:** Reclamation   **Division/Office:** Native American Affairs
**Address:** same as above   **Region** Washington Office
**City/State:** same

**3. Basis(es) for believing you were discriminated against?** (Check one or more and provide the specific information.)

| X | Race | Native American | | ___ | Age (Date of Birth) | |
|---|---|---|---|---|---|---|
| ___ | Color | | | ___ | Physical Handicap | |
| ___ | Religion | | | ___ | Mental Handicap | |
| ___ | Sex | | | X | Reprisal | for prior complaint activity |
| ___ | National Origin | | | | (Date of previous EEO activity) | April 8, 1999 |

**4. Allegation(s) of discrimination?** (For each allegation, state the date and the specific incident causing you to believe that you have been discriminated against. FOR EXAMPLE: I was discriminated against on January 1, 1992, when I was not selected for the position of Analyst. (Use additional pages as necessary.)

    See attached

**5. Have you discussed your complaint with an EEO Counselor?** Yes X No ___ (If yes, name of Counselor):
Pat Hagan, Ana M. Samour _____ Date you first contacted the Counselor: January 8, 2000

**6. Are you agreeable to using the Alternative Dispute Resolution (ADR) process?** Yes ___ No X

**7. Have you presented these allegations to any other forum? If so, please indicate:** N/A

___ Negotiated Grievance Procedure ___ Merit Systems Protection Board ___ Court (Civil Action)

**8. List the remedies which you believe will resolve your complaint:** (Use additional pages as necessary.)

    See attached

**9. Complainant's Signature:** _Chris M. Olay for R. Cochise_   **Date:** 2/29/2000

**10. For Agency Use:**
**Complaint Docket Number:**                     **Date Received of Postmarked:**

Page 2 of 6

## Formal Complaint of Discrimination of Rene Cochise

Item 4. Allegation(s) of discrimination? (For each allegation, state the date and the specific incident causing you to believe that you have been discriminated against. FOR EXAMPLE: I was discriminated against on January 1, 1992, when I was not selected for the position of Analyst . . .)

I have been discriminated against by the Bureau of Reclamation, Department of Interior, on the basis of my race (Native American), and in reprisal for my prior EEO complaint activities (sought EEO counseling and mediated complaint beginning on April 8, 1999). The events encompassed by this complaint include the following.

First, the Agency created a hostile work environment based on race and reprisal, through the actions of my immediate supervisor, Christopher Kenney, and a co-worker, Ms. Barbara White. The work environment has become hostile through the repeated failure of my immediate supervisor to communicate with me on matters concerning my performance and my employment, and through Mr. Kenney's granting of preferences and favoritism in assigning work and responsibilities to other similarly-situated employees not in my protected classes. Most recently, as discussed below, this hostile work environment has manifested itself in Mr. Kenney's issuance of a Letter of Counseling to me on December 10, 1999. I am the only member of the Policy staff that is a Native American.

Second, the Agency has committed an ongoing practice of discrimination and reprisal through its repeated failure to promote me to the next grade level. I was hired two and one-half years ago as a Policy Analyst GS-13/14, and I am the only remaining GS-13 Policy Analyst in this Office despite my positive performance record, and record of accomplishments. Other Program Analysts in our Office are graded at the appropriate GS-14 level. I consider this to be a

Page 4 of 6

continuing violation of my civil rights based on my race (Native American) and in reprisal for my prior informal complaint activities (April 8, 1999).

Third, I believe I was discriminated against on the basis of my race and in reprisal for my prior EEO activities when my immediate supervisor, Mr. Kenney, issued me a Letter of Counseling on December 10, 1999. The Letter of Counseling was based on a number of allegations of misconduct concerning my interactions with colleagues in the Office – allegations which I deny – and as to which Mr. Kenney failed to discuss even the underlying alleged incidents with me before he issued me the Letter on December 10th. I believe that the Letter of Counseling was issued to me as a show of favoritism for other Office employees not in my protected classes, including Ms. Barbara White.

Finally, I believe that I was discriminated against when I was issued an annual performance appraisal on February 11, 2000. The rating, while showing an overall "Achieved" level of performance, contained a remark that I disagree with. Specifically, Mr. Kenney stated in the narrative that, "Additional work in analysis and documentation is needed to be at full performance." Mr. Kenney failed to discuss his apparent concern about analysis and documentation, or any of the rated aspects of my performance with me prior to issuing the rating, or even after he provided the rating, and he failed to provide me any information in my midyear progress rating to advise me about any issues about which he was concerned. I don't believe that other similarly-situated members of our Office were provided ratings the bases of which were not discussed with the employee beforehand.

Item 8.        Requested relief.

I request, as relief for this complaint of discrimination, the following:

- immediate promotion to the GS-14 grade level, retroactive to August 18, 1998, with Back Pay, benefits and interest, pursuant to the Back Pay Act

- withdrawal of the Letter of Counseling issued December 10, 1999

- payment of compensatory damages, up to $300,000

- payment of all attorney fees and costs incurred in this matter

- restore all sick leave utilized by Complainant and related to this Complaint retroactive to August 18, 1997

- remove all negative remarks from annual performance appraisals, retroactive to August 18, 1997

- provide a positive job reference, purging all references to letter of counseling, and the above-referenced performance issues.

Exhibit L

Exhibit A

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1400 L Street, N.W., Suite 200
Washington, D.C.  20005

| | |
|---|---|
| Rene Cochise,<br>    Complainant,<br><br>        v.<br><br>Gale Norton, Secretary,<br>U.S. Department of the Interior,<br>    Agency. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

EEOC Case No.  100-A2-07428X[1]

Agency Case No. WBR-00-005,
WBR-00-023,
WBR-01-021,
WBR-02-021

**MAR 2 3 2004**

DECISION

Pursuant to the EEOC's regulations at 29 C.F.R. § 1614.109(i) (2003), I conducted a hearing in the above-captioned complaint on January 13, 14, February 16, and March 4, 2004. All jurisdictional requirements for this complaint have been met. The record before me includes the following: 1) the Reports of Investigation ("ROI"), 2) the Hearing Transcript ("HT"), exhibits produced by each party and admitted into evidence at the hearing, and various pleadings and arguments, including attachments.

ISSUES

Whether the agency discriminated against Complainant on the bases of her race (Native American) and reprisal (for prior participation in EEO activity), when:

A.    on December 10, 1999, she was issued a Letter of Counseling;

B.    she was subjected to a hostile work environment when:

---

[1] Please use this EEOC Hearing number instead of other case numbers that may have been used previously.

1

1. she was not promoted to a Policy Analyst, GS-301-14 before April 28, 2000;

2. on March 6, 2000, she was assigned to write a white paper on the database and upon completion of the assignment, her supervisor provided criticism in an unprofessional manner to her staff members about the completed assignment;

3. on March 9, 2000, she was given a directive instructing her not to meet with any Indian tribes unless approved by her supervisor first;

4. On March 28, 2000, while Complainant was Acting Director, all correspondence was not provided to her, but was placed in Kenney's locked office, and Complainant was not able to fulfill her duties as Acting Director;

5. on April 14, 2000, Complainant's supervisor requested a meeting with her, and he denied Complainant's request for representation;

6. on April 25, 2000, Complainant's open travel authorization was suspended;

7. on April 28, 2000, Complainant was issued a Letter of Reprimand;

8. on April 28, 2000, payment for Complainant's travel voucher was denied, and Complainant's supervisor lunged towards her and physically removed the travel voucher Complainant was holding; and

9. Complainant's supervisor consistently failed to allow her reasonable time frames for completion of assignments, withheld information on work assignments that were time sensitive, and granted personal preferences and favoritism of work assignments and responsibilities to other similarly situated employees; [WBR-00-023 and WBR-00-005]

C.    she was subjected to a hostile work environment when on March 15, 2001, she had a meeting with her supervisor, and he conducted an administrative investigation into her misconduct for her failure to follow his instructions and that if she gave any false answers to his questions that she could be subjected to criminal prosecution; and her supervisor proposed a three-day suspension [WBR-01-021]; and

D.    she was subjected to a hostile work environment from May 2, 2002 through July 31, 2003, when Perfilia Madalena moved a framed certificate of appreciation that Complainant received from the Commissioner of the Agency. [WBR-02-030]

2

## BACKGROUND

The Complainant began working at the agency in 1997, after she was hired by Chris Kenney as a Policy Analyst, GS-13. The job had a promotion potential to GS-14. Complainant testified that within days of her starting work, Kenney began discriminating against her and creating a hostile work environment. According to Complainant, the harassment never stopped.

Complainant charged that her supervisor, Kenney, and a co-worker, Barbara White, and others, created a hostile work environment. Complainant identified many incidents that she believed were caused by discrimination, and collectively amounted to the hostile work environment.

Eventually, Complainant was detailed from the Native American Affairs Office (NAAO) to the Commissioner's Office of Policy. After that detail ended, she was detailed to the Director of Operations.

## ANALYSIS

In order to prevail on an EEO complaint, a Complainant must demonstrate by the preponderance of the evidence that she was subjected to an adverse personnel action on the basis of prohibited factors (*e.g.*, sex, age, and disability). One way Complainant could satisfy her burden of proof would be to present direct evidence of discrimination.

Absent direct evidence, in order to establish a *prima facie* case of disparate treatment, a Complainant must demonstrate that she was treated less favorably than a similarly situated employee outside her protected group. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978). Absent comparative data, Complainant may also establish a *prima facie* case by setting forth sufficient evidence to create an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

3

Harassment is actionable if it is sufficiently severe or pervasive so that it results in an alteration of the conditions of the Complainant's employment. To establish a claim of harassment a Complainant must show that: (1) she belongs to a statutorily protected class; (2) she was subjected to unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on the statutorily protected class; (4) the harassment had the purpose or effect or unreasonably interfering with her work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. Furthermore, in assessing whether the Complainant has set forth an actionable claim of harassment, the conduct as issue must be viewed in the context of the totality of the circumstances, considering, *inter alia*, the nature and frequency of offensive encounters and the span of time over which the encounters occurred.

If a *prima facie* case is established, the burden shifts to the Agency to articulate a legitimate, non-discriminatory reason for the challenged action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *McDonnell Douglas*, 411 U.S. at 802. Complainant may then show that the explanation offered by the Agency was not the true reason, but a pretext for discrimination. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804. The ultimate burden of persuading the trier of fact that the Agency discriminated against the Complainant always remains with the Complainant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

A.      Letter of Counseling and Letter of Reprimand

The record shows that Complainant had been specifically counseled on her office demeanor, non-cooperation with supervisors and other employees, her processing of work assignments, and the

4

like. When Complainant failed to improve her conduct and performance, the two letters were issued to her.[2] As discussed below, Complainant has not shown that the assertions made in the letters were incorrect, or that her race or prior EEO activity played any role in the issuance of the letters.

B.    Hostile Work Environment

Complainant alleged many instances of harassment that created a hostile work environment, as included in the statement of the issue, at 1, *supra*. After a thorough review of the record, and hearing the testimony of Complainant and all the witnesses at the hearing, I find that Complainant was not subjected to a hostile work environment. Indeed, in the opinion of some of her co-workers, it was Complainant who caused a hostile environment. For example, Betty Johnson, Program Analyst, testified that Complainant caused a hostile environment in the office. Perfilia Madalena, a secretary, said that Complainant would try to manipulate others. She also testified that Complainant would not sit with others at staff meetings, but instead would sit at the back of the room. Darrel Ewing said that Complainant had a lack of camaraderie, and he too said it was Complainant who caused the hostile environment. Barbara White said that when she spoke to Complainant, Complainant would either be sarcastic or turn her back to her.

Based on the evidence before me, I find that Complainant was a disruptive and insubordinate employee who generally acted as if she knew better than anyone else how her job should be done. Indeed, her actions suggest she conducted herself as if only she knew how her office should conduct its business.

Some of her specific claims are addressed as follows.

_____

[2] Complainant said she did not recall receiving a Letter of Counseling. ROI 021, Ex. 10 at 110. I do not find her statement credible.

5

Instruction not to meet with tribes. All other employees in the office testified that they knew they were not to meet with representatives of tribes without notice or permission from their supervisor, or unless they had a specific work assignment that required specific meetings. Complainant refused to comply with this rule, even after being told specifically to stop unauthorized meetings. Complainant was not singled out when she was issued a memorandum directing her not to meet with tribes, because she was the only employee not complying with established policy.

Travel. The record revealed many instances of Complainant failing to comply with the most basic travel requirements of letting her supervisors and coworkers know her up to date travel plans. When Complainant presented a travel voucher for reimbursement that was over the authorized rates, she caused a confrontation with her supervisor. Complainant later claimed that the hotel bill she was submitting was in error (and later corrected by the hotel), but that fact reveals that she submitted an incorrect voucher, without having made the slightest review to certify that it was correct.

C.    Threat of Criminal Prosecution. When Kenney was investigating a dispute in the office, he read to Complainant a standard set of instructions concerning an official investigation. There is no evidence Kenney did anything wrong.

D.    Loss of Certificate. Complainant had moved out of her office. There was no way to tell who, when, or why her certificate was removed, and no evidence even suggesting discrimination or retaliation by anyone.

Non-Promotion to GS-14. Complainant also charged that she was not promoted to GS-14. The agency showed that Complainant had not demonstrated the ability to perform her job at the higher grade. Complainant's charge that she was not given better work assignments is not a

6

symptom of discriminatory treatment; it is a symptom of her demonstrated inability to do her job well, to follow instructions, or to follow the rules.

I also note that from time to time, Complainant recognized reasons other than discrimination for her treatment by Kenney or others. For example, Complainant said that Kenney had told her not to associate with Ramona Saunders, Deputy Program Manager. Complainant said that Kenney discriminated against her because she showed independent thinking and chose to remain neutral to the dispute between Kenney and Saunders. I note that with regards to this incident, the cause of Kenney's problem with Saunders was that Saunders had apparently passed confidential information to one of the Indian Tribes. Apparently, Complainant did not find this to be a problem.

The only incident that called for my further review was when Complainant and Kenney had a dispute about Complainant's incorrect travel voucher. Kenney wanted the document to make a photocopy. Events led to both Kenney and Complainant holding on to the one piece of paper, neither one letting go. Kenney removed Complainant's hand from the piece of paper. Complainant thereafter claimed that this was a physical assault on her. However, Complainant did not notify her agency's security office or the police, and in fact apparently did not tell anyone about it for some time. I find that in review of the totality of the relationship between Kenney and Complainant, I do not find that Kenney "assaulted" her.

Complainant failed to show that any of the Agency's explanations were pretext for discrimination or retaliation.

7

## CONCLUSION

Complainant has not shown, by a preponderance of the evidence, that the Agency subjected her to discrimination based on her national origin, or retaliated against her for her previous EEO activity.

Richard E. Schneider
Administrative Judge

To:

Ms. Rene L. Cochise
P.O. Box 23213
Alexandria, Va. 22304

Frazer Walton, Jr., Esq.
920 Burns Street, S.E.
Washington, D.C. 20019

Patricia Armstrong, Esq.
Department of the Interior
Office of the Solicitor, MS 6530
1849 C Street, N.W.,
Washington, D.C. 20240

Ms. E. Melodee Stith
Director, Office for Equal Opportunity
MS-5214
1849 C Street, N.W.
Washington, D.C. 20240

8