# EXHIBIT # 1

COPY

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

```
--------------------------x
RENE COCHISE,              :
                          :
                          :
        Complainant,       :
                          :
                          :
        v.                 : EEOC No. 100-A2-8041X
                          : Agency No. WBR 00005
GALE NORTON, SECRETARY    :   00023, 01021, 02030
UNITED STATES DEPARTMENT  :
OF THE INTERIOR,          :
                          :
        Respondent.        : Volume 1
--------------------------x
```

                              1849 C Street, NW.
                                Washington, D.C.

                    Tuesday, January 13, 2004


        The HEARING in this matter began

at 9:20 a.m. pursuant to notice.

BEFORE:

        RICHARD E. SCHNEIDER

        Administrative Judge

910 17th Street, NW, Suite 200
Washington, DC 20006
info@betareporting.com


Beta

p. 202.638.2400
f. 202.833.3030
1 800 522 BETA (2382)

3

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ramona Saunders | 41 | 66 | 76 | |
| Lynne Davis | 78 | 100 | 119 | |
| William J. Steele | 129 | 150 | 163 | |
| Shenan R. Atcitty | 172 | 198 | 204 | 220 |
| Adriene Marks | 223 | 233 | 248 | |
| Perfilia R. Madalena | 254 | 278 | | |
| Virginia H. Sibbison | 294 | 299 | | |
| Donald E. Ami | 311 | 342 | 353 | 357 |

| COMPLAINANT'S EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| No. 1 - March 29, 2001, Letter Atcitty to Gabaldon | 210 | 210 |

\*   \*   \*   \*   \*

129

as follows:

DIRECT EXAMINATION

BY MR. WALTON:

Q     For the record, Mr. Steele, would
you state your full name, spelling your last
name?

A     William Joseph Steele,
S-t-e-e-l-e.

Q     For the record, would you state
your present employer?

A     I work for the U.S. Bureau of
Reclamation.

Q     Would you tell the Judge your job
title?

A     I am currently the area manager of
the Southern California Area Office of the
Lower Colorado Region.

Q     Are you acquainted with
Ms. Cochise?

A     Yes, I am.

Q     Would you tell the Judge how you
know Ms. Cochise?

140

1      came to work on the group?

2           A     When they organized the team, we

3      had two issues going on in the Bureau at

4      that time and one of them was the amount of

5      money that eventually the Indian projects

6      may cost in the budget.  Since I was on the

7      policy staff to deal with Indian affairs

8      programs, they asked me from that standpoint

9      plus my knowledge of field environment to be

10     on the committee.

11          Q     Did Ms. Cochise work on that

12     group?

13          A     She chaired the committee.

14          Q     Did there ever come a time when

15     you were required to make a report from that

16     working group?

17          A     We -- we were tasked with the

18     effort to come up with recommendations, and

19     when our last meeting was held we had put

20     together a draft report that had been

21     circulated amongst all of us.  We prepared a

22     final draft and sent it and Rene was in

# EXHIBIT # 2



UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

```
- - - - - - - - - - - - - - - - - - - - - - - - - x
RENE COCHISE,                  :
                               :
                               :
        Complainant,           :
                               :
        v.                     : No. 100-A2-8041X
                               : Agency Nos. WBR00005
UNITED STATES DEPARTMENT        :            WBR00023
OF THE INTERIOR,               :            WBR01021
                               :            WBR02030
        Agency.                : Volume 2
- - - - - - - - - - - - - - - - - - - - - - - - - x
```

                           1849 C Street NW.
                           Washington, D.C.

                 Wednesday, January 14, 2004


          The HEARING in this matter

continued at approximately 9:01 a.m.

pursuant to notice.

BEFORE:

          RICHARD E. SCHNEIDER
          Administrative Judge

910 17th Street, NW, Suite 200
Washington, DC 20006
info@betareporting.com

βeta

p. 202.638.2400
f. 202.833.3030
1.800.522.BETA (2382)

364

1    APPEARANCES:

2       On behalf of Complainant:

3          FRAZER WALTON JR., ESQUIRE
           Law Office of Frazer Walton Jr.
4          920 Burns Street SE.
           Washington, D.C. 20019
5          (202) 584-7572

6       On behalf of Agency:

7          PATRICIA ARMSTRONG, ESQUIRE
           Division of General Law
8          Office of the Solicitor
           United States Department of the Interior
9          1849 C Street NW.
           Washington, D.C. 20240
10         (202) 208-6848

11

12

13                    C O N T E N T S

14   WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS

15   Rene Cochise          366

16

17

18

19

20

21

22                  *   *   *   *   *

441

1       A    I believe Betty Johnson's a GS-13.

2       Q    And what's the other lady --

3       A    Laverne Hill?

4       Q    Laverne.

5       A    I believe she is a GS-12.

6       Q    And was this a part of your

7 support staff?

8       A    They provided support to all the

9 policy analysts, yes.

10      Q    Do you know Mr. Bill Steele's

11 grade?

12      A    Mr. Steele is a GS-14.

13      Q    And do you know the other grades

14 of the staff members that you spoke about

15 that were on the committee that you served

16 on?

17      A    I knew some of their grades.

18 Bernice Sullivan was a GS-14.  Greg Gere is,

19 I think, a deputy manager -- I believe he's

20 a GS-14.  Jim Anderson is a GS-14.  Daryll

21 Beckman was a GS-15.  Bruce Stockenger, I

22 believe, is a GS-15.  Lon Knapp was a GS-15.

# EXHIBIT # 3



Form DI-2002
December 1997

## U.S. DEPARTMENT OF THE INTERIOR
### EMPLOYEE PERFORMANCE PLAN AND RESULTS REPORT

| | |
|---|---|
| Employee's Name: *Rene' Cochise* | Rating Period: *01/01/99 - 12/31/99* |
| Title/Series/Grade: *GS-301-13, Policy Anaylst* | Bureau/Office: *Bureau of Reclamation, W-6100* |
| Duty Location: *Washington, DC* | Social Security No.: ~~_____~~ |

| PART I. PERFORMANCE PLAN<br><br>CRITICAL RESULTS *(List no more than five)* | RESULTS (Enter:<br>*Achieved or Not Achieved*) |
|---|---|
| A. Plan, implement, and coordinate initiatives identified by Director. | *Achieved* |
| B. Serves as Reclamation member of assigned Departmental Indian Water Rights Negotiation and Implementation teams. | *Achieved* |
| C. Analyzes and comments on legislation pertaining to Indian issues; performs needed coordination and transmits comments. | *Achieved* |
| D. Provides policy analysis and recommendations on matters relating to Relamation's Native American Affairs program to Director, and policy guidance and interpretation to regional and area office staff in areas of expertise. | *Achieved* |
| E. | |

**PERFORMANCE INDICATORS.** Appraisals should fairly reflect the overall performance of an employee. Performance indicators identify those characteristics (such as quality, teamwork, customer service) that are important to successful performance in each critical result. In appraising an employee's performance, the rating official will carefully review the performance indicators in assessing whether a particular critical result has been achieved by the employee.

Generally, an employee will not be rated as "Results Not Achieved" in the critical result to which a particular performance indicator applies where there is only one failure in that performance indicator. It follows, of course, that a repetition of failures in a single performance indicator can be the basis for a "Results Not Achieved" rating for the critical result if, in the rating official's judgment, the critical result was not met overall. There may be situations where a single, particularly significant failure to maintain the level of performance expected in a particular performance indicator could warrant a determination that the employee will receive a "Results Not Achieved" for the applicable critical result. A significant failure could include, for example, harm to persons or property, a loss of a great amount of money or resources, or a breach of security.

Page 1 of 11

EXHIBIT

6-2

*Circle or underline the applicable critical result letter(s).*

## QUALITY

| | Apply to Critical Result(s): |
|---|---|
| **Knowledge of Field or Profession:** Maintains and demonstrates technical competence and/or expertise in areas of assigned responsibility. | All  A  B  C  D  E |
| **Accuracy and Thoroughness of Work:** Plans, organizes, and executes work logically. Anticipates and analyzes problems clearly and determines appropriate solutions. Work is correct and complete. | All  A  B  C  D  E |
| **Soundness of Judgment and Decisions:** Assesses tasks objectively and researches and documents assignments carefully. Weighs alternative courses of action, considering long and short term implications. Makes and executes timely decisions. | All  A  B  C  D  E |
| **Effectiveness of Written Documents:** Written work is clear, relevant, concise, well organized, grammatically correct, and appropriate to audience. | All  A  B  C  D  E |
| **Effectiveness of Communications:** Presentation meets objectives, is persuasive, tactful, and appropriate to audience. Demonstrates attention, courtesy, and respect for other points of view. | All  A  B  C  D  E |
| **Timeliness of Meeting Deadlines:** Completes work in accordance with established deadlines. | All  A  B  C  D  E |
| **Effectiveness of Supervision:** Directs and coordinates activities of unit, assuring deadlines are met. Coaches, counsels, develops, and utilizes staff effectively, demonstrating a commitment to the work force. | All  A  B  C  D  E |
| **Other (specify):** | |

## TEAMWORK

| | Apply to Critical Result(s): |
|---|---|
| **Participation:** Willingly participates in group activities, performing in a thorough and complete fashion. Communicates regularly with team members. Seeks team consensus. | All  A  B  C  D  E |
| **Team Leadership:** Provides encouragement, guidance, and direction to team members as needed. Adjusts style to fit situation. | All  A  B  C  D  E |
| **Cooperation:** Supports team initiatives. Demonstrates respect for team members, accepts the views of others, and actively supports team decisions. | All  A  B  C  D  E |
| **Other (specify):** | All  A  B  C  D  E |

## CUSTOMER SERVICE

| | Apply Critical Result(s): |
|---|---|
| **Quality of Service:** Delivers high quality products and service to both external and internal customers. Initiates and responds to suggestion for improving service. | All  A  B  C  D  E |
| **Timeliness of Service:** Delivers quality products and service, in accordance with time schedules agreed upon with customer. | All  A  B  C  D  E |
| **Courtesy:** Treats external and internal customers with courtesy and respect. Customer satisfaction is high priority. | All  A  B  C  D  E |
| **Other (specify):** | All  A  B  C  D  E |

Page 2 of 11

**PART II. PROGRESS REVIEWS:** *Date of review and initials of employee and Rating Official(R.O.)* must *also be provided for each review. A summary of comments is optional unless results are not being achieved.*

(Consultation) RAC

| | Date:<br>Emp. Initials:<br>R.O. Initials: |

Rene has been working on a special project w/ Dwight ~~and~~ which involves extensive travel.

| | Date: 10/1/99<br>Emp. Initials: RAC<br>R.O. Initials: Cork |

**PART III. SUMMARY RATING:** (Enter: *Achieved* or *Not Achieved* on this line) **RESULTS** *Achieved*
Space is provided to summarize the basis for rating given. A "Results Not Achieved" rating requires explanation; if more space is needed, provide additional comments as an attachment. Rene is accomplishing assigned tasks commensurate with her grade. Additional work ~~thus~~ in analysis and documentation is needed to be at full performance. Cork

**PART IV. CERTIFICATION:** *(Employee's signature certifies review and discussion with the Rating Official. It does not necessarily mean that the employee concurs with the information on this form.)*

| Performance Plan: *(Sign when plan is established)* | Summary Rating: *(Sign when report is completed)* |
|---|---|
| Employee:                          Date: | Rating Official:  Christopher J Kenney  Date: 2/11/00 |
| Rating Official:                   Date: | Reviewing Official (required for summary of "Results Not Achieved")                Date: |
| Reviewing Official: *(when required by Bureau Office)* Date: | Employee:                          Date: |

**Privacy Act Notice:** Submission of information is mandatory. Failure to provide information will prohibit data collection required by the Office of Personnel Management.

Ms. Cochise was provided this summary rating and ~~that~~ her general performance was discussed, as well as actions to improve her performance for the coming year. She has refused to sign this document. She has been provided a copy of this report. Christopher J Kenney 2/11/00

Page 3 of 11

# MEMORANDUM

FEB 11 2000
FEB 11 2000

To:        The Files

From:      Christopher L. Kenney
           Director, Office of Native American Affairs

Subject:   Performance Review for Ms. Rene' Cochise

On February 11, 2000, I conducted the year-end performance review for Ms. Cochise for the calendar year 1999.

Ms. Cochise was rated as achieved on all critical results and for her performance overall. In addition, I noted in the performance review the following:

> Rene' is accomplishing assigned tasks commensurate with her grade. Additional work in analysis and documentation is needed to be at full performance.

Ms. Cochise refused to sign her performance review.

Page 4 of 11

# EXHIBIT # 4

*Atch 3*

**Office of Personnel Management**

(2) *Noncompetitive actions.* Competitive procedures do not apply to:

(i) A promotion resulting from the upgrading of a position without significant change in the duties and responsibilities due to issuance of a new classification standard or the correction of an initial classification error; and

(ii) A position change permitted by reduction-in-force procedures in part 351 of this chapter.

(3) *Discretionary actions.* Agencies may at their discretion except the following actions from competitive procedures of this section:

(i) A promotion without current competition of an employee who was appointed in the competitive from a civil service register, by direct hire, by noncompetitive appointment or noncompetitive conversion, or under competitive promotion procedures for an assignment intended to prepare the employee for the position being filled (the intent must be made a matter of record and career ladders must be documented in the promotion plan);

(ii) A promotion resulting from an employee's position being classified at a higher grade because of additional duties and responsibilities;

(iii) A temporary promotion, or detail to a higher grade position or a position with known promotion potential, of 120 days or less;

(iv) Promotion to a grade previously held on a permanent basis in the competitive service (or in another merit system with which OPM has an interchange agreement approved under § 6.7 of this chapter) from which an employee was separated or demoted for other than performance or conduct reasons;

(v) Promotion, reassignment, demotion, transfer, reinstatement, or detail to a position having promotion potential no greater than the potential of a position an employee currently holds or previously held on a permanent basis in the competitive service (or in another merit system with which OPM has an interchange agreement approved under § 6.7 of this chapter) and did not lose because of performance or conduct reasons; and

(vi) Consideration of a candidate not given proper consideration in a competitive promotion action.

(vii) Appointments of career SES appointees with competitive service reinstatement eligibility to any position for which they qualify in the competitive service at any grade or salary level, including Senior-Level positions established under 5 CFR Part 319—Employment in Senior-Level and Scientific and Professional positions.

(d) *Grievances.* Employees have the right to file a complaint relating to a promotion action. Such complaints shall be resolved under appropriate grievance procedures. The standards for adjudicating complaints are set forth in part 300, subpart A, of this chapter. While the procedures used by an agency to identify and rank qualified candidates may be proper subjects for formal complaints or grievances, nonselection from among a group of properly ranked and certified candidates is not an appropriate basis for a formal complaint or grievance. There is no right of appeal of OPM, but OPM may conduct investigations of substantial violations of OPM requirements.

[59 FR 67121, Dec. 29, 1994, as amended at 63 FR 34258, June 24, 1998]

## § 335.104 Eligibility for career ladder promotion.

No employee shall receive a career ladder promotion unless his or her current rating of record under part 430 of this chapter is "Fully Successful" (level 3) or higher. In addition, no employee may receive a career ladder promotion who has a rating below "Fully Successful" on a critical element that is also critical to performance at the next higher grade of the career ladder.

[51 FR 8411, Mar. 11, 1986]

## § 335.105 Notice of job announcements to OPM.

Under 5 U.S.C. 3330, agencies are required to report job announcements to OPM for vacancies for which an agency will accept applications from outside the agency's work force. This requirement is implemented through § 330.102 of this chapter.

[61 FR 11501, Mar. 21, 1996]

231

EXHIBIT

tubbles

22

# EXHIBIT # 5

**JUSTIFICATION**    Required only for monetary awards, innovation awards, non-monetary recognition of significant value, or time off recognition. Citation is justification for honor awards. Attach copy of citation.

Please see the attached statement.

**APPROVED BY:** _Christoph. — Kennedy 7/2/98  202-2 8-5xx_

**ADDITIONAL SIGNATURES**
[As required by Bureau delegations]

(Signature, Date, and Telephone Number including Area Code)

_signature_ 7/6/98

(Signature and Date)

_signature_ 7/5/98
_James R. Wayne_ 7/6/98

(Signature and Date)

**FINANCIAL ACTION RECORD**    This record is to initiate payment, accounting and tax transactions for STAR awards, On-the-Spot awards, and non-monetary recognition of significant value. Do not complete for Quality Step Increases, Time Off recognition, Interior Innovation Award or Honor Awards.

Recipient Name:    Rene' L. Cochise         Social Security Number:    585 88 2926

| 07 | 09 | 005 | W961000 | A10-1523-4000-400-00-0-1 |
|----|----|----|----|----|
| Bureau | Sub-Bureau | Block | Org. Code | Cost Account |

**MONETARY AWARD TO BE PAID THROUGH IMPREST (ON-THE-SPOT)**
Amount Authorized for Imprest Payment  (Hours Code 66A)            $_____ (Net Amount)
Amount Including Taxes  (Amount Paid divided by .55)  (Hours Code 30A)    $_____ (Gross Amount)

      **IMPREST FUND PAYMENT RECORD**  (Present to Imprest Fund Cashier)
Paid by:       Cash [ ]        Third Party Draft [ ]         Subvoucher # _____

Received by Signature and Date:    _____

**MONETARY AWARD TO BE PAID THROUGH THE PAYROLL SYSTEM (STAR OR ON-THE-SPOT)**
Total Cash Award  (Hours Code 30A)                    $ 910.00    (Gross Amount)
Pay Period to be Processed by Payroll                        98  14

**NON-MONETARY RECOGNITION OF SIGNIFICANT VALUE**  (from $26 to $250)
Cash Value of Award  (Hours Code 66A)                  $  500.00   (Net Amount)
Value Including Taxes  (Cash Value divided by .55)          $  910.00   (Gross Amount)

Disposition of this form: Original to servicing personnel office, copy to recipient. For STAR awards, On-the-Spot awards, and non-monetary recognition of significant value FAX page 2 of this form to the Payroll Operations Division.
This fax is in lieu of original. *DO NOT* SEND ORIGINAL OF THIS DOCUMENT TO PAYROLL.

Note: Information on this form is protected by the Privacy Act. Disclosure may be made only to authorized persons according to Title 5 U.S.C., Section 552a(b).

On the Spot Award for Rene' L. Cochise

Ms. Rene Cochise served as the Team leader in developing the Director, Native American Affairs Group's, presentation to the Assistant Secretary - Water and Science on "Drinking Water Issues on Indian Reservations." Ms. Cochise worked through the Indian Health Service and the Bureau of Indian Affairs as well as Reclamation to gather information for this presentation. This presentation was well received by the Assistant Secretary and her staff, much to the credit of Ms. Cochise's efforts.

## NOTIFICATION OF PERSONNEL ACTION

Personnel Management
-33, Subch. 4

| , First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| HISE, RENE L. | | 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 | 07/11/57 | 08/02/98 |

| ST ACTION | | SECOND ACTION | |
|---|---|---|---|
| | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 7 | SPECIAL ACT OR SERVICE AWARD | | |
| | 5-D. Legal Authority | 6-C Code | 6-D. Legal Authority |
| 3 | 5 U.S.C. 4503 | | |
| | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| OM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | POLICY ANALYST |
| | W961000        -004590 |

| ian 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16.Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | $ 910 | |

| sic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| ne and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | COMMISSIONER'S OFFICE |
| | OPERATIONS |
| | NATIVE AMERICAN AFFAIRS |
| | DENVER, COLORADO |

## MPLOYEE DATA

| terans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 - None    3 - 10-Point/Disability -    5 - 10-Point Other | | | 1 | F  SEX | YES   X NO |
| 2 - 5-Point    4 - 10-Point Compensable    6 - 10-Point/Compensable/30% | | | 0 - None    2 - Conditional | | |
| | | | 1 - Permanent    3 - Indefinite | | |

| GU BASIC + ADDL OPT WITH 5 X PAY + | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| STD OPT + FAM OPT | 9  NOT APPLICABLE | 0 |

| irement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per |
|---|---|---|---|
| FERS & FICA | 06/18/90 | F  FULL-TIME | Biweekly Pay Period |

## OSITION DATA

| sition Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service    3 - SES General | E  E - Exempt | | 8888 |
| 2 - Excepted Service    4 - SES Career Reserved | N - Nonexempt | | |

| uty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 1-0010-001 | WASHINGTON, DISTRICT OF COLUMBIA |

| Agency Data NC | 41. VET-STAT | 42. EDUC LVL | 43. SUPV LVL | 44. POSITION SENSITIVITY |
|---|---|---|---|---|
| LS    00 | X | 17 | 5 | NONSENSITIVE/LOW RI |

emarks

Appellant's
Exhibit # 1

| . Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| IN - BUREAU OF RECLAMATION | Jessica Gallo |
| . Agency Code | 48. Personnel Office ID | 49. Approval Date | AUTHORIZING OFFICIAL |
| IN07 | 1368 | 07/31/98 | 980210094 |

99 - 4312090



## UNITED STATES DEPARTMENT OF THE INTERIOR
## AWARD CERTIFICATION

### Rene Cochise
(Recipient)
**Is Presented a:**

*Monetary Award or Recognition*

_____  **On-the-Spot Award** in the net amount of $_____

__X__  **STAR Award** in the gross amount of **$ 500.00**

_____  **Quality Step Increase** (sustained exceptional performance pay increase)

_____  **Time Off Recognition**--number of hours _____

_____  **Non-Monetary Recognition** with a cash value of $_____

_____  **Interior Innovation Award** ($1,000 increase to operating budget)

_____ **Continuous Improvement Incentive** (check appropriate award above)


*Bureau-Specific Award* _____
                                                (Title)

*Honor Award*

- **Highest Honors:**        _____  **Distinguished Service Award**
                                         _____  **Conservation Service Award**

- **Mid-Level Honors:**      _____  **Meritorious Service Award**
                                         _____  **Outstanding Service Award**
                                         _____  **Unit Award for Excellence of Service**

- **Initial Honors:**        _____  **Superior Service Award**
                                         _____  **Citizen's Award for Exceptional Service**

- **Heroic Act Honors:**     _____  **Valor Award**
                                         _____  **Citizen's Award for Bravery**
                                         _____  **Exemplary Act Award**

FORM DI-451
February 1996

**JUSTIFICATION**    Required only for monetary awards, innovation awards, non-monetary recognition of significant value, or time off recognition. Citation is justification for honor awards. Attach copy of citation.

### SEE ATTACHMENT

APPROVED BY: _Christopher J Kenney_    **202-208-5000**

(Signature, Date, and Telephone Number including Area Code)

**ADDITIONAL SIGNATURES**
[As required by Bureau delegations]

_Stephen V. Magnuson_                            _Stephen Lee_

(Signature and Date)                            (Signature and Date)

**FINANCIAL ACTION RECORD**    This record is to initiate payment, accounting and tax transactions for STAR awards, On-the-Spot awards, and non-monetary recognition of significant value. Do not complete for Quality Step Increases, Time Off recognition, Interior Innovation Award or Honor Awards.

Recipient Name: __Rene Cochise__    Social Security Number: ____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____

| __07__ | __09__ | __005__ | __W-96100__ | __A10-1523-4000-400-00-0-1__ |
|--------|--------|---------|-------------|------------------------------|
| Bureau | Sub-Bureau | Block | Org. Code | Cost Account |

**MONETARY AWARD TO BE PAID THROUGH IMPREST (ON-THE-SPOT)**
Amount Authorized for Imprest Payment  (Hours Code 66A)        $_____ (Net Amount)
Amount Including Taxes  (Amount Paid divided by .55) (Hours Code 30A)    $_____ (Gross Amount)

    **IMPREST FUND PAYMENT RECORD**  (Present to Imprest Fund Cashier)
Paid by:    Cash [ ]        Third Party Draft [ ]        Subvoucher # _____

Received by Signature and Date: _____

**MONETARY AWARD TO BE PAID THROUGH THE PAYROLL SYSTEM (STAR OR ON-THE-SPOT)**
Total Cash Award  (Hours Code 30A)                    $_____ (Gross Amount)
Pay Period to be Processed by Payroll                    _____

**NON-MONETARY RECOGNITION OF SIGNIFICANT VALUE** (from $26 to $250)
Cash Value of Award  (Hours Code 66A)                    $__500.00__ (Net Amount)
Value Including Taxes  (Cash Value divided by .55)            $_____ (Gross Amount)

**Disposition of this form**: Original to servicing personnel office, copy to recipient. For STAR awards, On-the-Spot awards, and non-monetary recognition of significant value FAX page 2 of this form to the Payroll Operations Division. This fax is in lieu of original. *DO NOT* SEND ORIGINAL OF THIS DOCUMENT TO PAYROLL.

Note: Information on this form is protected by the Privacy Act. Disclosure may be made only to authorized persons according to Title 5 U.S.C., Section 552a(b).

Ms. Rene` Cochise is recommended for a Star Award for the following reasons:

As a member of the National Drought Policy Commission, the Commissioner agreed to provide staff support to provide the Commission information on the impacts of drought on Indian tribes. Ms. Cochise was asked to support Roseanne Gonzalez in that effort. Ms. Cochise helped develop a survey instrument and made the contacts to survey Indian tribes on drought issues. In addition, Ms. Cochise was the principal person responsible for drafting and finalizing a report to the Commissioner which summarized the findings of the survey. Ms. Cochise materially contributed to the efforts of the National Drought Policy Commission in its deliberations for a report to Congress in FY2000.

Personnel Management
233, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| , First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| HISE, RENE L. | 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 | 07/11/57 | 01/02/00 |

| ST ACTION | | SECOND ACTION | |
|---|---|---|---|
| de | 5-B. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
| 7 | SPECIAL ACT OR SERVICE AWARD | | |
| de | 5-D. Legal Authority | 6-C Code | 6-D. Legal Authority |
| F | 5 U.S.C. 4503 - OTS | | |
| | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| :OM: Position Title and Number | | | | | | 15. TO: Position Title and Number |
|---|---|---|---|---|---|---|

**POLICY ANALYST**

W961000       -004590

| Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16.Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | $    500 | |

| Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|

| lame and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|

COMMISSIONER'S OFFICE
OPERATIONS
NATIVE AMERICAN AFFAIRS

DENVER, COLORADO

## :MPLOYEE DATA

Veterans Preference

| L | 1 - None<br>2 - 5-Point | 3 - 10-Point/Disability<br>4 - 10-Point Compensable | 5 - 10-Point Other<br>6 - 10-Point/Compensable/30% | 24. Tenure<br>1 | 0 - None<br>1 - Permanent | 2 - Conditional<br>3 - Indefinite | 25. Agency Use<br>F | SEX | 26. Veterans Preference for RIF<br>YES    X  NO |

| FEGU<br>Z1 | BASIC + OPTIONAL(5X) + STANDARD +<br>FAMILY(1X) | 28. Annuitant Indicator<br>9 | NOT APPLICABLE | 29. Pay Rate Determinant<br>0 |

| Retirement Plan<br>K | FERS & FICA | 31. Service Comp. Date (Leave)<br>06/18/90 | 32. Work Schedule<br>F | FULL-TIME | 33. Part-Time Hours Per<br>Biweekly<br>Pay Period |

## POSITION DATA

| . Position Occupied<br>1 | 1 - Competitive Service  3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | 35. FLSA Category<br>E | E - Exempt<br>N - Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status<br>8888 |

| I. Duty Station Code<br>11-0010-001 | 39. Duty Station (City - County - State or Overseas Location)<br>WASHINGTON, DISTRICT OF COLUMBIA |

| 0. Agency Data<br>CLS   00 | DWNC<br>41. VET-STAT<br>X | 42. EDUC LVL<br>17 | 43. SUPV LVL<br>5 | 44. POSITION SENSITIVITY<br>NONSENSITIVE/LOW RI |

5. Remarks

| 46. Employing Department or Agency<br>IN - BUREAU OF RECLAMATION | 50. Signature/Authentication and Title of Approving Official<br>ANNA LOVATO   *Anna Lovato*<br>PERSONNEL MANAGEMENT SPECIALIST<br>312044 |
|---|---|
| 47. Agency Code<br>IN07 | 48. Personnel Office ID<br>1368 | 49. Approval Date<br>12/30/99 |

1 - Employee Copy - Keep for Future Reference



### UNITED STATES DEPARTMENT OF THE INTERIOR
# AWARD CERTIFICATION

_Rene Cochise_
(Recipient)

## Is Presented a:

### *Monetary Award or Recognition*

__    **On-the-Spot Award** in the net amount of $

✓    **STAR Award** in the gross amount of $ 843.17 ✓

__    **Quality Step Increase** (sustained exceptional performance pay increase)

__    **Time Off Recognition**--number of hours

__    **Non-Monetary Recognition** with a cash value of $

__    **Interior Innovation Award** ($1,000 increase to operating budget)

__    **Continuous Improvement Incentive** (check appropriate award above)

### *Bureau-Specific Award* _____
(Title)

### *Honor Award*

•   **Highest Honors:**      __ **Distinguished Service Award**
                                      __ **Conservation Service Award**

•   **Mid-Level Honors:**      __ **Meritorious Service Award**
                                      __ **Outstanding Service Award**
                                      __ **Unit Award for Excellence of Service**

•   **Initial Honors:**      __ **Superior Service Award**
                                      __ **Citizen's Award for Exceptional Service**

•   **Heroic Act Honors:**      __ **Valor Award**
                                      __ **Citizen's Award for Bravery**
                                      __ **Exemplary Act Award**

JUSTIFICATION   Required only for monetary awards, innovation awards, non-monetary recognition of
significant value, or time off recognition. Clear justification for Honor awards. Attach copy of citation.

For work detail to Office of Law Enforcement and Security and for
Coordination efforts with Doi on budget/finance issues.

**APPROVED BY:**

(Signature, Date, and Telephone Number including Area Code)

**ADDITIONAL SIGNATURES**
[As required by Bureau delegations]

_____               _____
(Signature and Date)                         (Signature and Date)

**FINANCIAL ACTION RECORD**   This record is to initiate payment, accounting and tax transactions
for STAR awards, On-the-Spot awards, and non-monetary recognition of significant value. Do not complete for
Quality Step Increases, Time Off recognition, Interior Innovation Award or Honor Awards.

Recipient Name: Rene Cochise     Social Security Number: 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

Bureau TY07 Sub-Bureau 09 Block ____ Org. Cnde W9161008 Cost Account A40 1952 0003 9W2 0100(9)

## MONETARY AWARD TO BE PAID THROUGH IMPREST (ON-THE-SPOT)

Amount Authorized for Imprest Payment (Hours Code 66A)          $_____ (Net Amount)
Amount Including Taxes (Amount Paid divided by .55) (Hours Code 30A)   $_____ (Gross Amount)

**IMPREST FUND PAYMENT RECORD** (To be Completed by Imprest Fund Cashier)
Paid by:     Cash [ ]     Third Party Draft [ ]     Subvoucher #

Received by Signature and Date: _____

## MONETARY AWARD TO BE PAID THROUGH THE PAYROLL SYSTEM (STAR OR ON-THE-SPOT)

Total Cash Award (Hours Code 30A)
Pay Period to be Processed by Payroll                    $843.17 (Gross Amount)
                                                          ASAP

## NON-MONETARY RECOGNITION OF SIGNIFICANT VALUE (Date Presented: _____)

Cash Value of Award (Hours Code 66A)                     $_____ (Net Amount)
Value Including Taxes (Cash Value divided by .55) (Hours Code 30A)   $_____ (Gross Amount)

**Disposition of this form:** Original to servicing personnel office, copy to recipient. For STAR awards, On-the-Spot
awards, and non-monetary recognition of significant value FAX page 2 of this form to the Payroll Operations Division.
This fax is in lieu of original. *DO NOT* SEND ORIGINAL OF THIS DOCUMENT TO PAYROLL.

Note: Information on this form is protected by the Privacy Act. Disclosure may be made only to authorized persons according to Title 5 U.S.C., Section
552a(b).

FORM DI-451
February 1996



# United States Department of the Interior

BUREAU OF RECLAMATION
PO Box 25007
Denver, Colorado 80225-0007

IN REPLY REFER TO:

D-1400
PER-1.10

*Renee*
*Congratulations*
*for a job well*
*Done. Thx.*
*Bill*

Rene Cochise
Operations Group
Bureau of Reclamation
1849 C Street NW
Washington, DC 20240-0001

Dear Ms. Cochise:

In recognition of your response to post-9/11 immediate needs and advancing accomplishment of the 17 tasks, the Office of Security, Safety and Law Enforcement takes pride in presenting you a Star Award in the amount of $500.

You did an outstanding job and provided invaluable leadership in recommending and implementing multi-dimensional changes in the Bureau of Reclamation.

Congratulations on a job well done!

Sincerely,

Kathy A. Carlson
Program Manager, Security, Safety and
Law Enforcement

Larry L. Todd
Director, Security, Safety and Law
Enforcement

cc:    D-1450, W-6000

A Century of Water for the West
1902-2002

## NOTIFICATION OF PERSONNEL ACTION

Personnel Management
33, Subch. 4
Hist. Middle)

| | | |
|---|---|---|
| HISE, RENE L. | 2. Social Security Number 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 | 3. Date of Birth 07/11/57 | 4. Effective Date 02/23/03 |

**ST ACTION** / **SECOND ACTION**

| 5-D. Nature Of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|
| 0  INDIVIDUAL CASH AWARD | | |

5-D. Legal Authority

| 6-C. Code | 6-D. Legal Authority |
|---|---|

5-F. Legal Authority

| 6-E. Code | 6-F. Legal Authority |
|---|---|

**OM: Position Title and Number**

**15. TO: Position Title and Number**
POLICY ANALYST

| Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16.Pay Plan W961000 | 17. Occ. Code -004590 | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award $ 843 | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|

| ic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|

re and Location of Position's Organization

**22. Name and Location of Position's Organization**
COMMISSIONER'S OFFICE
OPERATIONS
NATIVE AMERICAN AFFAIRS

DENVER, COLORADO

**IPLOYEE DATA**

rene Preference

| 1 None   3 - 10-Point/Disability   5 - 10-Point Other | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 2 - 5-Point   4 - 10-Point Compensable   6 - 10-Point/Compensable/30% | 1 | 0 - None   2 - Conditional | 1 - Permanent   3 - Indefinite | F  SEX | YES  X NO |

BASIC + OPTIONAL(5X) + STANDARD +
FAMILY(1X)

| 28. Annuitant Indicator 9  NOT APPLICABLE | 29. Pay Rate Determinant 0 |
|---|---|

rement Plan
FERS & FICA

| 31. Service Comp. Date (Leave) 06/18/90 | 32. Work Schedule F  FULL-TIME | 33. Part-Time Hours Per   Biweekly   Pay Period |
|---|---|---|

**SITION DATA**

tion Occupied

| 1 - Competitive Service   3 - SES General | 35. FLSA Category E  E - Exempt  N - Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status 8888 |
|---|---|---|---|
| 2 - Excepted Service   4 - SES Career Reserved | | | |

y Station Code
-0010-001

**39. Duty Station (City - County - State or Overseas Location)**
WASHINGTON, DISTRICT OF COLUMBIA

| gency Date NC | 41. VET-STAT X | 42. EDUC LVL 17 | 43. SUPV LVL 5 | 44. POSITION SENSITIVITY NONSENSITIVE/LOW RI |
|---|---|---|---|---|
| S  00 | | | | |

arks

 loying Department or Agency
- BUREAU OF RECLAMATION

| ncy Code IN07 | 48. Personnel Office ID 1368 | 49. Approval Date 02/21/03 |
|---|---|---|

50. Signature/Authentication and Title of Approving Official
MARSHA SWINK
HUMAN RESOURCES SPECIALIST
030314590

2  OFF Copy - Long-Term Record - DO NOT DESTROY

F:\M7\UDALNM\UDALNM.047

# [DISCUSSION DRAFT]

107TH CONGRESS
1ST SESSION

# H. R. _____

---

## IN THE HOUSE OF REPRESENTATIVES

Mr. UDALL of New Mexico introduced the following bill; which was referred to the Committee on _____

---

# A BILL

To authorize the Secretary of the Interior, through the Bureau of Reclamation, to construct the Jicarilla Apache Nation Municipal Water Delivery and Wastewater Collection Systems in the State of New Mexico, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Jicarilla Apache Res-

5  ervation Rural Water System Act".



Appellant's
Exhibit # 2



# THE JICARILLA APACHE TRIBE



P.O. BOX 507 ◆ DULCE, NEW MEXICO 87528

(505) 759-3242

## JICARILLA APACHE NATION
## RESOLUTION OF THE LEGISLATIVE COUNCIL

**RE: Supporting Rene Cochise in detail position to the House Resources Water & Power Subcommittee, United States House of Representatives.**

Resolution No. _____2001-R-162-04_____

WHEREAS, Article XI of the Jicarilla Apache Tribal Constitution, as revised, vests the inherent powers of the Jicarilla Apache Nation, including responsibility for the management of all tribal lands and natural resources, in the Jicarilla Apache Legislative Council; and

WHEREAS, the federally owned and operated municipal water system that serves the community of Dulce on the Jicarilla Apache Reservation is in need of major rehabilitation and repair work, and the United States Congress has directed the Bureau of Reclamation to conduct a feasibility study on the rehabilitation and repair of the water system; and

WHEREAS, the House Resources Water & Power Subcommittee in the United States House of Representatives is the authorizing committee for expenditure of reclamation funds, including any funding of the rehabilitation of the municipal water system in Dulce; and

WHEREAS, the Jicarilla Apache Nation and its representatives have been working with Rene Cochise, Policy Analyst, Bureau of Reclamation, in pursuing legislation and funding to rehabilitate the municipal water system in Dulce; and

WHEREAS, Ms. Cochise is extremely knowledgeable of Reclamation law, the relevant. authorization and appropriations processes, tribal sovereignty and tribal governmental needs, and has been of enormous assistance to the Jicarilla Apache Nation in pursuing legislation and appropriations to rehabilitate the municipal water system in Dulce; and

WHEREAS, Ms. Cochise has an opportunity to work on a detail from the Bureau of Reclamation to the House Resources Water & Power Subcommittee in the 107th Congress.

Resolution of the Legislative Council No. _____ 2001-R-162-04 _____
Re:    Supporting Rene Cochise in detail position to the House Resources Water &
        Power Subcommittee, United States House of Representatives
Page 2 of 2

**NOW THEREFORE BE IT RESOLVED**, the Legislative Council of the Jicarilla Apache Nation hereby recognizes and commends Ms. Cochise for her excellent job in assisting and facilitating Government-to-Government relations between the Bureau of Reclamation the Jicarilla Apache Nation; and

**BE IT FURTHER RESOLVED**, the Legislative Council of the Jicarilla Apache Nation hereby supports Ms. Cochise to be appointed a detail from the Bureau of Reclamation to the House Resources Water & Power Subcommittee; and

**BE IT FINALLY RESOLVED**, the President and Vice-President are hereby authorized and instructed to communicate the directives of this Resolution to members of Congress, and the Commissioner of the Bureau of Reclamation and other agency officials.

_____
President of the Jicarilla Apache Nation

## CERTIFICATION

The foregoing Resolution was enacted upon by the Tribal Council of the Jicarilla Apache Tribe on the __4th__ day of __April__, __2001__, by a vote of __7__ for, __0__ against, and __0__ abstaining, at a duly called meeting at which a quorum of the Tribal Council members was present.

ATTEST: _____
Secretary of the Jicarilla Apache Nation

Law Offices

# HOLLAND & KNIGHT LLP

2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006-6801

202-955-3000
FAX 202-955-5564
www.hklaw.com

| | |
|---|---|
| Boston | Orlando |
| Bradenton | Providence |
| Chicago | St. Petersburg |
| Fort Lauderdale | San Antonio |
| Jacksonville | San Francisco |
| Lakeland | Seattle |
| Los Angeles | Tallahassee |
| Melbourne | Tampa |
| Miami | Washington, D.C. |
| New York | West Palm Beach |

International Offices:

| | |
|---|---|
| Buenos Aires* | São Paulo |
| Mexico City | Tel Aviv* |
| Rio de Janeiro | Tokyo |
| *Representative Offices | |

SHENAN R. ATCITTY
202-457-7128

Internet Address:
sratcitt@hklaw.com

March 28, 2001

Lorraine Bobian, EEO Counselor
Bureau of Reclamation
P.O. Box 25007, D4520
Denver, CO 80225-007

RE:    Meeting between the Bureau of Reclamation and Jicarilla Apache Nation,
Tuesday, March 6, 2001.

Dear Mrs. Bobian,

Holland & Knight LLP provides Federal governmental relations services to the Jicarilla Apache Nation. It has come to my attention that there is an administrative inquiry involving the scheduling and coordination of a meeting between the Bureau of Reclamation and the Jicarilla Apache Nation that occurred on Tuesday, March 6, 2001.

I would like it to be known that I scheduled and coordinated this meeting on behalf of the Nation. I represent the Nation in its efforts to obtain federal funding for the Bureau of Reclamation to conduct a feasibility study for rehabilitating the water delivery system on the Jicarilla Apache Reservation. Congress enacted our legislation last year and President Clinton signed into law PL 106-243 on December 21, 2000. Congress directed that the study be completed and reported to Congress by July 10, 2001. We are in the process of finalizing this study which will be used as a basis for securing project authorization for the construction of new tribal municipal water supply system. This is a $25 million project which involves two federal agencies, the Bureau of Reclamation and the Bureau of Indian Affairs and implicates the health, safety and economic development concerns of the Nation. This project is of the utmost priority for the Jicarilla Apache Nation.

March 28, 2001
Page 2

I called Mrs. René Cochise, Policy Analyst, Bureau of Reclamation, to inform her that the President and Tribal Council members of the Jicarilla Apache Nation would be in Washington D.C. the week of March 5, 2001. I asked Mrs. Cochise for the availability of Mr. Larry Todd to meet with the Jicarilla officials. Due to the magnitude of the project, the Jicarilla officials wanted to meet with the top officials in the Bureau of Reclamation to secure assurance that the change in Administration would not affect the agency's favorable position regarding our project. Mrs. Cochise later provided me with Mr. Todd's secretary's telephone and fax numbers. In fact, Mr. Todd was unavailable to meet with us, so I scheduled a meeting with Mike Gabaldon. For your review, I am attaching a copy of the letter confirming the meeting that I scheduled with Mr. Gabaldon. Mrs. Cochise also recommended that I contact Mr. Chis Kenney, Director of the Native American Affairs Office and informed me that she would not be available for the meeting. She was unsure of Mr. Kenney's availability, but reminded me to include him. As an oversight, I did not call Mr. Kenney.

For the past two years, we have been working with Mrs. Cochise on this particular project, and we believe that she has been absolutely instrumental to our success. In this instance as in many other instances in the past, I directly contacted Mrs. Cochise because of (1) her extensive knowledge of Reclamation law; (2) her knowledge of project authorization; (3) her knowledge of the legislative process; (4) her experience working with Indian tribes, and in particular working with my client the Jicarilla Apache Nation; and (5) her experience working with other federal agencies. In addition, it has been my experience that Mrs. Cochise is very likeable and as a professional Native American woman, she quickly developed and maintains a natural rapport with the tribal leaders and myself. Because she is a member of the Mescalero Apache Tribe, she knows many of the same people as the Jicarilla leaders, she's knowledgeable of Apache customs and traditions and has an inherent familiarity based on her heritage and background. The agency should be proud and supportive of Mrs. Cochise's ability to build trust with tribal leaders as it only improves the credibility of an agency that is known for its historically destructive impacts on tribal lands and people.

On the other hand, when I first began meeting with Reclamation, Mr. Kenney initially instructed that the Jicarilla Apache Nation must meet only with him or that he must be included in all meetings involving the Bureau of Reclamation in the Interior Building. I relayed this directive to the Jicarilla President who then instructed me to immediately inform Mr. Kenney that the Jicarilla Apache Nation is a sovereign Indian Nation and in accordance with Government-to-Government relations would meet with the Commissioner, Director of Operations, or Deputy of Operations, or whatever official of the Nation deemed necessary. Mr. Kenney understood our position, and since then, I believed that Mr. Kenney respected the Nation's prerogative to schedule meetings independent of his presence or involvement. In most of our meetings with the Bureau of Reclamation, we have coordinated with both Mrs. Cochise and Mr. Kenney.

March 28, 2001
Page 3

    Mrs. Cochise has always had a strong understanding and appreciation of tribal sovereignty and has never suggested that the Nation meet only with one particular office, but has strongly suggested that we keep all interested individuals informed in reference to our project. As I indicated above, it is my usual practice to coordinate with both Mr. Kenney and Mrs. Cochise in matter involving our project with the Bureau of Reclamation. With respect to the meeting on March 6, 2001, it was my oversight in not contacting Mr. Kenney, though we maintain the position that the Jicarilla Apache Nation is not required to coordinate or meet with Mr. Kenney and his office. Furthermore, I strongly believe that Mrs. Cochise should <u>not</u> be reprimanded in any manner with respect to her involvement in our meeting.

    If you have any questions or need additional information, please do not hesitate to contact me at (202) 457-7128.

Sincerely,

Shenan R. Atcitty
Senior Counsel
Holland & Knight LLP

Attachment

# HOLLAND & KNIGHT LLP

Law Offices

2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006-6801

202-955-3000
FAX 202-955-5564
www.hklaw.com

Atlanta          Northern Virginia
Boston           Orlando
Bradenton        Providence
Chicago          St. Petersburg
Fort Lauderdale  San Antonio
Jacksonville     San Francisco
Lakeland         Seattle
Los Angeles      Tallahassee
Melbourne        Tampa
Miami            Washington, D.C.
New York         West Palm Beach

International Offices:
Buenos Aires*    São Paulo
Mexico City      Tel Aviv*
Rio de Janeiro   Tokyo
*Representative Offices

March 29, 2001

SHENAN R. ATCITTY
202-457-7128

Internet Address:
sratcitty@hklaw.com

Mr. Mike Gabaldon
Deputy of Operations
Bureau of Reclamation
1849 C Street N.W. MS-7060-MIB
Washington, D.C. 20240

Appellant's

Exhibit # 4

RE:    Meeting between the Bureau of Reclamation and Jicarilla Apache Nation, Tuesday, March 6, 2001.

Dear Mr. Gabaldon:

For your information, I am enclosing a copy of a letter I sent to Lorraine Bobian, EEO Counselor, Bureau of Reclamation regarding an administrative inquiry into the conduct of Mrs. René Cochise, Policy Analyst, Bureau of Reclamation, in relation to a meeting I scheduled with you and officials of the Jicarilla Apache Nation ("Nation"). First, I would like to inform you that we enjoyed meeting with you earlier this month and that the Jicarilla leaders feel very confident that the Nation's project with the Bureau will not be adversely affected by the change in Administration. We were also very pleased to meet with you personally and to get to know a fellow New Mexican.

With respect to the inquiry into Mrs. Cochise's conduct, I am astonished that the agency would entertain taking action against her for being responsive and helpful to an Indian Nation. We have worked with Mrs. Cochise for well over two years, and she has always been extremely professional, well-prepared, well-knowledgeable and personable. Based on my personal observations and experiences, I am also disturbed by the fact that there appears to be a pattern of adverse agency reaction to her interactions with tribal leaders and representatives. My input is based on work relating to the Jicarilla Apache Nation.

As background, the municipal water system on the Jicarilla Apache Reservation is owned and operated by the Bureau of Indian Affairs and has fallen into severe disrepair basically due to lack of federal funding for regular capital improvements dating back to the 1960's. In October of 1998, the system failed leaving the Reservation without water for 6

days. The National Guard provided emergency basic water needs such as bottled water and portable commodes. One home burned downed with no water for fight the fire. Fortunately, no one was killed or seriously injured. Though the system is Federal property, the Tribal Council provided emergency funding to take corrective action. Water was restored to the community, but the problems with the system continued. The collection lines and sewage system are out of compliance with Federal safe drinking water standards and pose serious health and safety hazards to the community. Based on studies and evaluations from engineers that the Nation retained, the total cost of rehabilitation was estimated at $22-25 million. The Nation has already expended nearly $5 million to repair this system, however, the position of the Nation is that this system and its rehabilitation is the responsibility of the Federal Government.

We naturally began our quest for federal funding with the Bureau of Indian Affairs. The officials there informed the Nation that there was no funding available to address this problem and suggested that we contact the Bureau of Reclamation for assistance. Specifically, we were referred to Mrs. Cochise, who was portrayed as a knowledgeable individual with relevant experience to assist us with our request. After calling Mrs. Cochise, introducing myself and explaining the background of our issue, she provided general information about the Bureau of Reclamation and the Native American Affairs Office (NAAO) as well as specific information regarding the authorization and appropriations process for securing a Reclamation project. We then scheduled a meeting with Steve Magnussen, which included the NAAO. Following the meeting with Mr. Magnussen and his staff, I met separately with NAAO and was surprised by the demeanor of the NAAO staff towards Mrs. Cochise. Mrs. Cochise's input was basically ignored and treated as non-consequential, which was in stark contrast to the open and helpful conversation that I had had separately with her. In private, I asked if there were issues amongst the staff that we should know of given that we were beginning a working dialogue with the agency. She politely made excuses for the staff and pledged that the agency would have no difficulty working with the Nation.

Without rehashing in detail one of my first encounters with Chris Kenney, which is described in more detailed in my letter to Ms. Bobian, I formed an early impression that there were resentment issues amongst the NAAO staff against Mrs. Cochise. On more than one occasion, Chris Kenney and Betty Johnson have stated or strongly insinuated that the Nation should not interact with Mrs. Cochise without their involvement or without first checking with them. (Conversely, Mrs. Cochise has never attempted to exclude anyone, but always encourages the inclusion of all affect parties, including Chris Kenney himself.) I view this attitude as being very paternalistic towards an Indian Nation and pointedly biased against Mrs. Cochise. Mrs. Cochise has developed strong credibility with the Nation and has earned our trust. I do not believe that there is any regulatory or other restraint that would bar, limit or otherwise qualify our interaction with her.

Finally, I was displeased with the NAAO staff's reaction to our recognition of Mrs. Cochise's work in our meeting with you. In the midst of our recognition to you of Mrs.

March 29, 2001
Page 3

Cochise's exception work, Betty Johnson pulled out Chris Kenney's card, announced his title and stated that she was representing him and then reminded us that we should meet with him on all of our matters. Mrs. Johnson is well aware of the fact that we regularly meet with Chris Kenney and the NAAO staff, and I felt that it was somewhat tacky for her to attempt to steal the spotlight from Mrs. Cochise's well-earned recognition. In fact, you thanked us for complimenting one of your own, while Mrs. Johnson failed to even acknowledge Mrs. Cochise.

When evaluating each of the above instances separately, each event could be readily explained or justified. However, in the totality, I believe that there is an unquestionable problem. Because the instant action against Mrs. Cochise is based on a meeting involving me and my representation of the Jicarilla Apache Nation, I believe that my input is important and necessary to the evaluation of this specific matter as well as the larger issues involving Mrs. Cochise. As a Native American attorney, I am very disturbed that these issues surrounding Mrs. Cochise appear to be discriminatory in nature, and that her natural and professional rapport with tribal leaders is somehow being used against her. I trust that the agency will treat her with proper due process, including taking into account the appropriate consideration of her professional abilities and accomplishments.

The Jicarilla Apache Tribal Council will meet next week, and I will provide them with a legislative report and I will present a resolution in support of Mrs. Cochise's detail to the House Resources Water and Power Subcommittee. You should also be aware of the fact that the Jicarilla Apache Nation and myself have favorably commented in public on our working relationship with the Bureau of Reclamation which is due in large part to our work with Mrs. Cochise. If action is taken against Mrs. Cochise based on a meeting that I scheduled with you and the Jicarilla Apache Nation, I will be compelled to reevaluate our relationship with the Bureau of Reclamation and report my recommendations to the Nation as well other affected tribes.

In closing, I want to reiterate that it was an absolute pleasure meeting with you, and we look forward to a continued successful dialogue and relationship with the Bureau of Reclamation. If you have any questions or need additional information, please do not hesitate to contact me at (202) 457-7128.

Sincerely,

Shenan R. Atcitty
Senior Counsel
Holland & Knight LLP

Attachments

# EXHIBIT # 6

# In The Matter Of:

*RENE COCHISE   v.*
*GALE NORTON, SEC US DEPARTMENT OF INTERIOR*

---

### CHRISTOPHER KENNY
*April 30, 2002*

---

*BETA REPORTING & VIDEOGRAPHY SERVICES*
*910 SEVENTEENTH STREET, NW*
*SUITE 200*
*WASHINGTON, DC  USA  20006*
*(202) 638-2400    FAX: (202) 833-3030*

*Original File AAKENNY.TXT, 158 Pages*
*Min-U-Script® File ID: 2352553851*

## Word Index included with this Min-U-Script®

[5] appointed her as acting director, do you [6] recall a situation where there was a [7] complaint concerning material being locked [8] in your office in your absence and where she [9] was unable to obtain that information?

[10] A: Yes.

[11] Q: Would you tell me your knowledge [12] of that incidence.

[13] A: My memory was as acting director, [14] she was asked to provide comments on some [15] pending legislation. She was having [16] difficulty finding the material that had [17] come into the office and the report was that [18] that frustrated her ability to be responsive [19] to the request.

[20] Q: She made an attempt to get into [21] your office. Is that correct?

[22] A: I don't know.

Page 33

[1] Q: Do you recall whether or not your [2] secretary ever admitted that she did not [3] give Mrs. Cochise certain documents that [4] were in the possession of your office?

[5] A: I have correspondence from my [6] secretary that she has misplaced and [7] misunderstood and was late in getting [8] documents to Mrs. Cochise. That's what I [9] remember.

[10] Q: Now, as an acting director, [11] irrespective of whether it's Mrs. Cochise or [12] Mr. Peterson or Ms. Marks or Ms. White, [13] would they have an occasion to go into your [14] office, if they were serving in the role as [15] acting director?

[16] A: Yeah.

[17] Q: How would they get into your [18] office normally?

[19] A: In my absence, usually my office [20] is locked because I have negotiation files [21] in there. My secretary has a key to the [22] office and if they inquire of the secretary,

Page 34

[1] they can get in my office any time they [2] need.

[3] Q: Well, did Mrs. Cochise inquire of [4] your secretary, when she was acting [5] director, in an attempt to get into your [6] office?

[7] A: I'm told she did.

[8] Q: What, if anything, took place?

[9] A: I don't remember. I remember [10] being reported that she had difficulty [11] getting in the office.

[12] Q: But do you recall that your [13] secretary apologized for not getting [14] documents to Mrs. Cochise?

[15] A: She apologized for misplacing [16] documents, for misunderstanding, yes.

[17] Q: Did you issue any form of [18] disciplinary action to your secretary for [19] that?

[20] A: No.

[21] Q: Was there any reason why you did [22] not?

Page 35

[1] A: My assessment of the situation was [2] that it was a simple human error. It was a [3] misunderstanding, and it didn't arise to a [4] level of a disciplinary action.

[5] Q: Did you consider it any form of [6] insubordination when Mrs. Cochise, as [7] acting [8] director, attempted to get in and the [8] secretary did not give her access?

[9] A: That was not the way it was [10] represented to me.

[11] Q: How was it represented to you?

[12] A: I'm told that Mrs. Cochise said [13] she tried to get into the office, but she [14] couldn't, but that she did not make any [15] inquiry of the secretary that she was trying [16] to get in the office, so my memory of the [17] experience is that it was reported she was [18] frustrated and couldn't get in the office, i'm that she [19] didn't make an inquiry to get [20] into the office or ask for the key.

[21] Q: It was just an oversight. The [22] secretary just failed to give her documents

Page 36

[1] that she should have given to her. Is that [2] it?

[3] A: As I understand it, she [4] misunderstood the documents that she was [5] looking for, and once she realized what [6] Mrs. Cochise was looking for, she found them [7] for her.

[8] Q: Now, did that in any way impact [9] Mrs. Cochise's ability to respond to the [10] request for information that she had to [11] comply with?

[12] A: I can't say, because I don't [13] remember the circumstances of her actions.

[14] Q: Did there ever come a time when [15] you issued a directive on March 9th, [16] informing Mrs. Cochise not to contact Indian [17] tribes unless they were approved by you?

[18] A: The way you stated the question, [19] I'd say no.

[20] Q: Would you tell me in your own [21] way?

[22] A: Because I think it's very [22] important — let me find that document, the

Page 37

[1] e-mail transmittal to Rene. I want to be [2] very careful here. I'd like to read to you [3] the statement that I sent to her and the [4] e-mail.

[5] Q: Sure.

[6] MS. ARMSTRONG: For the record, [7] this is already in evidence. It's Agency [8] SDRY Reported Investigation Exhibit 2-2H, at [9] Page 10.

[10] THE WITNESS: What I said was any [11] meetings with Indian tribes, which involved [12] this office, meaning the Office of Native [13] American Affairs, are to be approved by the [14] director.

[15] BY MR. WALTON:

[16] Q: "To be approved by the director." [17] Now, what did you mean by "they are to be [18] approved by the director"?

[19] A: Exactly that; either myself or [20] someone acting in my capacity as acting [21] director has to approve a meeting with an [22] Indian tribe, and "meeting" means a meeting

Page 38

[1] with an Indian tribe in which the Bureau of [2] Reclamation would be represented to the [3] tribe in the context of that meeting.

[4] Q: Who is the director?

[5] A: I'm the designated director of the [6] office.

[7] Q: I see.

[8] A: I consider anyone who acts in my [9] place to be the director of the office for [10] the purposes of this statement.

[11] Q: How does the process work — [12] just so we can understand, for the record — [13] how does the process work, with respect to [14] setting up meetings with Indian tribes, [15] based on your knowledge?

[16] A: As a general principle, we don't [17] set up meetings with Indian tribes per se. [18] We have inquiries from Indian tribes who [19] want to meet with us in Washington or there [20] is formal circumstances, such as water [21] rights negotiations where meetings are going [22] to happen as a matter of course by virtue of

Page 39

[1] that activity.

[2] Q: I see. Now, there came a time [3] when you admonished Mrs. Cochise for [4] allegedly setting up a meeting. Is that [5] correct?

[6] A: I don't know what you're asking [7] me.

[8] Q: Well, did there ever come a time [9] when you attempted to issue some form of [10] discipline with regards to Mrs. Cochise and [11] her relationship with attempting to — in [12] your words — attempting to meet with or [13] arrange for a meeting with Indian tribes in [14] your office?

[9] Q: Did you report this incident to [10] anyone?

[11] A: No, sir. I didn't.

[12] Q: To your knowledge, did [13] Mrs. Cochise report this incident to anyone?

[14] A: Yes.

[15] Q: Who did she report it to?

[16] A: I don't know who she reported it [17] to. I got a phone call from Ms. Margaret [18] Sibley.

[19] Q: Who is Ms. Margaret Sibley?

[20] A: She's a senior executive that was [21] working on the corridor. I don't recall [22] what position she possessed at the time, but

**Page 100**

[1] she was on the front corridor, in the [2] commissioner's officer.

[3] Q: What, if anything, happened when [4] you received the telephone con-versation?

[5] A: She asked me to come up and meet [6] with her, is what I recall, and I guess at [7] the time she was Acting Deputy Director of [8] Operations.

[9] Q: Did you have the meeting with her?

[10] A: Yes.

[11] Q: What transpired?

[12] A: She told me what had been [13] reported, which was that I had assaulted [14] Rene. She asked me my version of the story, [15] and I told her substantially the same story [16] I told you and that was in my affidavit, and [17] I was released to go back to my office.

[18] Q: Did anything else transpire after [19] that?

[20] A: Not to my knowledge.

[21] Q: You never heard anything else [22] about it?

**Page 101**

[1] A: No. One amendment to my last [2] answer: Shortly thereafter, and I don't [3] remember the timeframes, maybe im-mediately, [4] Mrs. Cochise was re-assigned to another [5] office.

[6] Q: What office was that? Do you [7] recall?

[8] A: They put her in the Office of [9] Policy, I guess. She went down the corridor [10] with the people that analyze policy.

[11] Q: Did Mrs. Cochise say anything to [12] you during this conversation, during the [13] incident?

[14] A: Other than she objected to me [15] taking the package to go make a copy.

[16] Q: Now, turning to page 6 of your [17] affidavit, and I believe it's the second [18] paragraph where it begins with "the first

[19] assignment, as a high-visibility staff [20] assignment".

[21] A: Yes.

[22] Q: Was that an assignment that

**Page 102**

[1] Mrs. Cochise was involved in?

[2] A: Yes.

[3] Q: How did she perform that [4] as-signment?

[5] A: She was responsive to the people [6] that she was asked to go and support. They [7] expressed some frustration with her work [8] habits and work level, so eventually she was [9] sent back.

[10] Q: But in your affidavit, it [11] indic-ates that "The value of the assignment [12] was that Mrs. Cochise would be working at [13] the departmental level in a political [14] environment, one of the essentials for a [15] GS-14." Did you make that statem-ent?

[16] A: Yes.

[17] Q: Did you give any type of [18] accommodation to Mrs. Cochise for her work [19] in this assignment?

[20] A: Accommodation? I'm sorry.

[21] Q: Any type of recommendations, [22] accommodations, or awards?

**Page 103**

[1] A: I don't recall doing that, no.

[2] Q: Going to paragraph 2, the second [3] project assigned to Mrs. Cochise was to [4] analyze and restructure the stat-istical [5] information in a published document as part [6] of a briefing to the Assistant Secretary. [7] Do you recall that?

[8] A: Yes.

[9] Q: How did Mrs. Cochise perform that?

[10] A: Not real well. Parts of it, she [11] did relatively well. Parts of it I was [12] disappointed in.

[13] Q: Now, to your knowledge, did she [14] receive any type of accommodation or an [15] award for her work involved in that project?

[16] A: I don't remember.

[17] MR. WALTON: I'd ask that we mark [18] this as Complainant's No. 3.

[19] (Complainant's Exhibit No. 3 was [20] marked for identification.)

[21] BY MR. WALTON:

[22] Q: I'm showing you, Mr. Kenny and

**Page 104**

[1] Mrs. Armstrong, what's been marked as [2] Complainant's No. 3. I'd ask you if you can [3] identify this document and if so, what you [4] identify it to be.

[5] A: It's a personnel action that notes [6] a monetary award.

[7] Q: Do you know what the monetary [8] award was for?

[9] A: No.

[10] Q: Do you know who gave the monetary [11] award?

[12] A: I gave the monetary award.

[13] Q: But you don't recall what it was [14] for?

[15] A: Not specifically, no.

[16] Q: Would you have any way, in the [17] future, finding that out?

[18] A: Yes. Because I'm sure it's in our [19] personnel file.

[20] Q: Could this be for the project that [21] we're speaking of, the second pro-ject?

[22] A: I don't know.

**Page 105**

[1] Q: Gong to the next sentence, [2] " Finally, I assigned Mrs. Cochise a high [3] visibility project requiring the man-agement [4] of a policy team." Would you take a look at [5] that?

[6] A: Yes.

[7] Q: The last sentence says, "The final [8] report of the team has been due since [9] August 1999 and remains unfinished."

[10] A: Yes.

[11] Q: Did there ever come a time when [12] you gave any type of award or accommodation [13] to Mrs. Cochise concerning this project?

[14] A: I don't remember.

[15] MR. WALTON: I'd ask that this be [16] marked as Complainant's Exhibit No. 4. [17] Thank you.

[18] (Complainant's Exhibit No. 4 was [19] marked for identification.)

[20] BY MR. WALTON:

[21] Q: Showing you what's been marked as [22] Complainant's Exhibit No. 4 for

**Page 106**

[1] identification, I'd ask you if you recognize [2] this document and, if so, what you recognize [3] it to be?

[4] A: I recognize this as a personnel [5] action for a monetary award.

[6] Q: What's the date of that award?

[7] A: January 2, '02; January 2, 2000.

[8] Q: Do you know what that award was [9] given for?

[10] A: No, but I'm sure that we have [11] documentation in the files that we could [12] compare — match up with it.

[13] Q: So, if I represented to you that [14] that award was given for this project, the [15] high-visibility project that is refere-nced [16] in the beginning of "Finally, I assigned [17] Mrs. Cochise to a high-visibility project, [18] do you doubt that it

was given for that [19] particular project?

[20] **A:** I just don't know.

[21] **Q:** Could it be?

[22] **A:** I don't know.

---

Page 107

[1] **MR. WALTON:** Now, did there ever [2] come a time when you disapproved a travel [3] voucher for Mrs. Cochise — and if you will [4] hold, I will try to get the date for you.

[5] We're going to take a break. At [6] this time, maybe we can take a break. We'll [7] take a short break.

[8] (Whereupon, at 11:50 a.m., a [9] luncheon recess was taken.)

---

Page 108

[1] **AFTERNOON SESSION**

[2] (1:13 p.m.)

[3] **MR. WALTON:** Frazer Walton again. [4] For the record, as a preliminary matter, to [5] answer your question, Ms. Armstrong, in [6] reference to the counseling reports: I [7] talked with my client and Mrs. Cochise [8] indicates that her counselor is undergoing [9] serious medical treatment, and she's [10] attempted to get those records.

[11] We believe it will take at least a [12] week to two weeks to do that and we [13] certainly have no problems with — once we [14] get the reports — at your convenience or [15] the Department's convenience, having her [16] come back to testify concerning those [17] reports.

[18] So that's the problem. She can't [19] get the reports because her counselor's [20] undergoing serious medical treatments at [21] this time and she's not available to get the [22] reports for my client.

---

Page 109

[1] So it will take, we feel, [2] approximately two weeks and if you want to [3] proceed with her deposition today, that's [4] fine. If you want to continue it until we [5] get the reports, we have no problems with [6] that and we can represent that to the [7] administrative judge.

[8] Do you have a preference?

[9] **MS. ARMSTRONG:** I can start. [10] Since her allegations are quite lengthy, [11] I'll start.

[12] **MR. WALTON:** Okay.

[13] **MS. ARMSTRONG:** And when we get to [14] the compensatory damages, I'll see where [15] we are.

[16] **MR. WALTON:** Okay.

[17] **MS. ARMSTRONG:** I'll still reserve [18] my right to file a motion to compel because [19] I believe there could be other people in the [20] office that could possibly make copies of [21] those re-

---

cords, but we'll see because [22] discovery ends in May.

---

Page 110

[1] **MR. WALTON:** Okay.

[2] **MS. ARMSTRONG:** May 30th. If I [3] don't get the records, any claim for [4] compensatory damages we will be objecting [5] to. So I'll start and see where we are. If [6] I don't see them — you said a week.

[7] **MR. WALTON:** To two.

[8] **MS. ARMSTRONG:** To two?

[9] **MR. WALTON:** Yes. And again, [10] that's why —

[11] **MS. ARMSTRONG:** That will leave me [12] with no other option, but to file a motion [13] to compel.

[14] **MR. WALTON:** Sure, and with my [15] representations on the record, I would [16] recommend that you not do that, because [17] I'm officially making that statement on the [18] record. It's her counselor's medical [19] health, and if you do, we would certainly [20] seek compensation.

[21] What I would suggest is that we [22] talk with the administrative judge. Based

---

Page 111

[1] on those representations, I would make [2] them, on the record, without them being [3] true and, of course, the judge would [4] certainly grant a continuance because, as [5] you know, medical problems are a legitimate [6] excuse.

[6] **MS. ARMSTRONG:** Well, I [7] understand. I'm not going to argue with [8] you. I said I will start, and we'll see [9] where we are, but like I said, this was [10] requested on March 1st.

[11] **MR. WALTON:** Right.

[12] **MS. ARMSTRONG:** We're now two [13] months later, so I don't know what happened [14] between March 1st and now April 30th, which [15] is, like I said, two months, why those [16] records couldn't have been obtained during [17] the month of March.

[18] **MR. WALTON:** What I just told you.

[19] **MS. ARMSTRONG:** And she's been [20] under medical treatment for the last two [21] months?

[22] **MR. WALTON:** She's ill. She's

---

Page 112

[1] very ill. That's my representation.

[2] **MS. ARMSTRONG:** Well, I [3] understand. I thought this was a recent [4] development.

[5] **MR. WALTON:** That's where we are.

[6] **MS. ARMSTRONG:** Then that's fine.

[7] **MR. WALTON:** Okay.

[8] **MS. ARMSTRONG:** Okay.

---

[9] **MR. WALTON:** No. We're not trying [10] to keep the records. We certainly know that [11] there are damages, so we would want them as [12] much as you do. [13] Whereupon, [14] CHRISTOPHER KENNY [15] was recalled as a witness and, having been [16] previously duly sworn, was examined and [17] testified further as follows:

[18] **EXAMINATION BY COUNSEL FOR COMPLAINANT**

[19] **CONTINUED**

[20] **BY MR. WALTON:**

[21] **Q:** Continuing the deposition of [22] Mr. Kenny: Mr. Kenny, going back again to

---

Page 113

[1] the Letter of Reprimand, of April 27, I [2] would ask you — and I believe that's just [3] for informational purposes, and I'll try to [4] get that in the report of investigation, and [5] I'll give your counsel a chance to get [6] that — looking at the investigative — the [7] Letter of Reprimand, at page 2; page 2.

[8] Let me see if I have it. What [9] volume's that? I'm sorry?

[10] **MS. ARMSTRONG:** Volume III of [11] WBR00-005 and 000-23, Exhibit No. 6-6.

[12] **MR. WALTON:** I don't have it [13] either.

[14] **MRS. COCHISE:** It's in the [15] counselor's report, on page 3.

[16] **MR. WALTON:** Page 3.

[17] (Discussion off the record)

[18] **MRS. COCHISE:** It's in Volume II?

[19] **MR. WALTON:** Thank you.

[20] **BY MR. WALTON:**

[21] **Q:** That's all right. I'll show you [22] this letter. We were looking at that this

---

Page 114

[1] morning, I believe. Yes. Okay.

[2] **MR. WALTON:** I ask that you mark [3] this, please.

[4] We're marking this as [5] Complainant's Exhibit No. 5 for [6] identification, the Letter of Reprimand.

[7] I ask you to take a few seconds.

[8] **THE WITNESS:** I'm sorry. This is [9] not the Letter of Reprimand.

[10] **BY MR. WALTON:**

[11] **Q:** It's not? I'm sorry. Memorandum [12] of Counseling; I'm sorry. I'm sorry. [13] You're correct.

[14] Mark this as five, and I'll just [15] strike that.

[16] **MRS. COCHISE:** The Letter of [17] Reprimand is in the Counsel's Report.

[18] **MR. WALTON:** Oh, we do have it?

[19] **MRS. COCHISE:** Yeah.

[20] **MR. WALTON:** Good. If you could [21]

---

# EXHIBIT # 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RENEE COCHISE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:06-CV-00980 (RJL) |
| | ) | |
| DIRK KEMPTHORNE, Secretary, | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, defendant Dirk Kempthorne, Secretary of the U.S. Department of the Interior, by and through undersigned counsel, responds to Plaintiff's Request for Admissions as follows:

### GENERAL OBJECTIONS

Defendant objects to each request to the extent that it seeks to elicit information protected against disclosure by the attorney-client privilege, the work product doctrine, the joint interest privilege, and any and all other privileges or rules of confidentiality provided by law.

Defendant objects to each request to the extent that it is overly broad, calculated to cause undue burden and expense, or is oppressive.

Defendant objects to each request to the extent that it is irrelevant not reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to each request to any and all "Instructions" or "Definitions" to the extent that they might be construed to require responses that are beyond the scope required by 29 C.F.R. 1614.109(b).

Defendant objects to each request to the extent that it is vague, imprecise, ambiguous and confusing, and to the extent that the plaintiff has failed to describe the information sought with reasonable particularity.

Defendant objects to each request to the extent that it is repetitious, cumulative and/or duplicative.

Without waiving the foregoing objections, defendant responds as follows:

**Request 1.**

Please admit that at all pertinent times herein, the defendant was subject to the merit promotion provision of 5 U.S.C. Chapter 33, 5C.F.R. § 335, and the U.S. Department of Interior's Departmental Manual, Chapter 335: Promotion and Internal Placement.

**Response:**

Defendant admits that is covered by 5 U.S.C. Chapter 33 and 5 CFR 335, and the Department Manual is its policy, but denies the remainder of Request No. 1.

**Request 2:**

Please admit that plaintiff was hired as a Policy Analyst, GS-301-13, with the potential for promotion to a GS-14 career ladder position within one year.

**Response:**

Defendant admits only that plaintiff was hired as a Policy Analyst, GS-13, and the position had promotion potential to a GS-14.

**Request 3:**

Please admit that plaintiff was the team leader and chaired the Office of Reclamation Indian O & M Working Group.

**Response:**

**Request 7:**

Please admit that plaintiff received a 2000 "Star Award" in the amount of $500.00 for her work as a member of the National Drought Policy Commission. The Commissioner agreed to provide staff support to provide the Commission information on the impacts of drought on Indian Tribes.

**Response:**

The defendant objects to this request because it is vague, imprecise, ambiguous and confusing, and because plaintiff has failed to describe the information sought with reasonable particularity. Without waiving this objection, the defendant admits that plaintiff received an award in the amount of $500 for her work on the National Drought Policy Commission in the year 2000, but it denies the remainder of this requested admission.

**Request 8:**

Please admit that the plaintiff received a 2003 "Individual Cash Award" in recognition of her work on security issues during the requisite rating period.

**Response:**

The defendant objects to this request because it is irrelevant not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's complaint involves allegations of discrimination that allegedly took place during the time period 1999-2002.

**Request 9:**

Please admit that plaintiff received a commendation from the "Jicarilla Apache Nation,' and a "Resolution of the Legislative Council" in recognition of Ms. Cochise"s "excellent job assisting and facilitating Government-to-Government relations between the Bureau of Reclamation and the Jicarilla Apache Nation….."

**Response:**

Defendant lacks sufficient information to admit or deny.

**Request 10:**

Please admit that Mr. Kenny admitted in an earlier hearing testimony that "My observation of Ms. Cochise is that one of her strongest skill is she's very organized and very meticulous in making sure that other people know information, and that she gets other information from other people." Mr. Kenny defined these skills as good coordination. H.T., dated 03/14/04, p. 1047:20.

**Response:**

Admits only that Mr. Kenney testified that "My observation of Ms. Cochise is that one of her strongest skills is she's very organized and very meticulous in making sure that other people know information, and that she gets other information from other people." Denies the remainder of this requested admission.

**Request 11:**

Please admit that Mr. Kenny asserted that Ms. Cochise was having a problem with sensitivity. Mr. Kenney state [sic] that "if her sensitivity equaled her coordination - that she would be on the right track for the 14." However, when Mr. Kenny was asked, "Is there anything within your office that you define in writing as to what sensitivity would be for an employee? Mr. Kenny answered "No." H.T., dated 03/14/04, p. 1047:1 and H.T., dated 03/14/04, p. 1048:12-9.

**Response:**

Admits only that when Mr. Kenney was asked "if there was anything within his office that would define in writing as to what sensitivity would be for an employee," and he answered no. Denies the remainder of this requested admission.

Request 12:

Please admit that Mr. Kenny, without permission from Ms. Cochise and against her will, grabbed her wrist, bent back two of her fingers, and removed a voucher from her hand, and left the office.

**Response:**

Denies.

**Request 13:**

Please admit that Ms. Cochise was denied access to documents in the director's office when she served as Acting Director during Mr. Kenny's absence.

**Response:**

Denies.

**Request 14:**

Please admit that Mr. Kenny threatened Ms. Cochise with criminal prosecution if she failed to answer his questions during his administrative investigation.

**Response:**

Denies.

**Request 15:**

Please admit that Mr. Kenny required Ms. Cochise to obtain his permission before she contacted Indian Tribes.

**Response:**

Admits.

**Request 16:**

Please admit that Ms. Cochise's Job description permitted her to contact Indian Tribes in the performance of her duties.

**Response:**

Denies.

**Request 17:**

Please admit that there was no written or oral policy against contacting Indian Tribes in the Native American Affairs Office from 1997 through May 2000.

**Response:**

Denies.

Respectfully submitted,

JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

# EXHIBIT # 8

Department of the Interior

# Departmental Manual

**Effective Date**: 6/9/99

**Series**: Personnel Management

**Part 370**: Departmental Personnel Program

**Chapter 335**: Promotion and Internal Placement

**Originating Office**: Office of Personnel Policy

Appellant's

Exhibit # 5

## 370 DM 335

1. **Purpose and Authority**. This chapter establishes the Department of the Interior's Merit Promotion Plan (Plan) for filling positions covered by merit promotion and implements 5 U.S.C. Chapter 33 and 5 CFR 335.

2. **Merit Promotion Policy**. Recruitment methods and selection procedures will be based solely on merit after fair and open competition, and will be made without regard to political, religious, or labor organization affiliation or nonaffiliation, marital status, race, color, sex, national origin, nondisqualifying physical handicap, sexual orientation or age.

A. **Scope**. The Plan applies to all competitive service positions in the Department. This chapter must be used in conjunction with the current Departmental Career Transition Assistance Plan.

B. **Areas of Consideration.** Managers will determine and extend areas of consideration to ensure the attraction of a diverse pool of highly qualified applicants in accordance with the Department Strategic Plan for Improving Diversity. Managers should ensure that their employees on approved extended absence receive appropriate consideration for vacancies under their immediate jurisdiction. An approved announcement system, as determined by the Department, will be used to advertise all competitive service vacancies with an area of consideration of Department wide or greater. For limited areas of consideration within a Bureau, local methods of announcing a vacancy may be employed.

C. **Factors to be Considered in Promotion or Placement.** All applicants

will be evaluated to ensure that they meet the appropriate OPM qualification standards and time-in-grade requirements. Bureaus will establish, and publicize in the appropriate vacancy announcement, cut off dates for applicants to meet qualification standards and time-in-grade requirements for acceptance of applications. Qualitative, job-related distinctions must be made among promotion and other competitive eligibles in terms of relative merit and ability and documented through the use of a crediting plan or other rating methodology. Consideration will be given to performance appraisals and incentive awards. The validity and propriety of selective and/or ranking factors must be clearly reflected and supported by a current position description of the job for which they are used.

D. **Selection Procedures.** The selecting official will have an opportunity to choose from among an adequate number of best qualified candidates. Methodology for determining cut off points for best qualified candidates will be left to Bureau discretion. Selecting officials have the right to select or not select from among candidates referred. They also have the right to select from other appropriate sources.

E. **Records.** Appropriate records to allow for reconstruction of the action must be maintained for a minimum of two years. In instances where some form of complaint has been filed concerning an action, these records will be maintained for a minimum of two years following resolution of the case.

3. **Application of Competitive Procedures.**

A. Competitive procedures apply to the following actions:

(1) Permanent promotion to a higher-graded position or to a position with a higher full performance level than previously held on a permanent basis in the competitive service.

(2) Temporary promotions for more than 120 days or details for more than 120 days to a higher-graded position or to a position with greater promotion potential than previously held on a permanent basis in the competitive service.

(3) Selection for training which is part of an authorized training agreement required before an employee may be considered for promotion.

(4) Reassignment, transfer or change to a lower-graded position with promotion potential greater than any position held on a permanent basis in the competitive service.

# EXHIBIT # 9

# AFFIDAVIT

Location: Washington, D.C.

I, Saundra Tabron, being first duly sworn on oath make the following statement freely and voluntarily to Johnie McCoy who has identified himself to me as an EEO investigator, Southwind Enterprises, Inc. assigned by the Social Security Administration to perform this investigation, knowing this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties.

This statement is given in relation to a complaint of discrimination filed by Rene' Cochise.

I have been informed the accepted claims in this complaint are:

**WBR-00-005**

*Complainant alleges discrimination on the basis of race (Native American) and reprisal for her prior participation in the EEO counseling process when:*

> *From August 25-29, 1997, and of currently, actions taken by her supervisor Chris Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to Complainant and actions taken by a co-worker Barbara White have created a hostile work environment.*

**WBR-00-023**

*Complainant alleges discrimination on the basis of race (Native American) and reprisal for her prior participation in the EEO complaint process (prior complaint Docket Number WBR-00-005). Complainant claims the following actions/incidents by Mr. Christopher Kenney and Ms Barbara White have created a hostile work environment:*

1. *Because of the situation between Complainant and her supervisor Chris Kenney, she has not been promoted to Policy Analyst GS-301-14.*

2. *On March 6, 2000, Complainant was assigned by Mr. Kenney to write a "white*

Initials _ST_
of 8

EXHIBIT

_16_

Page 1

*paper" on the database and upon completion of the assignment by Complainant, Mr. Kenney provided criticism in an unprofessional manner to other staff members about the completed assignment.*

3.   *On March 9, 2000, Complainant was issued a directive by Mr. Kenney, instructing her not to meet with any Indian tribes unless approved by Mr. Kenney first.*

4.   *On March 28, 2000, when Complainant was Acting for Mr. Kenney, all correspondence were not provided to Complainant but placed in Mr. Kenney's locked office (to which Mr. Kenney's Secretary had access) and Complainant was unable to fulfill her duties as Acting Director.*

5.   *On April 14, 2000, Mr. Kenney requested a meeting between him and Complainant with a co-worker present as his witness and denied Complainant's request for representation.*

6    *On April 25, 2000, Complainant was issued a directive by Mr. Kenney which suspended Complainant's open travel authorization.*

7.   *On April 28, 2000, Complainant was issued a Letter of Reprimand.*

8.   *On April 28, 2000, Mr. Kenney denied approval for payment of Complainant's travel voucher and lunged toward Complainant and physically removed the travel voucher she was holding.*

9.   *Mr. Kenney consistently fails to allow Complainant reasonable time frames for completion of assignments; withholds information on work assignments that are time sensitive; and grants personal preferences and favoritism of work assignments and other responsibilities to similarly situated employees not in Complainant's protected class.*

My full name is Saundra Adele Tabron. I am employed as a Secretary, GS-8, in the Secretary's Indian Water Rights Office, Office of the Secretary of the Interior, 1849 C Street, N.W., Washington, DC 20240. I have been with the Federal Government for 16 years and with the Department of the Interior for three years. I have been in my current position for almost one year. My first line supervisor is  Michael Connor, Director, Secretary's Water Rights Office, and my second line

supervisor is the Deputy Secretary of the Interior, a position currently vacant. For the record, I am black and I have engaged in no prior EEO activity.

I know who Rene' Cochise is but I have no working relationship with her. My office deals with the Native American Affairs Office (NAAO) on water rights issues and they also help fund our office. I personally have no working relationship with the NAAO. My full time employee (FTE) billet used to be with that office.

**WBR-00-005**

**From August 25-29, 1997, and of currently, actions taken by her supervisor Chris Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to Complainant and actions taken by a co-worker Barbara White have created a hostile work environment.**

I am not aware of Ms. Cochise's prior EEO activity. In my opinion, a hostile environment does exist in the NAAO. When my billet was under that office, I felt that Christopher Kenney was not a fair person. He did not want to promote me. I had to go through a lot, including getting out from under his FTE, and he slowed down the process on that, too. If he is not in control, it is a "no go" situation.

Initials _SI_
of 8

Page 3

I have read this statement consisting of eight pages, and I have made all necessary changes, additions, or corrections, and I have signed or initialed every page.

I hereby declare under penalty of perjury that the foregoing statement is true, correct, and complete to the best of my knowledge and belief.

Signature: *Saundra Salmon*

Date: 3/19/01

Subscribed and sworn to before me this *19th* day of *March*, 2001

EEO Investigator, Southwind _____

or

~~Notary Public~~ Witness _____

My commission expires _____

# EXHIBIT # 10

1              **AFFIDAVIT**

2                                                    Location: Phoenix, AZ

3              I, Romona Saunders, being first duly sworn on oath make the following

4    statement freely and voluntarily to Johnie McCoy who has identified himself to me

5    as an EEO investigator, Southwind Enterprises, Inc. assigned by the Bureau of

6    Reclamation to perform this investigation, knowing this statement may be used in

7    evidence. I understand that this statement is not confidential and may be shown to

8    any party who must have access to this information in order to carry out his or her

9    official duties.

10             This statement is given in relation to a complaint of discrimination filed by

11   Rene' Cochise.

12             I have been informed the accepted claims in this complaint are:

14   *WBR-00-005*

16   *Complainant alleges discrimination on the basis of race (Native American) and reprisal for*
17   *her prior participation in the EEO counseling process when:*

19             *From August 25-29, 1997, and of currently, actions taken by her supervisor Chris*
20             *Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to*
21             *Complainant and actions taken by a co-worker Barbara White have created a hostile*
22             *work environment.*

24   *WBR-00-023*
25   *Complainant alleges discrimination on the basis of race (Native American) and reprisal for*
26   *her prior participation in the EEO complaint process (prior complaint Docket Number*
27   *WBR-00-005). Complainant claims the following actions/incidents by Mr. Christopher*
28   *Kenney and Ms Barbara White have created a hostile work environment:*

30   *1.        Because of the situation between Complainant and her supervisor Chris Kenney, she*
31             *has not been promoted to Policy Analyst GS-301-14.*

32

> **EXHIBIT**
>
> _17_

Initials _RVS_                                          Page 1 of 12

2.      *On March 6, 2000, Complainant was assigned by Mr. Kenney to write a "white paper" on the database and upon completion of the assignment by Complainant, Mr. Kenney provided criticism in an unprofessional manner to other staff members about the completed assignment.*

3.      *On March 9, 2000, Complainant was issued a directive by Mr. Kenney, instructing her not to meet with any Indian tribes unless approved by Mr. Kenney first.*

4.      *On March 28, 2000, when Complainant was Acting for Mr. Kenney, all correspondence were not provided to Complainant but placed in Mr. Kenney's locked office (to which Mr. Kenney's Secretary had access) and Complainant was unable to fulfill her duties as Acting Director.*

5.      *On April 14, 2000, Mr. Kenney requested a meeting between him and Complainant with a co-worker present as his witness and denied Complainant's request for representation.*

6       *On April 25, 2000, Complainant was issued a directive by Mr. Kenney which suspended Complainant's open travel authorization.*

7.      *On April 28, 2000, Complainant was issued a Letter of Reprimand.*

8.      *On April 28, 2000, Mr. Kenney denied approval for payment of Complainant's travel voucher and lunged toward Complainant and physically removed the travel voucher she was holding.*

9.      *Mr. Kenney consistently fails to allow Complainant reasonable time frames for completion of assignments; withholds information on work assignments that are time sensitive; and grants personal preferences and favoritism of work assignments and other responsibilities to similarly situated employees not in Complainant's protected class.*

My full name is Romona Vernice Saunders. I am employed as an Assistant Program Manager, GS-12, in the Native American Affairs Program, Lower Colorado Region, U.S. Bureau of Reclamation (USBR), 400 North 5th Street, Suite 1470, Phoenix, AZ 85004. I have been with USBR, the Interior Department, and the Federal Government for 17 years and seven months. I have been working in my present position for about five years. My first line supervisor is Deborah Saint,

Initials *RVS*                                    Page 2 of 12

1      Native American Affairs Program Manager for the Lower Colorado Region, and my

2      second line supervisor is Lorri Gray, Assistant Regional Director, Lower Colorado

3      Region.   For the record, I am African American and I have filed a prior EEO

4      complaint.

5

6          The Native American Affairs Office (NAAO) provides funding to this office

7      for technical assistance programs and for water rights negotiations.  I have known

8      Rene' Cochise since she started in the NAAO, and that was approximately three

9      years ago.  I did have a working relationship with her while she was still in the

10     office, but around August or September 2000 she moved to the Policy office.  The

11     most recent issue that Ms. Cochise and I worked on together was the National

12     Drought Policy.

13

14     **WBR-00-005**

15

16     **From August 25-29, 1997, and of currently, actions taken by her supervisor Chris**

17     **Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to**

18     **Complainant and actions taken by a co-worker Barbara White have created a**

19     **hostile work environment.**

20

21         I am aware of the problems Ms. Cochise was having in the NAAO and I

22     encouraged her to obtain EEO counseling regarding her issues.  Sometime during

Initials _RvS_                                              Page 3 of 12

1   1998 I learned from her about some of the problems she was dealing with. She told

2   me that in February or March 1998 she was left out of a NAAO conference in N.

3   Dakota that the rest of the staff attended. She also spoke about another conference

4   she attended in San Diego where her co-workers were presenters but she was not.

5   Again she was left out.    Ms. Cochise blamed Christopher Kenney for these

6   problems. I have only been involved in her past EEO activities as a sounding board

7   and sharing some of my experiences with her.

8

9       In my opinion, a hostile environment does exist in the NAAO. A couple of

10  things are contributing factors. I believe that Christopher Kenney and Barbara

11  White have an inappropriate relationship that is hostile to others. Mr. Kenney has a

12  problem with differing opinions and viewpoints about the Native American Affairs

13  program, and he tends to marginalize people who have opinions other than his own

14  about the program and how it should operate.    I am speaking about the

15  environment beyond Washington, which encompasses the entire program.

16

17      I have been verbally attacked by Ms. White on the positions I have taken,

18  and Mr. Kenney has supported her without getting my perspectives. At one time I

19  was removed from participating in a task force because of Ms. White's comments

20  against me.

21

1    Mr. Kenney is personally responsible for causing a hostile environment in

2    the NAAO in conjunction with his treatment of Ms. White compared to how he

3    treats others in the program.  In addition to the above, I was made aware that Ms.

4    Cochise was told not to talk to me or Debbie Saint because we have differing

5    opinions on the program.

6

7    I also believe Ms. White has caused a hostile environment.  I have not been

8    witness to particular events other than Ms. Cochise not participating in events and

9    the close scrutiny she was under when Ms. White was acting for Mr. Kenney.  I have

10   also experienced cold treatment when going into the office, i.e., my presence not

11   being acknowledged.

12

13   I do not believe that Ms. Cochise has created a hostile environment.  I believe

14   she has endeavored to fit into the organization but has been unable to do so for a

15   number of reasons.

16

17   The relationship between Mr. Kenney and Ms. Cochise seemed to be strained

18   and was different than those he had with other members of his staff.  Ms. Cochise

19   told me about the letter of counseling that he had issued to her on December 10,

20   1999, but I do not recall the details.  Regarding other actions taken against her, I also

21   know that Mr. Kenney disallowed her an open travel authorization.

22

Initials _____

1        The relationship between Ms. White and Ms. Cochise was very strained and

2    very tense. I have observed this both at the office in Washington and at conferences.

3    Regarding other actions taken against Ms. Cochise, I know that Ms. White closely

4    scrutinized her travel voucher, rejected it, and gave her a hard time about it.

5    Furthermore, I was told by Ms. Cochise that Ms. White would give her work to do

6    without the necessary input and would not answer her questions about the task,

7    which made it pretty difficult for her to do the task.

8

9        I have an indirect working relationship with Mr. Kenney. He works with my

10    supervisor, and therefore I do not have a lot of direct contact with him. I do

11    represent my supervisor at meetings that she cannot attend. However, I avoid Mr.

12    Kenney as much as possible. I also have minimal and indirect contact with Ms.

13    White, which is a result of the aforementioned incidences regarding her behavior.

14

15        I was detailed to the Bureau's Regional Liaison Office in Washington in

16    January 1998. I do not know whether it caused problems for Mr. Kenney and Ms.

17    White, but I do know that Ms. Cochise was fearful of being seen with me.

18

19        The answer to the question of whether I had a "confrontation" about the Gila

20    River Indian Community with Barbara White and John Peterson at lunch

21    during the spring 1996 Self-Governance Negotiations held in Albuquerque,

Initials _RWS_                           Page 6 of 12

1

2        I heard about this meeting from Ms. Cochise.  I suggested to her that she not

3    meet with him unless she had adequate representation.

4

5    6        On April 25, 2000, Complainant was issued a directive by Mr. Kenney

6            which suspended Complainant's open travel authorization.

7

8        Again, I learned about this incident from Ms. Cochise.  Those of us in the

9    Native American Affairs Program have always had open travel authorization.  The

10   nature of the work requires one to travel on short notice.  Employees who are

11   authorized open travel are Program Managers, Engineers, and the staff in the

12   Washington office with the exception of clerical personnel.  To my knowledge, no

13   one else has had his or her open travel authorization suspended.  This incident was

14   definitely a "first."

15

16       Regarding the Federal/Tribal Water Resources Workshop on April 19-21,

17   2000 in Phoenix, I did host it and Mr. Kenney was contacted with an invitation to

18   Ms. Cochise to be a guest speaker.  Debbie Saint talked directly to him about it, and I

19   sent him an e-mail message but received no response.  Later, Ms. Saint called Mr.

20   Kenney and he gave his approval to her, but apparently he never told Ms. Cochise

21   that he had approved it.  She did not make a presentation at the workshop because

22   Mr. Kenney never told her directly that she could.

Initials _RVS_                                    Page 9 of 12

1          I recommend you speak with my supervisor, Debbie Saint.  I also

2    recommend you speak with Frank Perniciaro, who is in the Sacramento, CA office in

3    the Native American Affairs Program.  Previously assigned to this office, he

4    attended some of the meetings and worked closely with Ms. Cochise on a number of

5    issues.  Further, I recommend as a witness Don Ami of the Great Plains Region

6    Native American Affairs Program.  He also worked closely with Ms. Cochise, and I

7    believe he has had some similar experiences with Mr. Kenney.  I also recommend

8    that you speak with Ms. Elizabeth Rieke, of the Carson City area office, who is a

9    former supervisor.

10          I would add that I believe discrimination exists against Native Americans.

11    Ms. Cochise is not the only Native American being treated unprofessionally.  Mr.

12    Ami, who I mentioned as a witness, is one.  I have heard disparaging remarks being

13    made about Native Americans by Christopher Kenney and other members of his

14    staff, including Barbara White, John Peterson, and Ron Eggers.  It appears that the

15    tone is being set by Mr. Kenney.

16

17          In addition, the inappropriate relationship between Ms. White and Mr.

18    Kenney is such that I am very uncomfortable in their presence.  Ms. Cochise has

19    commented about it and my supervisor, Debbie Saint and I have discussed it.

20

21

Initials _RVS_

1        I have read this statement consisting of 12 pages, and I have made all

2    necessary changes, additions, or corrections, and I have signed or initialed every

3    page.

4        I hereby declare under penalty of perjury that the foregoing statement is true,

5    correct, and complete to the best of my knowledge and belief.

6    Signature: *Romera Saunders*

7    Date: *4/23/01*

8    Subscribed and sworn to before me this *23rd* day of *April*, 2001

9    EEO Investigator, Southwind _____

10   or

11   Notary Public *April June Fredericks*

12   My commission expires *July 31, 2002*

13

> APRIL JUNE FREDERICKS
> Notary Public - Arizona
> MARICOPA COUNTY
> My Commission Expires
> JULY 31, 2002

Initials *RVS*                                    Page 12 of 12

# EXHIBIT # 11

1          **AFFIDAVIT**

2                                                          Location: Phoenix, AZ

3          I, Deborah Saint, being first duly sworn on oath make the following

4    statement freely and voluntarily to Johnie McCoy who has identified himself to me

5    as an EEO investigator, Southwind Enterprises, Inc. assigned by the Bureau of

6    Reclamation to perform this investigation, knowing this statement may be used in

7    evidence. I understand that this statement is not confidential and may be shown to

8    any party who must have access to this information in order to carry out his or her

9    official duties.

10         This statement is given in relation to a complaint of discrimination filed by

11   Rene' Cochise.

12         I have been informed the accepted claims in this complaint are:

14   *WBR-00-005*

16   *Complainant alleges discrimination on the basis of race (Native American) and reprisal for*
17   *her prior participation in the EEO counseling process when:*

19        *From August 25-29, 1997, and of currently, actions taken by her supervisor Chris*
20        *Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to*
21        *Complainant and actions taken by a co-worker Barbara White have created a hostile*
22        *work environment.*

24   *WBR-00-023*
25   *Complainant alleges discrimination on the basis of race (Native American) and reprisal for*
26   *her prior participation in the EEO complaint process (prior complaint Docket Number*
27   *WBR-00-005). Complainant claims the following actions/incidents by Mr. Christopher*
28   *Kenney and Ms Barbara White have created a hostile work environment:*

30   *1.     Because of the situation between Complainant and her supervisor Chris Kenney, she*
31        *has not been promoted to Policy Analyst GS-301-14.*

Initials
of 10



EXHIBIT
_18_

Page 1

2.     *On March 6, 2000, Complainant was assigned by Mr. Kenney to write a "white paper" on the database and upon completion of the assignment by Complainant, Mr. Kenney provided criticism in an unprofessional manner to other staff members about the completed assignment.*

3.     *On March 9, 2000, Complainant was issued a directive by Mr. Kenney, instructing her not to meet with any Indian tribes unless approved by Mr. Kenney first.*

4.     *On March 28, 2000, when Complainant was Acting for Mr. Kenney, all correspondence were not provided to Complainant but placed in Mr. Kenney's locked office (to which Mr. Kenney's Secretary had access) and Complainant was unable to fulfill her duties as Acting Director.*

5.     *On April 14, 2000, Mr. Kenney requested a meeting between him and Complainant with a co-worker present as his witness and denied Complainant's request for representation.*

6     *On April 25, 2000, Complainant was issued a directive by Mr. Kenney which suspended Complainant's open travel authorization.*

7.     *On April 28, 2000, Complainant was issued a Letter of Reprimand.*

8.     *On April 28, 2000, Mr. Kenney denied approval for payment of Complainant's travel voucher and lunged toward Complainant and physically removed the travel voucher she was holding.*

9.     *Mr. Kenney consistently fails to allow Complainant reasonable time frames for completion of assignments; withholds information on work assignments that are time sensitive; and grants personal preferences and favoritism of work assignments and other responsibilities to similarly situated employees not in Complainant's protected class.*

My full name is Deborah Anne Saint. I am employed as a Program Manager, GS-14, in the Native American Affairs Office (NAAO), Lower Colorado Region, U.S. Bureau of Reclamation (USBR), 400 North 5th Street, Suite 1470, Phoenix, AZ 85004. I have been with USBR, the Interior Department, and the Federal Government for 27 years. I have been working in my present position for ten years. My first line

Initials _____
of 10

Page 2

1   supervisor is Lorri Gray, Assistant Regional Director, and my second line supervisor

2   is Bob Johnson, Regional Director.  For the record, I am white and I have engaged in

3   no prior EEO activity.  However, I have talked to investigators in previous

4   complaints.

5

6       I have known Rene' Cochise for about three to four years.  I have been at

7   meetings she has attended but we have no direct working relationship.  I have a

8   working relationship with the Native American Affairs Office (NAAO) in

9   Washington as the Native American Program Manager here.  The Washington office

10  provides funding for this office, and we work on projects together, solving issues

11  and those types of things.

12

13  WBR-00-005

14

15  **From August 25-29, 1997, and of currently, actions taken by her supervisor Chris**

16  **Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to**

17  **Complainant and actions taken by a co-worker Barbara White have created a**

18  **hostile work environment.**

19

20      Regarding Ms. Cochise's prior EEO activity, I have heard general rumors that

21  she was having trouble with Christopher Kenney.  He was aware that I had dealt

22  with a serious personnel problem some years ago, so he confided to me that he was

Initials 
of 10

Page 3

1    having some problems with Ms. Cochise.  I also heard from a confidant of hers that

2    she was having problems.  I have not been involved in any way in her past EEO

3    activity.

4

5         I cannot really describe the relationship between Mr. Kenney and Ms. Cochise.

6    She has only said to me that their relationship is very, very difficult.  I am not aware of a

7    letter of counseling issued to her by Mr. Kenney on December 10, 1999, nor am I aware

8    of other actions taken by him against her.  Also, I have no direct knowledge of the

9    relationship between Barbara White and Ms. Cochise, and I am not aware of any actions

10   taken by Ms. White against her.  Ms. Cochise has said to me that she felt that Mr.

11   Kenney was unfair to her by listening to Ms. White without getting her input into what

12   has actually happened.  I have experienced this.  On two occasions, Mr. Kenney

13   reported problems to Bob Johnson based on Ms. White's input without ever discussing

14   the matter with me.  Mr. Kenney expressed surprise to me that  Mr. Johnson had  asked

15   for my input in his evaluation of the situations.

16

17        I have a working relationship with Christopher Kenney.  As head of the

18   Native American Affairs Program for USBR, he has policy oversight of my activities.

19   I also have a working relationship with Barbara White.  She has responsibility for

20   the area of self-governance, and I rely on her for information, policy advice, etc.

21   related to that issue.

22

Initials 
of 10

Page 4

1    I have no direct knowledge that a hostile environment exists within the

2    NAAO. I do not have much contact with the office now, but I have personally

3    experienced a great deal of hostility from the office, which I believe has been caused

4    by Mr. Kenney. I believe that my proposals for funding have in the past been held

5    to a different standard than those for others and that different criteria for serving on

6    water rights negotiation teams have been applied to my staff.

7

8    I have heard from Romona Saunders who is on my staff that Mr. Kenney has

9    instructed Rene' Cochise to not associate with me. In my opinion, it would not

10    surprise me. My own relationship with him has been very difficult and very

11    painful. I have believed at times that a campaign was on to make life difficult for me

12    and to discredit me. As I stated before, different standards seem to apply to me. My

13    guess as to why is that Mr. Kenney and I have had a long-standing disagreement on

14    how the Native American Affairs program should be run and its objectives, and I

15    am pretty vocal about these things.

16

17    The answer to the question of whether I had a "confrontation" with Lynn

18    Davis on August 27, 1997 at a Native American Affairs Program Team

19    Building Workshop in San Francisco, CA, is "yes," and Ms. Cochise was a

20    witness to this incident. However, I did not put a lot of significance to it. The

21    workshop was an event at which I felt personally attacked by Mr. Kenney

Initials
of 10

1     Complainant, Mr. Kenney provided criticism in an unprofessional manner to

2     other staff members about the completed assignment.

3

4     I have no knowledge of this assignment.

5

6     3.     On March 9, 2000, Complainant was issued a directive by Mr. Kenney,

7     instructing her not to meet with any Indian tribes unless approved by Mr. Kenney

8     first.

9

10     I am not aware of such a directive being issued to neither Ms. Cochise nor

11     anyone else.   I would not know of a policy on this concerning his office in

12     Washington.

13

14     4.     On March 28, 2000, when Complainant was Acting for Mr. Kenney, all

15     correspondence were not provided to Complainant but placed in Mr. Kenney's

16     locked office (to which Mr. Kenney's Secretary had access) and Complainant was

17     unable to fulfill her duties as Acting Director.

18

19     I have no knowledge of this incident, but I have heard that it happened.

20

Initials
of 10

Page 7

1

2          I have read this statement consisting of 10 pages, and I have made all

3   necessary changes, additions, or corrections, and I have signed or initialed every

4   page.

5          I hereby declare under penalty of perjury that the foregoing statement is true,

6   correct, and complete to the best of my knowledge and belief.

7   Signature: *Deborah A Saint*

8   Date: *March 14, 2001*

9   Subscribed and sworn to before me this *14th* day of *March*, 2001

10  EEO Investigator, Southwind _____

11  or

12  Notary Public *April June Fredericks*

13  My commission expires *July 31, 2002*

14



```
APRIL JUNE FREDERICKS
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
JULY 31, 2002
```

Initials
10 of 10                                          Page

# EXHIBIT # 12

1          **AFFIDAVIT**

2                                                    Location: Hyattsville, MD

3          I, Lynne Davis Dyer, being first duly sworn on oath make the following

4    statement freely and voluntarily to Johnie McCoy who has identified himself to me

5    as an EEO investigator, Southwind Enterprises, Inc. assigned by the Bureau of

6    Reclamation to perform this investigation, knowing this statement may be used in

7    evidence. I understand that this statement is not confidential and may be shown to

8    any party who must have access to this information in order to carry out his or her

9    official duties.

10         This statement is given in relation to a complaint of discrimination filed by

11   Rene' Cochise.

12         I have been informed the accepted claims in this complaint are:
13
14   ***WBR-00-005***
15
16   *Complainant alleges discrimination on the basis of race (Native American) and reprisal for*
17   *her prior participation in the EEO counseling process when:*
18
19       *From August 25-29, 1997, and of currently, actions taken by her supervisor Chris*
20       *Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to*
21       *Complainant and actions taken by a co-worker Barbara White have created a hostile*
22       *work environment.*
23
24   ***WBR-00-023***
25   *Complainant alleges discrimination on the basis of race (Native American) and reprisal for*
26   *her prior participation in the EEO complaint process (prior complaint Docket Number*
27   *WBR-00-005). Complainant claims the following actions/incidents by Mr. Christopher*
28   *Kenney and Ms Barbara White have created a hostile work environment:*
29
30   *1.     Because of the situation between Complainant and her supervisor Chris Kenney, she*
31          *has not been promoted to Policy Analyst GS-301-14.*
32

┌─────────────────────┐
│      **EXHIBIT**        │
│  ubbles   *19*          │
└─────────────────────┘

Initials _____                              Page 1 of 15

2.  On March 6, 2000, Complainant was assigned by Mr. Kenney to write a "white paper" on the database and upon completion of the assignment by Complainant, Mr. Kenney provided criticism in an unprofessional manner to other staff members about the completed assignment.

3.  On March 9, 2000, Complainant was issued a directive by Mr. Kenney, instructing her not to meet with any Indian tribes unless approved by Mr. Kenney first.

4.  On March 28, 2000, when Complainant was Acting for Mr. Kenney, all correspondence were not provided to Complainant but placed in Mr. Kenney's locked office (to which Mr. Kenney's Secretary had access) and Complainant was unable to fulfill her duties as Acting Director.

5.  On April 14, 2000, Mr. Kenney requested a meeting between him and Complainant with a co-worker present as his witness and denied Complainant's request for representation.

6   On April 25, 2000, Complainant was issued a directive by Mr. Kenney which suspended Complainant's open travel authorization.

7.  On April 28, 2000, Complainant was issued a Letter of Reprimand.

8.  On April 28, 2000, Mr. Kenney denied approval for payment of Complainant's travel voucher and lunged toward Complainant and physically removed the travel voucher she was holding.

9.  Mr. Kenney consistently fails to allow Complainant reasonable time frames for completion of assignments; withholds information on work assignments that are time sensitive; and grants personal preferences and favoritism of work assignments and other responsibilities to similarly situated employees not in Complainant's protected class.

My full name is Lynne Davis Dyer. I retired from the Federal Government on May 26, 2000, after 12 years and 10 months. Prior to retirement, I was employed as a Program Analyst, GS-11, by the Native American Affairs Office (NAAO), Bureau of Reclamation (BOR), Department of the Interior, 1849 C Street, N.W., Washington, DC 20240. I was with BOR for eight years and ten months and in my

1    last position for three years.    My former first line supervisor was Christopher

2    Kenney, Director, NAAO, and my former second line supervisor was Larry Todd,

3    Director of Operations, BOR.  For the record, I am Caucasian and I have engaged in

4    no prior EEO activity.

5

6          I have known Rene' Cochise as a co-worker for about two and a half years.

7    However, I knew her though the gym in our building before becoming her co-

8    worker.  Altogether, I have known her for about five years.

9

10   **WBR-00-005**

11

12   **From August 25-29, 1997, and of currently, actions taken by her supervisor Chris**

13   **Kenney, i.e., when on December 10, 1999, a letter of counseling was issued to**

14   **Complainant and actions taken by a co-worker Barbara White have created a**

15   **hostile work environment.**

16

17         I am aware of this complaint and know nothing of EEO complaints prior to

18   it.  I learned about this complaint from my co-workers and from Ms. Cochise that

19   she and Mr. Kenney were going to be participating in mediation.  I understood that

20   the complaint concerned Mr. Kenney treating Ms. Cochise differently than the other

21   Policy Analysts in the office.  I could see for myself that Ms. White was concerned

22   about  how  much  travel  was  performed  by  Ms.  Cochise  and  that  she  was

1    unaccountable for the travel. Ms. White implied that Ms. Cochise was not doing

2    any work while traveling, and Mr. Kenney has a tendency to listen to her. He began

3    making policy statements about travel and that we should put our travel schedules

4    into a calendar on the computer, something we had never done before.

5

6        In my opinion, a hostile environment existed in the Native American Affairs

7    Office. Most of the hostility was the sense of being judged, scrutinized, and

8    questioned by Ms. White. She would complain about Ms. Cochise a lot and make

9    implications about her travel and her comings and goings. Mr. Kenny never did

10    anything to stop the implications she was making. Ms. White used to be friendly to

11    me, but after I realized what was going on and did not join in her bashing of Ms.

12    Cochise, she was no long friendly.

13

14        For example, in November 1999 when the NAAO held a meeting in

15    Albuquerque, NM, we spent some time at a festival at the Jemez Pueblo. At the

16    time, I was supposed to ride back to Albuquerque with Ms. Cochise. In Ms.

17    Cochise absence and in the presence of other people, Ms. White started talking

18    about Ms. Cochise, saying that she would probably leave me hanging. I said to Mr.

19    Kenney, "Are you going to let her talk about Rene' like that when she is not here?"

20    He was irritated with me for saying that, and a few minutes later Ms. Cochise

21    arrived. I was upset because Ms. White was bad-mouthing a co-worker in front of

22    other people and Mr. Kenney allowed her to do it.

Initials _____                Page 4 of 15

1

2          Ms. Cochise does not socialize much, and being Native American, she does

3   not drink. Ms. White would say things to imply that Ms. Cochise was anti-social.

4   She is also vegetarian, and therefore did not go out to eat with us meat eaters. Ms.

5   White always attempted to show her in a negative light, and because I defended

6   her, Ms. White started to challenge me also. After the trip out to New Mexico in

7   November 1999, she basically stopped speaking to me.

8

9          Adrienne Marks also does not drink and is a vegetarian. Ms. White never

10  got away with talking about Ms. Marks the way she talked about Ms. Cochise for

11  not going out with the group for drinks or to dinner. Ms. Marks is Caucasian.

12

13         As another example of Ms. White's hostility, in January or February 2000,

14  during a presentation I was giving on the office database concerning the Indian

15  tribes, she would ask challenging questions in a negative way. Mr. Kenney just sat

16  there and let her "beat up" on me. Ms. Cochise and I shared an office and it would

17  have been difficult for me to treat her in the way Ms. White wanted me to treat her.

18

19         In my opinion, Mr. Kenney created a hostile work environment because, first

20  of all, he allowed Ms. White to behave the way she did. Second, he kept losing his

21  temper with Ms. Cochise. For example, he would hear that she met with a tribe,

22  and he would come storming into our office, or he would be upset about a policy

Initials _____                                    Page 5 of 15

1    paper she was working on.  Third, Mr. Kenney would say things about Ms. Cochise

2    in her absence.  For example, he told me that he was having her work with me on

3    the database so that he could see what she could do.  I felt uncomfortable that he

4    was telling me this behind her back.  The environment was very stressful for me

5    and that triggered my migraines.  Ms. White continually stirred the pot and Mr.

6    Kenney did nothing to stop it.

7

8         It takes extremely sensitive people to work well with Native Americans.

9    One of our jobs was to attempt to heal relationships on behalf of the Federal

10   Government.  I have never heard Mr. Kenny speak badly about Native Americans.

11   This was his dream job.  On the other hand, Ms. Cochise believed he disparaged

12   Native Americans.    However, I believed Ms. Cochise because Mr. Kenney

13   constantly puts his foot in his mouth.  I have never heard nor been aware of Ms.

14   White or any other NAAO staff member making disparaging remarks about Native

15   Americans.

16

17        I do not believe Ms. Cochise created a hostile work environment in the office.

18   I think she was "damned if she did" and "damned if she didn't."

19

20        I have no knowledge of a period of time during which Mr. Kenney was

21   hardly speaking to Ms. Cochise.  However, some of her co-workers were giving her

22   the silent treatment.  Ms. White, Betty Johnson, and Leia Madalena basically ignored

Initials _____                                    Page 6 of 15

1    her because Ms. White was mad at her and did not like her. It was more or less

2    continuous. Ms. Cochise never made any overtures to change the situation and

3    only spoke in the line of business. Also, it is difficult to say whether she was

4    ostracized during staff meetings because I missed a lot of them.

5

6    I am not aware of a letter of counseling issued to Ms. Cochise by Mr. Kenney

7    on December 10, 1999.

8

9    I am not aware of several individuals complaining to Barbara White that Ms.

10   Cochise asked too many questions in a training class on P.L. 93-638 that was held

11   November 12-13, 1997.

12

13   When Mr. Kenney took over the NAAO, I got along well with him in the

14   beginning. For the last couple of years, he has grown increasingly frustrated, but I

15   got along OK with him.

16

17   I have not observed Ms. Cochise to be uncooperative and inappropriate in

18   her behavior and insubordinate to Mr. Kenney or Ms. White.

19

20   I had a "confrontation" with Debbie Saint on August 27, 1997 at a Native

21   American Affairs Program Team Building Workshop in San Francisco, CA.  I

22   questioned Ms. Saint closer than she wanted to be questioned about trust. One of

1    the issues in the workshop was trust within and outside of the group. Ms. Saint has

2    said that she did not trust Mr. Kenney, and I believe she said she did not trust the

3    group, either. After the meeting, I asked her why she did not trust Mr. Kenney and

4    she would not respond. I am usually not very forward, and that is why some

5    people probably viewed this exchange as a confrontation. I do not recall who

6    witnessed this incident.

7

8    Mr. Kenney refused to allow the Ms. Cochise to participate on the agenda at

9    Reclamation's Native American Affairs Workshop in San Diego on October 19-21,

10   1998. However, he never directly gave a reason.

11

12   I believe Ms. Cochise refused to support the nomination of Mr. Kenney for

13   the Commissioner's Workforce Diversity Award in September 1999. I have no idea

14   whether she was treated differently by her co-workers as a result because she was

15   already being treated differently.

16

17   In November 1999, Ms. White questioned Ms. Cochise's use of a rental car

18   on the previously mentioned trip to Albuquerque, NM. She always questioned Ms.

19   Cochise's travel and use of rental cars. This was nothing new. In my opinion, it

20   was unfair. If Mr. Kenney did not want her to use a rental car, he should have said

21   so. The issue was whether she needed one or not. What I thought was unfair was

Initials _____

1    that Ms. Cochise was the only person Ms. White complained about concerning those

2    issues.

3

4    **WBR-00-023**

5    **1.      Because of the situation between Complainant and her supervisor Chris**

6    **Kenney, she has not been promoted to Policy Analyst GS-301-14.**

7

8            I am aware of Ms. Cochise's promotion situation.  From what I heard from

9    her, Mr. Kenney was not happy to hire her from the beginning, but he was told by

10   the Commissioner to do so.  When Ms. Cochise had been with us for a year, she

11   believed she should be promoted to GS-14.   Mr. Kenney believed she had not

12   demonstrated the professionalism necessary to be promoted, and he pointed to a

13   project that she was working on but had not finished.  She stated that she could not

14   finish it because she could not write it the way he wanted her to write it, as her

15   conclusions were different.   Mr. Kenney said he would not promote her because

16   she had not finished the paper.  Ms. Cochise believed he was trying to retaliate

17   because he was forced to hire her.

18

19   **2.      On March 6, 2000, Complainant was assigned by Mr. Kenney to write a**

20   **"white paper" on the database and upon completion of the assignment by**

21   **Complainant, Mr. Kenney provided criticism in an unprofessional manner to**

22   **other staff members about the completed assignment.**

1

2        I believe Ms. Cochise was set up for failure by being assigned this task

3        because of what Mr. Kenney had said prior to me to assigning it. As I previously

4        stated in discussing the hostile work environment in the NAAO, Mr. Kenney told

5        me he was having her work with me on the database so that he could see what she

6        could do. Ms. Cochise was supposed to write a paper on what the database would

7        look like when completed and provide a framework on how to get there and include

8        milestones. Upon completion of the assignment, Mr. Kenney implied that it was "a

9        bunch of nothing," which hurt my feelings because I put a lot of effort into it. I was

10       the only person present, and I believed his criticism was unprofessional because he

11       had not made an effort to understand what he had read.

12

13       **3.     On March 9, 2000, Complainant was issued a directive by Mr. Kenney,**

14       **instructing her not to meet with any Indian tribes unless approved by Mr. Kenney**

15       **first.**

16

17        I am aware of the directive being issued to Ms. Cochise because she told me

18       about it. No one else has had a similar directive issued to him or her, and I know of

19       no policy on employees meeting with Indian tribes. The reason Ms. Cochise gave

20       me concerning Mr. Kenney's directive to her was that he felt that because she was

21       Native American, he believed her friendship with the tribes would provide entrée to

1    tribal governing members, and he wanted to take advantage of it. She believed this

2    was wrong, and that these friendships were personal and not work-related.

3

4        Two members of our office, Darrell Ewing and John Peterson are located in

5    Denver, CO, and their jobs are equivalent to Ms. Cochise's job. They met with

6    Indian tribes and this level of scrutiny was not applied to them. The restrictions

7    were applied to Ms. Cochise because of Mr. Kenney's animosity toward her.

8

9    **4.    On March 28, 2000, when Complainant was Acting for Mr. Kenney, all**

10   **correspondence were not provided to Complainant but placed in Mr. Kenney's**

11   **locked office (to which Mr. Kenney's Secretary had access) and Complainant was**

12   **unable to fulfill her duties as Acting Director.**

13

14       Mr. Kenney started locking his office door, and if his secretary was not there,

15   no one could get into his office. He never informed us beforehand that he was

16   going to lock his office door or why.

17

18       I was there at the time, and I recall Ms. Cochise's efforts to get a document

19   from his office, and because she could not, the result was that she looked bad. I do

20   not recall the details, but I was later informed that there was something on his desk

21   that needed attention, and she could not do anything about it because she was

22   locked out of his office.

1

2          I have no knowledge of this incident.

3

4    9.      **Mr. Kenney consistently fails to allow Complainant reasonable time**

5    **frames for completion of assignments; withholds information on work**

6    **assignments that are time sensitive; and grants personal preferences and**

7    **favoritism of work assignments and other responsibilities to similarly situated**

8    **employees not in Complainant's protected class.**

9

10          The "white paper" discussed under Issue 2 above falls into the category of

11   failing to allow reasonable timeframes for completing assignments.   When Mr.

12   Kenney assigned the paper, he gave us only two or three days to complete it, and he

13   was not in the office on the day he said he wanted it.

14

15          I am aware of his granting personal preferences and favoritism.  He does not

16   treat everyone the same.  For example, when Ms. White was going through her

17   divorce, she could come and go as she pleased.  He had given her an open offer to

18   work out of the Denver office or travel when she wanted because she felt threatened

19   by her husband. This occurred when Ms. White was criticizing Ms. Cochise's travel,

20   and all the while she was traveling because she needed to be out of the area, which

21   was common knowledge in the office.  Further, when Betty Johnson had a personal

22   problem, she had an office cell phone to use because of this personal situation.

Initials _____                                    Page 13 of 15

1

2       I am aware of an assignment that Ms. Johnson passed to the Ms. Cochise

3    from Mr. Kenney on March 20, 2000 pertaining to a congressional request for

4    information on funding for Indian water settlements. It was "a big to do about

5    nothing." Ms. Cochise asked me for information about the subject. She was very

6    thorough about finding out information, and it was more than anyone wanted her

7    to do. It was "damned if you do" and "damned it you don't" again.

8

9       There is no one I would recommend as a witness.

10

11       I have nothing further to add to my statement.

12

1

2          I have read this statement consisting of 15 pages, and I have made all

3     necessary changes, additions, or corrections, and I have signed or initialed every

4     page.

5          I hereby declare under penalty of perjury that the foregoing statement is

6     true, correct, and complete to the best of my knowledge and belief.

7     Signature:          _____

8     Date:                _____

9     Subscribed and sworn to before me this _____ day of _____, 2001

10    EEO Investigator, Southwind _____

11    or

12    Notary Public _____

13    My commission expires _____

14

Initials _____                                    Page 15 of 15

# EXHIBIT # 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COPY

- - - - - - - - - - - - - - x

RENE COCHISE                    :

         Plaintiff       :

vs.                             :    Case No. 06-0980

GALE A. NORTON, SECRETARY       :
DEPARTMENT OF INTERIOR
                                :
         Defendant
                                :
- - - - - - - - - - - - - - x

Washington, D.C.

Thursday, October 11, 2007

Deposition of:

RENE COCHISE

the Deponent, called for examination by counsel for the

Defendant, pursuant to notice and agreement as to time

and place, at 501 3rd Street, Washington, D.C., before

Sean Williams, a Notary Public in and for the District of

Columbia.

1  about your travel authorization being suspended and you

2  filed another complaint, and then you got the Letter of

3  Reprimand, and then the altercation between the two of

4  you and you filed -- you went and sought counseling

5  again.  So every time you had contact with Mr. --

6      A.    Kenney.

7      Q.    -- Kenney at that point you filed a complaint

8  during that one period of time.

9      A.    Thank you.  If we could just break for a

10 second.

                    (OFF THE RECORD)

                    (ON THE RECORD)

13          BY MS. WHITAKER:

14     Q.    So you were made Acting Director in his absence

15 in late March --

16     A.    That's correct.

17     Q.    -- and you were able to perform those duties

18 even though there was some issue about Leah locking you

19 out of the office and having to get the documents?

20     A.    Well, what Leah did was she took information

21 was coming into the office that was time sensitive and

22 she took it into Mr. Kenney's office and locked it up.

23     Q.    Okay.  And then -- but you were able to get

24 that information unlocked?  I mean did you actually --

25 you did respond to whatever the time sensitive

77

1  information was?

2      A.    No, didn't meet the deadline.

3      Q.    You missed it?

4      A.    Missed it, missed it, and that was when I asked

5  Chris, you know, why -- he felt that her apology was

6  enough.

7      Q.    I see.  So you missed the deadline?

8      A.    We missed the deadline.

9      Q.    And was it ever made up?

10     A.    No.  Can't make that up.  It was sensitive.  It

11  had to do with a water rights settlement, a bill that was

12  up on the hill and we usually had to clear those through

13  the Department and OMB before it goes up on the hill.

14     Q.    Did you do your part?

15     A.    Like I told you, we didn't meet the deadline,

16  so --

17     Q.    You didn't get anything out?

18     A.    -- it was not reviewed.  I pulled together the

19  information, but all the Department said they were going

20  to do was just put in a folder.  It was going to go

21  nowhere.

22     Q.    But you did do it?

23     A.    Did do it.

24     Q.    Okay.  And then you went to Phoenix.  You came

25  back.  And then at that point in time these various

C E R T I F I C A T E

I, Sean Williams, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, RENE COCHISE, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the testimony given by the foregoing witness. I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter. In witness whereof I have hereunto set my hand this 24th day of October, 2007.

/s/
_____
Sean Williams
Notary Public in and for the
District of Columbia

My Commission Expires:

March 14, 2012

# EXHIBIT # 14

POSITION DESCRIPTION

**Program Analyst GS-343-13/14**

## INTRODUCTION

This position is located in the office of the Native American Affairs Group, of the Office of the Director, Operations, duty stationed in Washington, D.C.  The Group serves as a focal point for Reclamation activities related to Indian policies and issues related to the Reclamation Program.  This Group defines policy matters affecting Reclamation's Native American clients, fosters building partnerships with tribes, and supports the Department of the Interior in the settlement of Indian water rights claims.

## MAJOR DUTIES

Serves as a Bureau of Reclamation representative on negotiation teams established to negotiate settlement of Indian water rights claims.

The incumbent conducts an in-depth review and analysis of legislative packages related to Indian issues.  Prepares all documents and responses to congressional and legislative matters for the Native American Affairs Group. The incumbent is responsible for assembling and transmitting comments to the Chief, Native American Affairs Group.

The incumbent assists the Chief, Native American Affairs Group, in developing policy.  Assignments involve extensive research and analysis of Reclamation and Departmental and Federal policies on Reclamation law and Indian laws, and Indian proposed legislation, and major policy questions and controversial issues pertaining to Indian water rights issues.

Represents Reclamation in conferences or task forces and at meetings with officials of other Government agencies and the private sector.  Maintains liaison with Federal, state, and private sector officials in order to stay abreast of developments affecting the Native American Affairs Program.  Advises the Chief of the need for further development or expansion of Reclamation policies and programs regarding Indian people.

## FACTORS

1.  Knowledge Required of the Position

This is an interdisciplinary position in which broad professional qualifications and experience in people management skills are required in order to communicate with diverse groups of people.  Knowledge related to water resources, Reclamation and Indian law and policy are principal requisites for successful performance of the work.

Page 2 of 5

3

methods, and techniques; working across organizational boundaries; and securing cooperation of officials across a wide spectrum of interests. The incumbent's work has significant effect and influence in the Bureau's Indian policies, programs, and actions.

5. Scope and Effect

The purposes of this position are to represent the Bureau of Reclamation on negotiating teams established to negotiate settlement of Indian water rights claims, to coordinate activities relating to Indian issues through the Bureau, and to facilitate Indian benefits from the Reclamation program.

6. Personal Contacts

Contacts are with key personnel in the Department of the Interior, the Commissioner's Office, regional and field offices, water users organizations, and Indian tribes.

7. Purpose of Contacts

The purpose of the contacts are to represent the Bureau of Reclamation on negotiating teams established to negotiate settlement of Indian water rights claims; explain and defend Reclamation's position on certain Indian issues and technical studies; and explain operation and maintenance of water resource systems.

8. Physical Demands

The work is primarily sedentary work with periods of intense mental concentration. The position also includes some walking, standing, bending and carrying of light items. There is extensive travel to negotiation sites and field installations which may require some climbing of ladders, scaffolds and entering confined spaces.

9. Work Environment

Work is normally performed in an office setting, well-lighted and ventilated. During travel to the field locations, the incumbent is exposed to hazards which normally involve operation and maintenance personnel, which sometimes results in a requirement to wear safety glasses, hardhat and safety footwear.

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

GS-13: 00459   GS-14 00409

| 2. Reason for Submission | | 3. Service | | 4. Employing Office Location | 5. Duty Station | | 6. OPM Certification No. |
|---|---|---|---|---|---|---|---|
| ☐ Redescription | ☒ New | ☐ Hdqtrs. | ☐ Field | Denver CO | Washington DC | | |
| ☐ Reestablishment | ☐ Other | | | | | | 9. Subject to IA Action |

1. ation *(Show any positions replaced)*

| 7. Fair Labor Standards Act | | 8. Financial Statements Required | | | 9. Subject to IA Action |
|---|---|---|---|---|---|
| ☒ Exempt | ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure | ☐ Employment and Financial Interests | | ☐ Yes  ☒ No |

| 10. Position Status | 11. Position Is: | 12. Sensitivity | | 13. Competitive Level Code |
|---|---|---|---|---|
| ☒ Competitive | ☒ 1—Non-Sensitive | ☐ 3—Critical Sensitive | | GS-N: 2 7 N GS-13: 22 |
| ☐ Excepted *(Specify in Remarks)* | 5 ☐ Managerial | | | 14. Agency Use |
| ☐ SES (Gen.)  ☐ SES (CR) | ☒ Neither | ☐ 2—Noncritical Sensitive | ☐ 4—Special Sensitive | FPL GS-14 |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | POLICY ANALYST | GS | 301 | 13/14 | RJR | 1/11/94 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|
| | Cochise |

**18. Department, Agency, or Establishment**

| a. First Subdivision | | c. Third Subdivision |
|---|---|---|
| Department of the Interior - Reclamation | | Native American Affairs |
| Washington Office | | d. Fourth Subdivision |
| b. Second Subdivision | | e. Fifth Subdivision |
| Operations | | |

19. Employee Review—This is an accurate description of the major duties and responsibilities of my position. | Signature of Employee *(optional)*

20. **Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
|---|---|
| Joseph Miller Director Native American Affairs Group | |
| Signature | Date 1/9/95 | Signature | Date |

21. **Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

**22. Position Classification Standards Used in Classifying/Grading Position**
- Miscellaneous Admin + Program Series, GS-301, 1/79
- Policy Analysis Grade Evaluation Guide; 3/81
- FES Primary standard, 8/91 (Evaluation Statement Prepared)

| Typed Name and Title of Official Taking Action | |
|---|---|
| Wendy Pritchard Chief Personnel Operations Branch | **Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management. |
| Signature Wendy Pritchard | Date 1-11-95 | |

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

**24. Remarks**

**EXHIBIT**

**21**

25. Description of Major Duties and Responsibilities *(See Attached)*

BUG' 8888

Page 1 of 5